## UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF NEW YORK

-------------------------------------------------X

**ST. FRANCIS HOLDINGS, LLC, and**
**FRANCIS J. AVERILL, M.D.,**

        **Plaintiffs,**

**v.**

**MMP CAPITAL, INC., and**
**AMUR EQUIPMENT FINANCE, INC.,**

        **Defendant.**

-------------------------------------------------X

**Case No. 2:20-cv-4636-MKB-AYS**

**MOTION FOR LEAVE TO AMEND**

## PLAINTIFFS' MOTION FOR LEAVE TO FILE SECOND AMENDED COMPLAINT

Plaintiffs, St. Francis Holdings, LLC's and Francis J. Averill, M.D., pursuant to Federal Rules of Civil Procedure 15(a) and the Court's January 20, 2021 Schedule Order, respectfully move this Court for leave to file a Second Amended Complaint asserting claims against Defendants MMP Capital, Inc. ("MMP Capital") and Amur Equipment Finance, Inc. ("Amur"). A copy of the proposed Second Amended Complaint is attached as Exhibit A.

Plaintiffs respectfully submit that leave to amend should be granted to permit Plaintiffs an opportunity to streamline the causes of action and address issues raised in MMP Capital's motions to dismiss in part by incorporating information learned from discovery received in related cases that shed additional light on the facts and circumstances underlying Plaintiffs' claims.

## BACKGROUND

1.     On December 30, 2019, St. Francis filed its initial complaint in Florida state court asserting claims against Cynosure, Inc. ("Cynosure").

2.     On May 12, 2020, Cynosure filed a Notice of Removal that removed this case to the United States District Court for the Middle District of Florida ("Florida Court").  *See* Dkt. 1.

3.     On June 12, 2020, Plaintiffs filed an amended complaint that added MMP Capital and Amur as Defendants.  *See* Dkt. 21.

4.     On September 23, 2020, the Florida Court entered an Order granting MMP Capital's motions to transfer venue.  *See* Dkt. 81.  The claims against MMP Capital were transferred to the United States District Court Eastern District of New York and assigned Case No. 2:20-CV-4636-MKB-AYS, which is the present action.  *See* Dkt. 83.

5.     On November 17, 2020, the Florida Court entered an order granting Amur's motion to transfer, and the claims against Amur were transferred to the Eastern District of New York and assigned Case No. 2:20-CV-5628-MKB-AYS.  *See* Dkts. 90-91.

6.     On December 11, 2020, Plaintiffs filed a letter requesting consolidation of case No. 2:20-CV-4636-MKB-AYS with case No. 2:20-CV-5628-MKB-AYS given that both cases stem from the same underlying Florida litigation and involved overlapping issues of fact and law.  *See St. Francis Holdings, LLC, et al. v. Cynosure, et al.*, Case No. No. 2:20-CV-5628-MKB-AYS, Doc. 98, Letter Requesting Consolidation (E.D.N.Y.).

7.     Plaintiffs' request for consolidation was granted on December 14, 2020, and both cases were consolidated as the present action.

8.     Following consolidation, on December 28, 2020, Plaintiffs filed a letter requesting leave to file a Second Amended Complaint considering that only two of the four defendants in the Florida litigation and presently before this Court.  *See* Dkt. 93.

9.     Defendants' opposed Plaintiffs' request for leave to amend, and MMP Capital requested a stay of discovery in light of its pending motion to dismiss.  *See* Dkts. 92, 94-96.

10.     The Court held a Pre-Motion conference on January 20, 2021 concerning Plaintiffs' request for leave to file a Second Amended Complaint and MMP Capital's request to stay discovery.   Following the Pre-Motion conference, the Court entered a scheduling order that directed MMP Capital to withdraw its motion to dismiss and further set a briefing schedule for MMP Capital to file a renewed motion to dismiss and for Plaintiffs to file a motion for leave to amend the complaint.  *See* Jan. 20, 2021 Scheduling Order.

11.     Accordingly, Plaintiffs hereby move for leave to file a Second Amended Complaint to assert claims against MMP Capital and Amur.  A copy of the proposed Second Amended Complaint is attached hereto as Exhibit A.

## MEMORANDUM OF LAW

A party may amend its pleading a second time either with the opposing party's written consent or with leave of court.  Fed. R. Civ. P. 15(a)(1).  Leave to amend should be freely granted "when justice so requires."  Fed. R. Civ. P. 15(a)(2).  A party opposing an amendment has the burden to show that it will be substantially prejudiced by allowing the amendment.  *State Farm Mut. Auto. Ins. Co. v. CPT Med. Servs., P.C.*, 246 F.R.D. 143, 148 (E.D.N.Y. 2007).

Leave to amend should be "granted absent a good reason to the contrary, allowing disputes to be resolved upon the merits rather than on the basis of procedural technicalities." *Assam v. Deer Park Spring Water, Inc*., 163 F.R.D. 400, 404 (E.D.N.Y. 1995).  "In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be 'freely given.'"  *Foman v. Davis*, 371 U.S. 178, 182 (1962).

Plaintiffs seek leave to file the Second Amended Complaint to assert claims against MMP Capital and Amur as the remaining defendants in this action. The purpose of the proposed amendments is in part to streamline the allegations and claims now that the counts against Cynosure and Pawnee are no longer before the Court by, for example, eliminating certain allegations directed toward Cynosure and Pawnee and eliminating Count II for breach of contract against Cynosure and Count V for Civil Conspiracy. Plaintiffs further intend to address issues raised in MMP Capital's pending motion to dismiss, such as the arguments that the allegations of agency are insufficient. The proposed amendments are not for the purpose of delay or bad faith, nor are they made with dilatory motive.

If leave to amend were granted, the proposed pleading would be Plaintiffs' second pleading asserting claims against MMP Capital and Amur. Neither defendant would suffer prejudice as the case is still at a relatively early stage given that neither Defendant has answered the Amended Complaint, and discovery has not commenced and is currently stayed. Moreover, the proposed Second Amended Complaint is premised on the same underlying facts and circumstances, not an entirely new transaction, and the proposed pleading would not, therefore unnecessarily expand the scope of discovery or delay the progress of the litigation.

Further, MMP Capital and Amur will likely assert affirmative claims against Plaintiffs for outstanding amounts owed under a Finance Agreement. Plaintiffs will have a right to respond with affirmative defenses that raise issues overlapping with the claims asserted in the Second Amended Complaint, such as defenses seeking to invalidate the Finance Agreement. For this additional reason, granting Plaintiffs' leave to amend will not prejudice MMP Capital or Amur by presenting a risk of extensive additional factual and legal issues that would then need to be addressed by the parties and the Court.

Leave to amend is also appropriate because contrary to MMP Capital's arguments otherwise, the amendment is not futile such that Plaintiffs could prove no set of facts in support of their claims. *State Farm Mut. Auto. Ins.* 246 F.R.D. at 148 ("A proposed amendment to a pleading would be futile if . . . . it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim.") (citations omitted). In fact, the courts in both the related case against Cynosure, Inc. and the related case against Pawnee Leasing Corporation—another finance company defendant—have both denied motions to dismiss Plaintiffs' second amended complaint similar to what Plaintiffs propose filing in this case. *See St. Francis Holdings, LLC, et al. v. Pawnee Leasing Corp.*, Case No. 8:20-CV-1101, Doc. 103 (M.D. Fla.) (Jan. 22, 2021 Order denying Pawnee's motion to dismiss); *St. Francis Holdings, LLC, et al. v. Cynosure, Inc.*, Case No. 1:20-cv-11747-WGY, Dkt. 123 (D. Mass.) (denying Cynosure's motion to dismiss).

MMP Capital maintains that the amendment is futile in part because certain provisions in its Finance Agreement provide MMP Capital with absolute immunity from suit, including certain liability disclaimers and a "hell-or-high-water" provision. However, as discussed in Plaintiffs' response to MMP Capital's motion to dismiss, the reality is that neither the general liability disclaimers nor the "hell-or-high-water" provision provide blanket immunity from liability for intentional torts, such as fraudulent inducement. *See, e.g.*, *Sterling Nat. Bank v. Kings Manor Estates, LLC*, 9 808 N.Y.S. 2d 920 (N.Y. Civ. Ct. 2005) ("As a procedural matter, the party seeking to enforce a 'hell or high water' clause must show that a fraud defense lacks merit."); *see also CIT Fin. LLC v. Treon, Aguirre, Newman & Norris PA*, 2016 WL 6610604, at *4 (D. Ariz. Nov. 9, 2016) ("[A] hell or high water clause in a lease that was induced by fraud is invalid because the lease itself is invalid."); *Colonial Pac. Leasing Corp. v. McNatt*, 486 S.E. 2d 804, 805 (Ga. 1997) ("We conclude that

a 'hell or high water' clause does not insulate a lessor's assignee from a claim of fraud."). For at least this reason, the amendment is far from futile.

In short, granting the present motion for leave to file a Second Amended Complaint will favor the strong federal policy of resolution on the merits while permitting Plaintiffs an opportunity to streamline the counts asserted. The Second Amended Complaint does not present new legal theories and is premised on the same underlying transaction such that granting leave to amend will not expand the scope of discovery or the legal issues presented. As agreed by two other federal district courts, the amendment would not be futile. Moreover, the Second Amended Complaint is not being submitted for purposes of bad faith or delay, nor will it prejudice MMP Capital by unnecessarily expanding the scope of or otherwise delaying the litigation.

<u>**CONCLUSION**</u>

For the foregoing reasons, Plaintiffs hereby respectfully requests this Court grant this motion and grant Plaintiffs leave to file a Second Amended Complaint.

Dated: March 3, 2021      **SHUMAKER, LOOP & KENDRICK, LLP**

Shumaker, Loop & Kendrick, LLP

By:*/s/ C. Philip Campbell Jr.*
C. Philip Campbell, Jr.
Fla. Bar No. 160973
Shumaker, Loop & Kendrick, LLP
101. E. Kennedy Blvd., Ste. 2800
Tampa, FL, 33602
pcampbell@shumaker.com
Ph: (813) 227.2228

By: */s/ Peter R. Silverman*
Peter R. Silverman
New York Bar No.: 1769470
1000 Jackson Street
Toledo, OH 43604
(419) 241-9000
Primary: psilverman@shumaker.com

Secondary: anyers@shumaker.com
Attorneys for Plaintiffs

## **CERTIFICATE OF SERVICE**

I hereby certify that on March 3, 2021, I electronically served the foregoing via email to counsel of record for MMP Capital Frank Peretore (peretore@peretore.com, fperetore@csglaw.com) and Lisa M. McQuade (lmcquade@csglaw.com) and counsel for Amur Equipment Finance, Inc., Matthew Kye (mkye@kyelaw.com)

By: */s/ C. Philip Campbell, Jr.*
*Counsel for Plaintiffs*

-------------------------------------------------------X

ST. FRANCIS HOLDINGS, LLC, and
FRANCIS J. AVERILL, M.D.,

                                     **Case No. 2:20-cv-4636-MKB-AYS**

        **Plaintiffs,**

**v.**

**MMP CAPITAL, INC. and
AMUR EQUIPMENT FINANCE, INC.,**

        **Defendants.**

-------------------------------------------------------X

## SECOND AMENDED COMPLAINT

Plaintiffs, St. Francis Holdings, LLC ("St. Francis") and Francis J. Averill, M.D. ("Dr. Averill") by and through their undersigned counsel, sues MMP Capital, Inc. and Amur Equipment Finance, Inc. and alleges as follows:

## PARTIES, JURISDICTION AND VENUE

1.     Plaintiff, St. Francis Holdings, LLC is a Florida limited liability company authorized to conduct business in Florida, with its principal place of business located in Pinellas County, Florida.

2.     Plaintiff, Francis J. Averill, M.D. is an individual who resides in Florida and serves as a managing member of St. Francis Holdings, LLC.

3.     On or about June 26, 2019, St. Francis and Cynosure, LLC entered two Customer Purchase Agreements in Florida relating to a SculpSure Non-Invasive Body Contouring Platform ("SculpSure System") and a TempSure Envi System ("TempSure System") that were shipped to Plaintiffs' offices in Florida and are currently located in Plaintiffs' office in Florida. *See* **Exhibit 1**, Cynosure Customer Purchase Agreements ("Purchase Agreements").

EXHIBIT A

4. Defendant MMP Capital, Inc. ("MMP Capital") is incorporated in New York with its principal place of business in New York.

5. MMP Capital solicits customers and conducts business in Florida, as evidenced at least by its business dealings with Plaintiffs and customer testimonials from at least one of MMP Capital's customers in Sarasota, Florida. *See* **Exhibit 2**, MMP Capital Testimonial Webpage, *available at* https://www.mmpcapital.com/testimonials.

6. MMP Capital has solicited business from Plaintiffs in Florida by directing targeted email communications to Plaintiffs in Florida. *See* **Exhibit 3**, MMP Capital Solicitation Emails to Plaintiffs.

7. MMP Capital maintains agents and representatives in Florida, including at least a Senior Vice President. *See* **Exhibit 4**, MMP Capital About MMP Capital Webpage, *see* https://www.mmpcapital.com/about.

8. MMP Capital entered an Equipment Finance Agreement with St. Francis on June 26, 2019 relating to the acquisition of the TempSure System with Dr. Averill having signed the finance agreement as a Guarantor ("Finance Agreement"). *See* **Exhibit 5**, Equipment Acceptance Certificate and Equipment Finance Agreement. The MMP Capital Finance Agreement contemplates that MMP Capital would withdraw monthly lease payments from St. Francis's bank account in Florida, and MMP Capital has made such withdraws.

9. The MMP Capital Finance Agreement was entered in Florida and relates to TempSure System equipment located in Plaintiffs' offices in Florida.

10. MMP Capital has directed communications to Plaintiffs in Florida regarding the Finance Agreement and the equipment located in Plaintiffs' offices in Florida. *See* **Exhibit 6**, Emails from MMP Capital to Plaintiffs.

EXHIBIT A

11.     MMP Capital's activities in Florida related to the Finance Agreement are what gave rise to the present dispute and Plaintiffs' injuries.

12.     MMP Capital further conducts activities in Florida such that it has purposefully availed itself of the privileges of Florida law and should reasonably anticipate being sued under Florida causes of action.

13.     Defendant Amur Equipment Finance, Inc. ("Amur") is incorporated in Nebraska with its principal place of business in Nebraska.

14.     Amur claims to be an assignee of MMP Capital to certain rights under the Finance Agreement pursuant to a July 16, 2019 Assignment and a January 16, 2019 Master Discounting Agreement ("Amur Agreement"), including specifically a right to receive payments from Plaintiffs pursuant to the Finance Agreement. *See* **Exhibit 7**, July 16, 2019 Assignment between MMP Capital and Amur.

15.     The Amur Agreement relates to equipment located in Plaintiffs' offices in Florida.

16.     Amur recorded with the Florida Secretary of State a UCC Financing Statement relating to the Amur Lease Agreement, thereby evidencing an intent to avail itself of the protections of Florida law. *See* **Exhibit 8**, Amur UCC Financing Statement.

17.     Amur has directed physical mail to Plaintiffs in Florida concerning insuring the TempSure System. *See* **Exhibit 9**, August 2019 Notice Re: Required Property Insurance Coverage on Your Equipment.

18.     Amur has also directed email communications to Plaintiffs in Florida concerning the Finance Agreement and the TempSure System. *See* **Exhibit 10**, Amur Emails to Plaintiffs.

19.     On information and belief, Amur further conducts activities in Florida such that it has purposefully availed itself of the privileges of Florida law and should reasonably anticipate being sued under Florida causes of action.

20.     Plaintiffs have a strong interest in obtaining relief against MMP Capital and Amur.

21.     This is an action for damages in excess of $75,000.00, exclusive of interest, attorneys' fees, and costs.

22.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a).

## GENERAL ALLEGATIONS

### *Cynosure Equipment and Marketing Tactics*

23.     In 2015, Cynosure began selling the SculpSure System throughout the United States.  Cynosure's customers include cosmetic surgery practices, aesthetics practices, spas, and business owners in the aesthetics and cosmetics industries all of which are not apparently internal medicine, pulmonology, or allergy practices.  *See generally* **Exhibit 11**, Printout of Cynosure Find Provider Webpage for the Tampa Bay Area.

24.     Cynosure's marketing materials represent that the SculpSure System effectively eliminates unwanted fat cells and provides patients with pain free non-invasive body contouring without surgery or downtime.

25.     The SculpSure System uses a laser to heat patient tissue to a temperature between 108°F (42ºC) and 117°F (47ºC).  *See* **Exhibit 12**, Lasers in Surgery Article,[1] *available at* https://www.cynosure.com/product/sculpsure/ (select "View Clinical Data" link).

26.     Cynosure claims that the SculpSure laser heating causes the targeted fat cells to eventually die before being removed by the body's lymphatic system.  *See* **Exhibit 13**, Cynosure, Non-Invasive Laser Treatment — SculpSure® — Cynosure, *available at* https://www.cynosure.com/product/sculpsure/.

---

[1] Decorato, *et al.*, *Subcutaneous Adipose Tissue Response to a Non-invasive Hyperthermic Treatment Using a 1,060 nm Laser*, LASERS IN SURGERY AND MEDICINE (July 2017), *available at* https://pubmed.ncbi.nlm.nih.gov/28103642

EXHIBIT A

27. According to Cynosure's Clinical Reference Guide, each SculpSure treatment has two phases—a "build mode" and "sustain mode." The build mode occurs for the first four (4) minutes of the procedure during which the machine attempts to heat the fat to the target temperature. The sustain mode lasts the remaining twenty-one (21) minutes and aims to maintain the target temperature in the fat layer.

28. The SculpSure System can deliver energy in a range of 0.90 to 1.40 Watts per square centimeter ($W/cm^2$) in increments of 0.05 $W/cm^2$. The build mode power density setting defaults to 1.10 $W/cm^2$.

29. Despite the default setting being 1.10 $W/cm^2$, Cynosure directs SculpSure System operators who are administering treatment to start at a lower power level and increase the power level while adjusting the heat based on patient feedback. Initially, Cynosure released the following Zone Adjustment Chart to guide the treatment:

| Zone Score | ZONE |
|---|---|
| 1 | Pleasant cool/cold feeling. Increase setting. |
| 2 | Gentle warming and cooling. Increase setting. |
| 3 | Tingly, short intervals of warmth and cooling. No change in setting. |
| 4 | Longer peaks of moderate deep warmth and cooling. No change in setting. |
| | Beyond Fat Destruction Zone. Select Advance-to-Cool button. |

(Fat Destruction Zone spans zone scores 3 and 4.)

30. Early on after the SculpSure System product launch, Cynosure aggressively marketed the SculpSure system as being able to achieve optimal results in a single twenty-five minute (25) treatment as well as being comfortable, "pain-free," and "hands-free."

31. However, Cynosure soon recognized that patients failed to achieve the promised results even when Cynosure's treatment protocols were followed, including following the Zone Adjustment Chart.

32. Recognizing the problem, Cynosure subsequently revised its treatment protocol for the SculpSure System. In mid-2016, Cynosure introduced a "Treat to Complete" treatment plan, advising customers to manage patient expectations that multiple treatments may be part of the treatment plan.

33. Furthermore, Cynosure directed physicians and practitioners to raise the power levels on the machine to compensate for poor results, which contradicted prior claims that any setting between 0.9 and 1.4 W/cm$^2$ would suffice.

34. As to the TempSure System, Cynosure's marketing materials represent that the TempSure System "heats deep into the skin to regenerate collagen and reduce the appearance of forehead wrinkles, crow's feet, and smile lines." *See* **Exhibit 14**, TempSure webpage printout, *available at* https://www.cynosure.com/product/tempsure-envi/

35. The TempSure System offered by Cynosure can be equipped with different hand pieces meant to target differing areas of the body, such as the TempSure Vitalia hand pieces.

36. Cynosure suspended sales of the TempSure Vitalia hand pieces after receiving a warning letter from the United States Food and Drug Administration ("FDA") stating that with respect to Cynosure's MonaLisa Touch System, the FDA was unable to identify agency clearance or approval supporting use of claims that include the system delivered "gentle, virtually painless laser energy." *See* **Exhibit 15**, U.S. Food & Drug Administration, It Has Come to Our Attention Letter ("IHCOA") (July 24, 2018);[2] **Exhibit 16**, Medical Device + Diagnostic

---

[2] *Available at https://www.fda.gov/media/114912/download*

6

EXHIBIT A

Industry, Hologic Heard FDA's Vaginal Rejuvenation Warning (September 13, 2018) (noting that Cynosure ceased sales of the TempSure Vitalia in response to the FDA warning letter).[3]

37.     Cynosure's marketing tactics eventually led to Cynosure becoming embroiled in multiple lawsuits with over a dozen customers who were misled by claims that the SculpSure System was "pain free" and "hands free."  *See David M. Alessi, M.D., P.C. v. Cynosure, LLC*, Case No. 1:19-CV-12384 (D. Mass. 2019); *Plastic Surgery Associates, S.C. v. Cynosure, Inc.*, Case No. 1:17-CV-11850 (D. Mass. 2017); *Ederra Plastic Surgery, P.C., et al. v. Cynosure, Inc.*, Case No. 1:19-CV-10164 (D. Mass. 2019).

38.     Nonetheless, Cynosure continued to market the SculpSure and TempSure Systems in the same manner claiming, among other things, the equipment could be used "pain free" to patients.

39.     At the center of Cynosure's misleading marketing campaign was Kristopher Huston, who at the time was Cynosure's Director of Sales Growth, who is based in the Tampa Bay area.  *See* **Exhibit 17**, Huston LinkedIn Biography.

40.     Huston was an influential force at Cynosure in directing Cynosure's marketing with regard to sales of the SculpSure System and TempSure System, including helping to shape Cynosure's messaging with regard to the pain inflicted on patients and the number of treatments required.  Prior to accepting a position as Cynosure's Director of Sales Growth, Huston held a position as Cynosure's Director of Sales and Training and was responsible for training Cynosure's sales force on how to sell.  Huston was named Cynosure's Director of Sales and Training after he spent time serving as Cynosure's Western District Sales Manager and was a top-selling sales representative from 2010 to 2017 with sales of $41 million in 2016 alone.

---

[3] *Available at available at https://www.mddionline.com/regulatory-quality/hologic-heard-fdas-vaginal-rejuvenation-warning-loud-and-clear*

EXHIBIT A

41.     In shaping Cynosure's messaging and marketing campaign, part of Huston's focus was to, among other things, try to convince customers that: (i) the SculpSure System and TempSure System were virtually painless" for patients while concealing that treatment with the SculpSure System required anesthesia; (ii) the SculpSure System and TempSure System were capable of "hands free" use; (iii) both the SculpSure System and TempSure System had to be purchased together to establish a new, viable aesthetics practice that generated a significant income stream; and (iv) both the SculpSure System and TempSure System were capable of achieving significant results for patients with relatively few treatments of short duration.

42.     Cynosure partners with third-party leasing and equipment financing companies and presents customers with the option to lease or finance equipment through one of Cynosure's pre-selected leasing or financing partners, such as MMP Capital.

43.     MMP Capital, Amur, and Pawnee Leasing Corporation ("Pawnee") specifically sought to partner with Cynosure for this reason, even creating affiliations amongst themselves. For example, MMP Capital referred to Pawnee, another entity that sought to finance Cynosure's equipment, as well as Amur as "key banking partner[s]." *See* **Exhibit 18**, August 14, 2019 Email from MMP Capital.

44.     In fact, MMP Capital and Cynosure had such a close relationship that the two entities coordinated sales deals with one another, including sales to Plaintiffs. For example, communications between them shows that both entities coordinated in determining whether and how much additional credit could be extended to Plaintiffs—specifically so that MMP Capital and Cynosure could sell Plaintiffs additional equipment during a conference in Miami Beach, as discussed in more detail below. Cynosure even had its own inbox with MMP Capital (*e.g.*

8

EXHIBIT A

cynosure@mmpcapital.com).  *See* **Exhibit 19**, August, 2019 Emails discussing additional financing opportunities.[4]

45.     At the time Plaintiffs executed the MMP Capital Finance Agreement, by virtue of the multiple pending lawsuits against Cynosure, MMP Capital and Amur were aware of Cynosure's misleading marketing practices in falsely representing that the SculpSure System and TempSure System were "pain free" and that the SculpSure System could be used "hands free."

46.     Also at the time Plaintiffs executed the MMP Capital Finance Agreement, MMP Capital and Amur were aware that Cynosure was litigating with several customers over false claims that the SculpSure System could be used "pain-free" and "hands-free."

47.     Notwithstanding its knowledge of Cynosure's misleading marketing practices, MMP Capital provided Cynosure and Huston with authority to act on MMP Capital's behalf in presenting the MMP Capital Finance Agreement to Plaintiffs, in negotiating the terms of the MMP Capital Finance Agreement, and in entering the MMP Capital Finance Agreement.

### *Amur's Relationship with MMP Capital*

48.     Approximately twenty (20) days after Plaintiffs executed the Finance Agreement, MMP Capital executed an Assignment conveying some rights to Amur under the Finance Agreement, including a right to receive payments from Plaintiffs relating to the TempSure System and purportedly a right to initiate litigation against Plaintiffs to seek such payments.  The Finance Agreement references a "Master Discounting Agreement" pursuant to which MMP Capital's interest in "lease agreements, equipment finance agreements, [and] secured loan agreements" may be assigned to Amur.  *See* **Exhibit 7**, July 16, 2019 Assignment.

---

[4] Exhibits 19 and 24 were produced in discovery by Cynosure in litigation pending in Massachusetts, and the emails in both exhibits were marked confidential by Cynosure.

EXHIBIT A

49.    In addition to an assignment of rights under the Finance Agreement, Amur has obtained assignments of various financing arrangements from MMP Capital pursuant to the Master Discounting Agreement.

50.    Upon information and belief, Amur has received assignments of rights in financing arrangements relating to Cynosure equipment other than the TempSure System shipped to Plaintiffs in this case.

51.    Given that Amur has received rights in multiple financing arrangements from MMP Capital, including equipment supplied by Cynosure, at the time Plaintiffs executed the Finance Agreement, Amur was aware of, or should have been aware of, Cynosure's misleading marketing practices.

### June 26, 2019 Sales Pitch and the Financing Agreements

52.    In or around June 2019, Huston "cold called" Plaintiffs' offices to solicit business from Plaintiffs by seeking to sell Plaintiffs on the idea of establishing a new aesthetics practice through the purchase of two of Cynosure's so-called "hot ticket" products—the SculpSure System and the TempSure System.

53.    On or about June 26, 2019, Huston visited Plaintiffs' office in Clearwater, Florida and conducted a presentation on the SculpSure System and the TempSure System.  Dr. Averill attended the June 26 presentation along with other St. Francis representatives, Rose Averill, Cassy Moreau, and Cesar Fernandez.

54.    At the time of the June 26, 2019 presentation, as noted above, Cynosure was a named defendant in multiple lawsuits relating to the SculpSure System.  Based on the allegations in those proceedings, Huston, MMP Capital, and Amur knew of the systemic issues concerning certain attributes of the SculpSure System and should have disclosed said issues to Plaintiffs, including that the SculpSure System or TempSure System could not be used pain free or hands

free. However, at no point during the June 26, 2019 presentation or at any other time, did Huston or MMP Capital mention the lawsuits against Cynosure or any of the problems giving rise to the litigation.

55. During the June 26, 2019 presentation, Huston, acting on behalf of Cynosure and MMP Capital, made a number of inflated claims and material misrepresentations and omissions concerning the efficacy, operation, and financing of the SculpSure System and TempSure System. The moment Plaintiffs expressed an interest in obtaining a SculpSure System, Huston pounced. Huston hastily presented Plaintiffs with a series of convoluted contract instruments relating to the SculpSure System and TempSure System with the intent to beguile Plaintiffs into believing that they were being given an option to secure cutting edge products at a reasonable monthly price that were well suited for a startup aesthetics practice. The reality of the matter is, however, that Huston was putting the finishing touches on a deceptive scheme that attempts to lock customers like St. Francis into a series of payment obligations, supposedly with no recourse, in exchange for equipment that is not nearly as patient or provider friendly as Huston represented.

56. Prior to the June 26, 2019 presentation, Huston knew that Plaintiffs did not have an aesthetics practice and that Plaintiffs' principal areas of medical practice are sleep, allergy, and pulmonology.

57. Moreover, neither Dr. Averill nor St. Francis had any significant experience in the cosmetic or aesthetics industry, and Plaintiffs did not have prior familiarity or knowledge concerning the operation, efficacy, or potential profitability of aesthetics equipment such as the SculpSure System and TempSure System.

58. Prior to the June 26, 2019 meeting, Huston and MMP Capital were also well aware that Cynosure's customers were almost entirely based in the aesthetics and cosmetics

industries, and Cynosure did not serve medical practices such as St. Francis. *See* **Exhibit 20**, January 8, 2019 Email from Cynosure (referring to St. Francis and stating "I do not call on these type of people practices? [sic] I am in aesthetics."). But Huston nevertheless pitched the combination of the SculpSure System and TempSure System to Plaintiffs as well suited to serve as a starting point for a new aesthetics practice that would generate significant revenue in a matter of months. Huston stated that Plaintiffs were exactly the sort of example site that Huston could use to launch a successful sales campaign in part because Plaintiffs would be totally new to the aesthetics industry, and Huston could use Plaintiffs' success as an example to show that Cynosure's equipment would be an option for a variety of medical practices, not just aesthetics practices.

59.     Huston also represented that the combination of both the SculpSure System and the TempSure System had to be acquired as a package to generate a significant income stream for a new aesthetics practice, which is precisely why Huston showed up to the June 26, 2019 meeting with pre-printed copies of contracts for both pieces of equipment. *See* **Exhibit 5**, Finance Agreement; **Exhibit 21**, Pawnee Lease Agreement (pre-printed with St. Francis' address and the last four digits of Dr. Averill's social security number).

60.     More specifically, Huston acting on behalf of Cynosure and MMP Capital, told Plaintiffs that Plaintiffs could expect to generate approximately $30,000 per month in revenue from performing procedures using the SculpSure System and generate an additional $10,800 per month from website and social media promotions. According to Huston, if just 1% of Plaintiffs' patient base were to elect to undergo SculpSure procedures, Plaintiffs would earn $18,000 per month.

61.     Huston, acting on behalf of Cynosure and MMP Capital, represented that the use of the SculpSure System was virtually "pain-free" for patients, and patients using the SculpSure

System would experience a 25% reduction in fat after just twenty-four minutes. Huston knew that these representations were false and misleading and that the use of the SculpSure System required anesthesia and that patients would need multiple treatments to see acceptable results.

62. Huston, acting on behalf of Cynosure and MMP Capital, also represented during the June 26, 2019 presentation that the SculpSure System and TempSure System could be used "hands free" making it an ideal starting point for a new practice. More specifically, Huston claimed that the SculpSure System could be set up by a medical assistant, and procedures could be initiated by a provider who then did not need to be present while the procedure was ongoing. Huston even went as far as to recommend that Plaintiffs purchase a large television for patients to watch during procedures. Again, Huston knew these statements were false and misleading at least because, among other reasons, Huston knew that patients who received anesthesia should not be left alone and because Cynosure's "Zone Adjustment Chart" required monitoring of patients receiving treatment to ensure the proper adjustment to the SculpSure System power levels.

63. Huston assured Plaintiffs that they would receive support for the new aesthetics venture. In particular, Huston represented on behalf of Cynosure and MMP Capital that Plaintiffs would be provided with financing for the equipment and that payments would be deferred for the first six (6) months after signing.

64. Huston's statements on behalf of Cynosure and MMP Capital concerning Cynosure's provision of financing and payment deferrals were intended to convey to Plaintiffs that Huston had the authority to act on behalf of both Cynosure and its financing and leasing partners, including MMP Capital. Huston did not state to Plaintiffs that the equipment was being financed through third parties or that the Finance Agreement was subject to approval or acceptance by MMP Capital. Notably, Dr. Averill later sent a letter to Cynosure and MMP

Capital on August 7, 2019 that was addressed to "Cynosure . . . . and related entities including . . . MMP Capital," which evidences the obfuscation that Huston sought to create with regard to the identity of the parties and the impression conveyed by Huston that he was acting on behalf of Cynosure and MMP Capital.  *See* **Exhibit 22**, Aug. 7, 2019 Letter from F. Averill to Cynosure.

65.     Based on Huston's representations during the June 26, 2019 sales presentation, Plaintiffs expressed an interest in purchasing the Cynosure SculpSure System—but not the TempSure System.   In response, Huston, acting on behalf of Cynosure and MMP Capital, presented Plaintiffs with paperwork relating to both systems, including the two Cynosure Purchase Agreements, the MMP Capital Finance Agreement, and the Pawnee Lease Agreement.

66.     Huston provided the agreements predated and preprinted with the last four digits of Dr. Averill's social security number, Dr. Averill's home address, St. Francis's tax payer ID, and an internal MMP Capital document tracking "EFA No."  *See* **Exhibits 5 & 21**.

67.     Huston received the agreements, including the Finance Agreement, directly from MMP Capital with instructions from MMP Capital's Senior Account Executive telling Huston to obtain signed copies of the Finance Agreement and Pawnee Lease Agreement as well as a copy of a driver's license and a voided check.  *See* **Exhibit 23** June 26, 2019 from MMP Capital to Huston with directions on entering the Finance Agreement.

68.     Plaintiffs executed the agreements the same day as Huston's presentation.

69.     Huston tried leaving Plaintiffs' offices without providing Plaintiffs with copies of any of the agreements signed by Plaintiffs on June 26.

70.     Huston's misleading sales tactics were motived in whole or in part by a desire to close the deal with Plaintiffs and bolster Huston's sales numbers before the end of Cynosure's quarter.  Following execution by Plaintiffs, Cynosure rushed to finalize the deal, and requested

on the next day that the equipment be shipped overnight to Plaintiffs. *See* **Exhibit 24**, June 27, 2019 Email directing overnight shipping prior to close of the quarter.

71.     Plaintiffs subsequently obtained a fully executed copy of the Finance Agreement indicating that MMP Capital did not sign the MMP Capital Finance Agreement until July 11, 2019—after the TempSure System was delivered to Plaintiffs' office.

72.     The MMP Capital Finance Agreement presented to Plaintiffs on June 26 directed MMP Capital to pay Cynosure the contract price for the TempSure System based on the false statement that such payment was premised on the equipment having already been "delivered to [St. Francis], installed, and/or is operating as intended" with St. Francis supposedly agreeing that despite no such delivery having occurred, the TempSure System was irrevocably accepted. *See* **Exhibit 5**, Equipment Acceptance Certificate, p. 1. These statements are false because the TempSure System was not delivered until days after June 26, 2019, and, therefore, there was no equipment for Plaintiffs to accept, nor could Plaintiffs know that the TempSure System was in good working condition, nor could Plaintiffs express the TempSure System was "operating as intended" when they had never even seen it. In short, the MMP Capital Finance Agreement sought acceptance of the TempSure System based on false premises.

73.     With regard to the monthly payments, although Huston represented that payments would be deferred for six (6) months, the MMP Capital Finance Agreement indicated that monthly installment payments of $99 were owed for the first six (6) months. *See* **Exhibit 5**.

74.     After the first six (6) months, the MMP Capital Finance Agreement provided that the monthly payments would be set at $3,349.29 for the TempSure System. *See* **Exhibit 5**.

75.     The Finance Agreement does not reveal an interest rate or explain the basis for how the payment amounts were calculated.

76.    Contrary to both Huston's representations and the plain language of the MMP Capital Finance Agreement, St. Francis's bank account was hit with two automated withdrawals from entities mentioned nowhere in the agreements signed by Plaintiffs, including: (i) a withdrawal of $499 from Amur Equipment on July 17, 2019; and (ii) a withdrawal of $99 from Axis Capital (Amur's predecessor) on August 2, 2019.

### *The Picture Painted by Huston's Sales Pitch Unravels*

77.    The day after the sales presentation, on Jun 27, 2019, Plaintiffs' received an email from Cynosure's North Florida Account Manager, Heather McCleod, introducing Brittney Walton as Plaintiffs' Customer Service Representative.  Ms. Walton is Cynosure's Customer Service Manage for South Florida and resides in Palm Beach.  Ms. Walton later visited Plaintiffs' offices on July 12, 2019 to discuss marketing and to discuss training that was supposed to be provided in Plaintiffs' office.

78.    In or around July 5, 2019, the equipment for the SculpSure and TempSure Systems was delivered to Plaintiffs' offices.  Plaintiffs retained an electrician to upgrade electrical outlets in Plaintiffs' offices to accommodate the SculpSure and TempSure Systems as part of the installation.

79.    Plaintiffs were never able to begin using either the SculpSure or TempSure systems because Cynosure did not send a representative to train Plaintiffs how to use the systems, as Cynosure previously promised it would do.

80.    Cynosure stated that a representative would visit St. Francis to provide the required training.  St. Francis cancelled patient appointments and refrained from scheduling appointments so that staff would be available to attend the training, and St. Francis paid staff to be at work for those days during which training was to occur.  But the Cynosure representative did not show up for the scheduled training session.

81.     In the meantime, on July 25, 2019, Plaintiffs learned through another sales representative from a Cynosure competitor that Cynosure had become embroiled in litigation over alleged false representations relating to the SculpSure System, including the same representation made to and relied upon by Plaintiffs that the procedures using the SculpSure were "pain free."  Plaintiffs followed up by conducting online research to obtain more information about the Cynosure litigation only to also learn of negative online reviews from patients who had been treated with Cynosure equipment.

82.     Shortly after learning about the Cynosure litigation, but before learning that use of the SculpSure System and TempSure System required anesthesia and significant medical personnel oversight, in or around July 25, 2019, Plaintiffs called Pawnee and Cynosure to reject the SculpSure and TempSure Systems and rescind the agreements.

83.     That same day, or about July 25, 2019, Plaintiffs spoke with Cynosure manager, Mike Russo ("Russo"), who also sought to diminish Plaintiffs concerns.  This time, Russo encouraged Plaintiffs to attend a Miami Beach conference taking place on August 3-4, 2019 where Cynosure would demonstrate the use of the SculpSure System on actual patients.  Russo offered to discuss cancelling the purchase/lease of the SculpSure and TempSure equipment if Plaintiffs were still not satisfied following the conference.

84.     That same day, on July 25, 2019, Plaintiffs received an email from John-Paul Smolenski, President of MMP Capital, stating that Mr. Smolenski had learned Plaintiffs contacted Pawnee about rejecting the equipment and rescinding the agreements but that Pawnee was separate from Cynosure as the manufacturer.  Mr. Smolenski further refused to rescind the agreements and insistent that Plaintiff remain responsible for payments.  *See* **Exhibit 25**, July 25, 2019 Email from Smolenski.

85.     The next day on July 26, 2019, Rose Averill of St. Francis spoke with Mr. Smolenski concerning cancelling the Purchase Agreements, Finance Agreement, and the Pawnee Leasing Agreement.  Plaintiffs sought to return the TempSure System in part because they had no desire to subject Plaintiffs' patients to a painful procedure.  MMP Capital refused the return stating it had already paid Cynosure and that the transaction and Finance Agreement could not be rescinded or cancelled.  Smolenski stated it was not in Plaintiffs' best interest to default because Plaintiffs would incur interest charges of 30%.

86.     During the July 26, 2019 call, Mr. Smolenski echoed Huston's misrepresentations regarding the SculpSure System in an attempt to assuage Plaintiffs' concerns.  Smolenski acknowledged the multiple lawsuits against Cynosure, but represented they were without merit and that the SculpSure System was painless.  Mr. Smolenski stated that he personally underwent treatment with the SculpSure because he wanted to personally test any equipment that MMP Capital financed.  Mr. Smolenski also revealed that he had discussed a financing arrangement with a separate partner besides Cynosure to finance purchases of the CoolSculpting System, but Mr. Smolenski declined because he felt that system was too painful.  Mr. Smolenski further encouraged Plaintiffs to use the SculpSure System and TempSure System because Mr. Smolenski believed there was money to be made.  Mr. Smolenski also encouraged Plaintiffs to attend a Cynosure conference in Miami Beach in early August.

87.     Both Dr. Averill and Rose Averill attended the Miami Beach conference.

88.     During the Miami Beach conference, Plaintiffs actually met Mr. John Paul Smolenski a representative of the Broker MMP Capital at the Miami Beach conference.  Mr. Smolenski told Plaintiffs that a representative from Pawnee Leasing Corporation, another entity financing the purchase of Cynosure's equipment, had expressed to MMP Capital an intent to begin financing or leasing Cynosure equipment.

EXHIBIT A

89.     Cynosure offered for sale and did in fact sell a variety of products during the conference.  Cynosure stated to Plaintiffs that Cynosure did not accept cash for the purchase of products but instead required financing through third-parties.

90.     Critically, Plaintiffs did learn for the first time from the demonstrations and from speaking with others at the conference that use of SculpSure and TempSure Systems require the use of anesthesia, which indicates the procedures are not, in fact, virtually "pain free" or "hands free."  The required use of anesthesia exacerbated Plaintiffs' concerns about potentially subjecting Plaintiffs' patients to painful procedures and raised the further concern of subjecting potentially vulnerable patients to the administration of unnecessary medications.

91.     The live demonstrations were conducted using the anesthetic Nitrous Oxide ("Nitrox") on the demonstration models, and Cynosure sold anesthesia products at the conference, including a product called "Nitronox."

92.     Moreover, although Cynosure emphasize procedures using its equipment are handled primarily by medical assistants, it became clear during the demonstrations that use of the Cynosure products was more complex and risky than Huston had previously led Plaintiffs to believe.  It was evident that use of the SculpSure System and TempSure System would require significant training and personnel resources and could not possibly be "hands free."

93.     The required use of anesthesia necessarily means that, contrary to Huston's representations, the procedures are not "hands free" as patients would need to be monitored during procedures using the SculpSure System and TempSure System, and the procedures would require the attention of a physician and could not be performed by a nurse practitioner or medical assistant.  In fact, the State of Florida requires a sedation permit as well as formal training in the use of conscious sedation.

EXHIBIT A

94.     Cynosure's own instructional materials, including specifically Cynosure's Nitronox product "Physician FAQ" cautions physicians against leaving patients alone after administering Nitrox.  *See* **Exhibit 26**, Cynosure Nitronox Product FAQ ("Do I need to be in the room with the patient? . . . .  The prudent answer would be that a patient shouldn't be left alone in a room if they are medicated.").  Huston knew, consistent with Cynosure's own product materials, that the use of Nitrox would necessarily mean that patients could not be left alone, and as a result, the SculpSure system and TempSure System could not be used "hands free."

95.     Additionally, Nitrous Oxide is known to present significant risks for patients experiencing certain pulmonary conditions or ailments, such as COPD or upper respiratory tract infections.  In fact, Cynosure's own product materials acknowledge that patients with pulmonary or respiratory problems should not use Nitrox, including patients with COPD, air embolism, active sinus or middle ear problems, and pulmonary hypertension.  *See* **Exhibit 27**, Cynosure Patient Selection Guide for Nitronox product.  Given that St. Francis is a pulmonary practice, many of St. Francis's patients would not elect or be eligible to undergo procedures using the TempSure System.  Not only did Huston know before June 26, 2019 that Plaintiffs' principal areas of practice are sleep, allergy, and pulmonology, but Huston also knew, consistent with Cynosure's product materials, that Nitrox was not suitable for use with patients exhibiting pulmonary or respiratory problems many of whom match Plaintiffs' patient profile.

96.     Huston and MMP Capital knew, or should have known, that the SculpSure System and TempSure System were not well suited for Plaintiffs' practice and patient base especially considering that Cynosure's customers were typically in the cosmetic or aesthetics industries and that Plaintiffs fell outside the typical profile for a Cynosure customer.

97.     The need for constant patient monitoring by medical staff, the required involvement of a physician, and the need for significant training all contradict Huston's

representations that either the SculpSure or TempSure Systems are well suited as centerpieces for a brand new aesthetics practice—particularly a practice such as St. Francis's. The reality is that substantial costs in personnel and other resources are required to set up and maintain a practice using the SculpSure or TempSure System. Further, the revenue amounts highlighted by Huston could not be achieved by St. Francis so as to achieve a return on investment for the SculpSure System or TempSure System.

98. During the conference, Plaintiffs met with one of Cynosure's speakers, Dr. Dianne Quibell and her colleague, Flo Goshgarian. Dr. Quibell confirmed that use of the SculpSure and TempSure System required an anesthetic.

99. Dr. Quibell and Ms. Goshgarian also relayed that the SculpSure and TempSure Systems were not suitable for starting an aesthetics practice and that instead, the systems are more suitable for established aesthetics practices in part because of the price points for procedures using the system. Dr. Quibell recommended that newcomers like Plaintiffs should instead purchase entry level equipment such as the Cynosure "Icon" and "PicoSure" machines. Dr. Quibell believed that Plaintiffs would never be able to launch a successful aesthetics practice without such entry level machines.

100. With regard to the price point, Cynosure maintains policies requiring that procedures using its products, including the SculpSure System and TempSure System, are subject to certain minimum charges and restrictions with regard to sales and discounts. For the SculpSure System and TempSure System, the minimum price points are significant such that only a relatively small subset of patients would elect or even be able to regularly afford procedures using the systems. The problem with the affordability of procedure pricing is exacerbated by Cynosure's "treat to complete" policy encouraging customers to push multiple treatments on patients because such treatments are necessary for patients to experience

significant beneficial results. As a result, an aesthetics practice would require a substantial client base—which a new practice would not have—to have enough patients that would elect to receive treatments using the SculpSure System and TempSure System such that the systems would be profitable.

101. In short, following the Miami Beach conference, it became clear that the pricing, the complexity, the need for anesthesia, the required medical training and monitoring, and need for physician oversight all cut squarely against Huston's statements that the SculpSure or TempSure Systems were suitable for starting a new aesthetics practice given the substantial equipment and personnel costs and the difficulty of achieving a significant sales volume for a new practice.

102. Immediately following the Miami Beach conference on August 7, 2019, St. Francis sent Cynosure and MMP Capital a notice cancelling the purchase/lease of the TempSure System. The August 7, 2019 cancellation notice stated that the equipment had not been used and tendered return of the equipment back to Cynosure. *See* **Exhibit 22**, Aug. 7, 2019 Letter from F. Averill to Cynosure and MMP Capital.

103. Notably, while the August 7, 2019 letter includes a header identifying the "Law Offices of Averill Law Firm," Dr. Averill does not represent clients as part of an active law practice, and instead, Dr. Averill's focus is on the full time practice of medicine.

104. Cynosure refused to cancel the purchase/lease of the SculpSure System or the TempSure System or to accept the return of the equipment. *See* **Exhibit 28**, August 30, 2019 Letter from Cynosure.

105. MMP Capital responded by agreeing to cancel the purchase and finance of a Cynosure Icon & Picosure workstation but refused to cancel purchase of the TempSure

workstation—which indicates that MMP Capital does, in fact, have some discretion to cancel financing for Cynosure equipment.  *See* **Exhibit 6**.

106.     At present, neither the TempSure System or SculpSure System can be used in the way that Cynosure marketed them to Plaintiffs.  And in fact, the equipment remains unused to this day.

107.     Further, Huston's statements during the June 26, 2019 meeting on behalf of Cynosure and MMP Capital, that the TempSure System could be used "hands free" and "pain free" also factor into the value of the equipment and undermine the benefit of the bargain. Namely because the statements imply that the TempSure System can be utilized with a low overhead cost, including no anesthesia, and imply that patients will, in fact, elect to undergo procedures using the TempSure System.

108.     Huston's statements concerning the value of the equipment to Plaintiffs are false. The reality is that the TempSure System has little or no value to Plaintiffs because, *inter alia*, use of the TempSure System is not compatible with Plaintiffs' patient base, the TempSure System cannot be used on patients "pain free," the TempSure System is not "hands free" but instead requires physician and trained personnel oversight, and the TempSure System is not well suited for establishing a new aesthetics practice.

109.     Plaintiffs did not receive the benefit of the bargain and have suffered actual damages based on the value of the TempSure System as it was represented to Plaintiffs on June 26, 2019 versus the little or no value of the TempSure System as it was actually delivered to Plaintiffs.  Plaintiffs were further required to make lease payments and carry expensive insurance for the equipment under the threat that failure to do so would result in MMP Capital force placing insurance at a significant cost to Plaintiffs.  Plaintiffs also incurred damages in the form of expenses in installing new electrical conduits to accommodate the installation of the

SculpSure and TempSure Systems and in preparing for the training that never occurred as promised through the cancellation of patient appointments and paying staff to be available.

110.    Plaintiffs have retained the undersigned law firm in this action and has agreed to pay the firm a reasonable fee for the services rendered.

111.    All conditions precedent to this action have been performed, occurred, or waived.

## COUNT I

## FRAUD IN THE INDUCEMENT

112.    Plaintiffs incorporate the allegations contained in paragraphs 1 through 111 as though fully set forth herein.

113.    Cynosure and MMP Capital acting through Huston as their representative during a meeting on June 26, 2019, falsely claimed that: (i) use of the SculpSure System and TempSure System were virtually painless; (ii) procedures using the SculpSure System and TempSure System could be performed "hands free" without a trained staff member needing to be present during the majority of the treatment; and (iii) the SculpSure System and TempSure System were well suited for establishing a new aesthetics practice.  Huston and MMP Capital knew that these representations were false at the time they were made.

114.    At no time prior to the Miami Beach conference did Cynosure or MMP Capital reveal that procedures using the SculpSure System and TempSure System would require Nitrous Oxide or any other form of anesthesia.

115.    On June 26, 2019, Cynosure and MMP Capital, acting through Huston as their agent, sought Plaintiffs' acceptance of the TempSure System equipment based on the false statement Plaintiffs were completely satisfied with the equipment "as it is now" even though the TempSure System had not been delivered yet and there was no equipment to be satisfied with in the first place.

116.    On June 26, 2019, Cynosure and MMP Capital, acting through Huston failed to disclose the material fact that Cynosure and MMP Capital would refuse to accept return of the TempSure System or cancellation of the Cynosure Purchase Agreements and MMP Capital Finance Agreement.

117.    At the time of the June 26, 2019 meeting, Huston and MMP Capital were aware of the material omissions and misrepresentations concerning the acceptance, delivery, installation, and operation of the TempSure System and aware that such material omissions and misrepresentations were made so that Cynosure could secure immediate payment from MMP Capital and so that Cynosure and MMP Capital could claim that the Cynosure Purchase Agreements and the MMP Capital Finance Agreement were irrevocable and non-cancellable.

118.    The representations and omissions made by Huston are false statements or omissions made concerning material facts in that: (i) the use of the SculpSure System and TempSure System are not virtually painless for patients; (ii) the SculpSure System and TempSure System cannot be effectively used "hands free" without a trained staff member needing to be present during procedures; (iii) the SculpSure System and TempSure System are not well suited for establishing a new aesthetics practice and in particular not well suited for Plaintiffs' patient base; and (iv) Plaintiffs would not have entered the agreements knowing that Cynosure and MMP Capital would refuse to accept return of the equipment or cancellation of the agreements.

119.    Cynosure and MMP Capital, acting through Huston knowingly and intentionally misled Plaintiffs because they knew Plaintiffs would not be interested in the TempSure System if Plaintiffs knew about and understood the full scope of costs in personnel and other resources required to set up and maintain a practice using Cynosure's equipment

120.    Cynosure and MMP Capital, acting through Huston, made the aforementioned false representations and omissions with the intent that Plaintiffs rely on the false representations and omissions in order to induce Plaintiffs to execute and/or enter into the Cynosure Purchase Agreements and the MMP Capital Finance Agreement.

121.    MMP Capital's intent is further shown and corroborated by MMP Capital's conduct after the time of contracting, in which MMP Capital's own President made clear MMP Capital's intent. On July 26, 2019, John-Paul Smolenski, echoed Huston's earlier misrepresentations. John-Paul first acknowledged the multiple lawsuits against Cynosure, but represented they were without merit—showing MMP Capital was in fact aware, at the time of contracting, of the multiple lawsuits against Cynosure, but failed to disclose them.   Mr. Smolenski further stated that the SculpSure System was painless, despite the fact that such a product from Cynosure was not even the subject of MMP Capital's Finance Agreement—again showing MMP Capital's undivided loyalty to Cynosure and selling its products for MMP Capital's own gain. Lastly, Mr. Smolenski again assured Plaintiffs that they could earn profits by utilizing the TempSure and SculpSure Systems—once again showing MMP Capital's agreement with Huston's representations, made as MMP Capital's agent.

122.    Plaintiffs did, in fact, justifiably rely upon the false representations made by Huston on June 26, 2019 in entering the Cynosure Purchase Agreements and the MMP Capital Finance Agreement.  Plaintiffs' reliance was justifiable at least because of substantial specificity and extent of Mr. Huston's statements, which took them far beyond matters of opinion.

123.    It was only after the Plaintiffs executed the June 26, 2019 agreements that the Plaintiffs learned that the TempSure System and SculpSure System required anesthesia, could not be performed "hands free," would require monitoring during procedures, and would require the attention of a physician while the procedure was ongoing.

124.    But for the express representations and material omissions made by Cynosure and MMP Capital through Huston, Plaintiffs would not have entered the agreements or the transaction in general to purchase/lease the TempSure System or the SculpSure System equipment.

125.    As a result of Huston's fraudulent inducement, Plaintiffs have suffered damages including, but not limited to, receiving equipment that has little to no value to Plaintiffs, incurring lease payments to MMP Capital and/or Amur, being required to carry expensive insurance on the TempSure system, and expenses incurred in preparation for the TempSure System installation and operation training that did not occur.

WHEREFORE, Plaintiffs demand judgment against MMP Capital and Amur rescinding the MMP Capital Finance Agreement, the corresponding assignment to Amur, or alternatively, the entry of a judgment against defendants for all damages, prejudgment and post-judgment interest, attorneys' fees, costs, and all other relief this Court deems necessary, just and proper.

## COUNT II

## VIOLATION OF FLORIDA'S DECEPTIVE AND UNFAIR TRADE PRACTICES ACT

126.    Plaintiffs incorporate the allegations contained in paragraphs 1 through 125 hereof as though fully set forth herein.

127.    The above acts constitute unfair and deceptive trade practices under Florida Statutes Sections 501.201 *et seq*.

128.    Cynosure and MMP Capital, acting through Huston, falsely and deceptively marketed the TempSure System and SculpSure System to Plaintiffs as being well suited for Plaintiffs to establish a new aesthetics practice.

129.    Cynosure and MMP Capital, acting through Huston, further marketed the TempSure System and SculpSure System to Plaintiffs through material and false representations

concerning the function and operation of the system, including that the TempSure System and SculpSure System could be used without causing pain to patients and used "hands free" without a trained staff member needing to be present during the majority of the treatment.

130.    Contrary to the representations alleged herein, at no time during marketing of TempSure System and SculpSure System to Plaintiffs did Cynosure or MMP Capital report that patients would feel pain, or require any anesthesia after the use of the equipment.

131.    On June 26, 2019, MMP Capital, acting through Huston, engaged in deceptive and unfair business practices by seeking Plaintiffs' acceptance of the TempSure System equipment based on the false statement Plaintiffs were completely satisfied with the equipment and that it was in good working condition even though the TempSure System had not been delivered yet and there was no equipment to be satisfied with in the first place, and Plaintiffs could not know that the equipment was in a good working condition.  MMP Capital sought Plaintiffs' pre-delivery acceptance based on a false premise so that Cynosure could secure immediate payment from MMP Capital and so that Cynosure and MMP Capital could claim that the Cynosure Purchase Agreements and the MMP Capital Finance Agreement were irrevocable and non-cancellable.

132.    On June 26, 2019, MMP Capital, acting through Huston, also engaged in deceptive and unfair business practices by failing to disclose the material fact that Cynosure and MMP Capital would refuse to accept return of the TempSure System or cancellation of the Cynosure Purchase Agreements and MMP Capital Finance Agreement.

133.    MMP Capital immediately commencing unauthorized withdrawals from St. Francis's bank in or around July 17, 2019 in the amount of $499 by Amur and a $99 withdrawal on or around August 2, 2019 by Amur.

EXHIBIT A

134.     The false representations made to Plaintiffs, buttressed by Cynosure's misleading promotional practices, and MMP Capital's scheme to seek Plaintiffs' purportedly irrevocable acceptance of equipment that had not been delivered, were all practices likely to deceive customers such as Plaintiffs acting reasonably under the circumstances into purchasing or leasing equipment from MMP Capital and continuing to make payments notwithstanding any demands to return the equipment.

135.     MMP Capital has engaged in unfair or deceptive trade practices in the conduct of trade and commerce through the acts alleged herein.

136.     As a direct and proximate cause of MMP Capital's conduct, Plaintiffs have suffered and will continue to suffer damages including, but not limited to, receiving equipment that has little to no value to Plaintiffs contrary to what was promised and previously represented, incurring lease payments to MMP Capital and Amur, being required to carry expensive insurance on the TempSure system, and expenses incurred in preparation for the TempSure System installation and operation training that did not occur.

WHEREFORE, Plaintiffs demand entry of a judgment against MMP Capital for all damages, prejudgment and post-judgment interest, attorneys' fees, costs, and all other relief this Court deems necessary, just and proper.

## COUNT III

## RESCISSION

137.     Plaintiffs incorporate paragraphs 1 through 125 hereof as though fully set forth herein.

138.     Plaintiffs were fraudulently induced into entering the Cynosure Purchase Agreement and the MMP Capital Finance Agreement through Huston acting on behalf of Cynosure and MMP Capital, Huston's various false representations and omissions and deceptive

and unfair trade practice, including that the TempSure System and SculpSure System could be used without causing pain to patients and used "hands free" without a trained staff member needing to be present during the majority of the treatment.

139.     The TempSure System and SculpSure System are unsuitable for the purpose for which it was purchased or leased in that the system is not suitable for establishing a new aesthetics practice—particularly for a pulmonary medical practice with Plaintiffs' patient base.

140.     MMP Capital's actions acting through Huston were conscious and deliberate and resulted in a frustration of the purpose of the agreements, made the agreements impossible to perform and contravened Plaintiffs' reasonable commercial expectations that the TempSure System and SculpSure System would be suitable for the intended purpose for which the equipment was purchased or leased—*i.e.*, to establish a new aesthetics practice.

141.     MMP Capital, acting through Huston, induced Plaintiffs into executing agreements premised on false statements that Plaintiffs were completely satisfied with the TempSure System equipment as it was and that the equipment was in good working condition even though the TempSure System had not been delivered yet and there was no equipment to be satisfied with in the first place.

142.     On July 25, 2019, July 26, 2019 and again on August 7, 2019, Plaintiffs notified Cynosure and MMP Capital that Plaintiffs were cancelling and/or rescinding the agreements and rejecting the TempSure System.   Plaintiffs offered to return the equipment in an unused condition.

143.     Plaintiff took steps to reject and offer the return of the TempSure System, and took steps to cancel and/or rescind the agreements with Cynosure and MMP Capital, and the corresponding assignment to Amur, in a reasonable time frame following delivery of the

equipment to Plaintiffs and before Plaintiffs had even received the necessary training that would allow them to commence use of the TempSure System.

144. Plaintiffs reached out to Huston, Russo, and MMP Capital on or about July 25—the same day that Plaintiffs learned Cynosure was embroiled in litigation with its customers—and reached out again on June 26, 2019, promptly after learning that the TempSure System was marketed to Plaintiffs under false pretenses. Plaintiffs were urged by Cynosure and MMP Capital to reconsider following attendance at the August 3-4 Miami Beach conference. Plaintiffs again acted promptly in sending a cancellation, rejection, and rescission notice to Cynosure and MMP Capital on August 7, 2019—only days after the conference.

145. Plaintiffs are ready, willing and able to return the TempSure System in the same condition as when it was delivered.

WHEREFORE, Plaintiffs demand judgment against MMP Capital and Amur rescinding the MMP Capital Finance Agreement, and the corresponding assignment to Amur.

<u>**DEMAND FOR JURY TRIAL**</u>

St. Francis Holdings, LLC and Francis J. Averill, M.D. hereby demand a trial by jury of all issues so triable.

Dated: March 3, 2021

**SHUMAKER, LOOP & KENDRICK, LLP**

By: _/s/_ _____
C. PHILIP CAMPBELL, JR., ESQ. (FBN: 160973)
101 East Kennedy Boulevard – Suite 2800
Tampa, FL 33602-5126
Telephone: (813) 229-7600
Facsimile: (813) 229-1660
Primary email: pcampbell@shumaker.com
Secondary email: psantivasci@shumaker.com

By: _/s/_ _____
PETER R. SILVERMAN, ESQ.
New York Bar No.: 1769470
1000 Jackson Street

Toledo, OH  43604
(419) 241-9000
Primary:  psilverman@shumaker.com
Secondary:  anyers@shumaker.com
Attorneys for Plaintiffs

*Counsel for Plaintiffs*

EXHIBIT A

## CERTIFICATE OF SERVICE

I hereby certify that on _____, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

By: _/s/_ _____._____
                    *Counsel for Plaintiffs*

EXHIBIT A

# EXHIBIT 1

Cynosure, Inc.
5 Carlisle Rd
Westford, MA 01886
T: 800-886-2966
F: 978-349-7443

Terms
Prices are FCA, Westford, MA Incoterms 2000 in U.S. dollars
Payment Terms: 15% non-refundable deposit required with purchase order.
        Balance due next 30 days with prior credit approval.  (VISA/Mastercharge/American Express accepted.)
        Payment is not contingent upon installation and/or acceptance.
        1.5% interest due monthly on overdue balances.
**All Sales are final.  Cynosure Grants no right of return.**

*Due to continuing improvements, prices and specifications are subject to change without notice.*

*Cynosure reserves and the Customer grants to us, a security interest in all Products sold and all proceeds to secure the full payment.*

**Warranty Information**

**Return Goods Authorization Service**
Product, damaged or otherwise, will not be accepted by return shipments without prior approval from Cynosure's Customer Service Department.  Authorization for return is at the sole discretion of Cynosure.  All returned Product must be accompanied by a RETURN MATERIALS AUTHORIZATION number issued by Cynosure.

**SculpSure® Workstation Warranty**
Cynosure warrants to the original purchaser of the Product, including applicators, that the Product is free from defects in materials and workmanship, under normal use and service, for a period of twelve (12) months from the date of shipment ("SculpSure Product Warranty").  Product consumables and accessories such as water filters, attachment frames, belts, and headgear are warranted for a period of thirty (30) days from the date of shipment.  Replacement parts other than the items stated above that are purchased outside of this SculpSure Product Warranty are warranted for a period of thirty (30) days from the date of shipment.
**PAC Key Warranty**
The warranty period for the PAC Key for use  with the Product  shall be for the useful life of the individual key (i.e., the remaining number of PAC treatment applications), which period shall begin on the date Cynosure ships the applicable PAC Keys to Customer (the "PAC Key Warranty Period").  Cynosure warrants to Customer during the PAC Key Warranty Period that the applicable PAC Keys will be free from defects in materials and workmanship and will substantially conform to Cynosure's written specifications applicable to the PAC Keys as such specifications exist on the date of shipment.

Cynosure is an Equal Opportunity Employer.

THE OBLIGATIONS OF CYNOSURE UNDER THIS WARRANTY ARE LIMITED, IN ITS EXCLUSIVE OPTION, TO REPAIR OR REPLACE PARTS AND MATERIALS WHICH PROVE TO BE DEFECTIVE.

These Warranties are null and void a) where the Product is unpacked, installed, serviced, and/or repaired by person(s) other than an authorized Cynosure service representative; b) where service is required due to the Customer's failure to operate an maintain the Product in an manner consistent with the specifications and guidelines set forth in the Product's operator manual; and/or c) where service is required due to attempted or actual dismantling, disassembling, alteration, and/or modification of the Product by person(s) other than an authorized Cynosure service representative.

Additional services, including, but not limited to telephone support, repair, maintenance, and refurbishment of equipment, may be purchased.

THE FOREGOING WARRANTIES ARE THE SOLE AND EXCLUSIVE WARRANTY OBLIGATIONS OF CYNOSURE, AND THE REMEDY PROVIDED ABOVE IS IN LIEU OF ANY AND ALL OTHER REMEDIES.  THERE ARE NO OTHER AGREEMENTS, GUARANTEES, OR WARRANTIES, ORAL, WRITTEN, EXPRESSED, IMPLIED, OR STATUTORY, INCLUDING, WITHOUT LIMITATION, WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. CYNOSURE SHALL NOT BE LIABLE FOR LOST PROFITS OR ANY INDIRECT, INCIDENTAL, SPECIAL, PUNITIVE OR CONSEQUENTIAL DAMAGES DUE TO ANY CAUSE WHATSOEVER EVEN IF ADVISED AS TO THE POSSIBILITY OF SUCH DAMAGES. THE CUSTOMER AGREES THAT CYNOSURE'S LIABILITY IS SO LIMITED.

This Agreement shall be governed by and construed under the substantive laws of the Commonwealth of Massachusetts.  The Customer agrees to submit all disputes arising out of, or relating to, this Agreement to a court in Boston, Massachusetts.

AUTHORIZED USE
Use of the Product is permitted only for individuals who are: (i) authorized to treat patients, as defined by the applicable state medical review board in the jurisdiction in which the Product is operated; or, (ii) under the supervision of such licensed physicians.
The Customer is responsible to ensure that all operators have the requisite skill required to use the Products as defined by the applicable state medical review board in the jurisdiction in which the Product is operated. Customer will, at all times, ensure that it and its employees and agents are and remain in full compliance with all federal, state, and local laws and statutes, including without limitation state medical agencies and certification boards, relating to this Agreement or the Product or their use.

The Customer acknowledges that proper operation of the Product requires use of supplies specifically engineered to meet Cynosure's compatibility, quality and performance standards.  Accordingly, the Customer Agrees to use only supplies provided by or expressly authorized by Cynosure and never to buy supplies from any other supplier for use with the Product.  Customer use of supplies not provided or expressly authorized by Cynosure will void all warranties and extended warranties on the Product.
All future PAC Key purchased by Customer must be used in the purchased Product or other SculpSure laser systems purchased by Customer and may not be transferred to a third party for use in another SculpSure laser system.

Upon completion of training, Customer shall become an authorized provider of Cynosure products and authorized in connection therewith to use the Cynosure trademarks solely in its promotion and delivery of services utilizing Cynosure products, and in accordance with any guidelines provided by Cynosure. However, Cynosure strictly prohibits Customers from purchase and/or use of internet domain(s) consisting of or incorporating any of the Cynosure trademarks. Customer agrees not to purchase and/or use internet domain(s) consisting of or incorporating any of the Customer trademarks. Customer acknowledges Cynosure's exclusive ownership of the Cynosure trademarks and that its use thereof inures solely to Cynosure's benefit. Customer shall not attempt to obtain registration of any Cynosure trademark, and shall not debrand, rebrand or private label any Cynosure product or service.

TERMINATION OF USE

Customer acknowledges that its use of the Product (including the Software) is subject to compliance with the usage and other requirements described in this Agreement (including, without limitation, the "Authorized Use" provisions above). Customer's authorization to operate the Product and license to the software will terminate automatically in the event Customer fails to comply with such requirements. In such event, in addition to any other remedies available to Cynosure under applicable law, Customer expressly agrees that Cynosure will have the right to cease selling Products to the Customer, including but not limited to SculpSure Drives, supplies and consumables.

DATA COLLECTION
Cynosure reserves the right to collect system usage data from time to time for the purpose of running diagnostics and improving usability and performance of the Product. Data collected will not contain any patient identification information.

# EXHIBIT A

*727 424 3402*

*Caverill@StFrancismed ___*

**Customer Purchase Agreement**

Date: _____

## CUSTOMER INFORMATION

| | |
|---|---|
| Customer Name: | Ultimate Ship To: |
| Contact Person: | |
| Address: | |
| City/State/Zip: | Telephone/Fax: |
| Telephone/Fax: | |

| PRODUCT DESCRIPTION | QTY | Unit Price (in USD) | Total Price (in USD) |
|---|---|---|---|
| **SCULPSURE® NON-INVASIVE BODY CONTOURING PLATFORM**<br>1060nm wavelength, 240W maximum power.  Complete with on-site installation & 2 day clinical in-service, and one (1) year equipment warranty.  System includes:<br>• 4 ea Laser Diode Applicators<br>• 1 Body wearables kit with attachment frames & belts<br>• Photo Positioning Mat and Backdrop<br>• 2 Bottles Lux Lotion<br>• 1 Patented Applicator for Contouring (PAC) key with 50 body PACs for clinical training<br>• Two Component Pager System (transmitter & pager) for non-emergency patient communication to the treatment staff<br>Freight | 1 | $220,750 | $220,750 |

*APP included*

*2 Years Parhard P... Included*

*5K Marketing Rebate*

**Marketing Package:** Printed and electronic marketing material support including: product brochures, print-ready files, web and media files, before and after photos.

**\*** Commencing 120 calendar days from the SculpSure clinical in-service date, a minimum purchase of 2 PAC Key per 90 days thereafter will need to be maintained along with compliance with Cynosure's Minimum Advertised Pricing (MAP) Policy in order to qualify for the discounted pricing ($3500 for body PAC Keys & $3750 for submental PAC KEYs).

*205,750*

**Quoted Price Valid for 30 days from above date.  Prices do not include sales, duty or excise taxes, including medical device excise taxes which are the responsibility of the Customer to pay and will be billed separately.**

| | $ 205,750.00 |
|---|---|

## ACCEPTANCE OF AGREEMENT

By signing below, the Customer (i) is representing to Cynosure, Inc. ("Cynosure") that it has the requisite corporate authority to execute and deliver this Customer Purchase Agreement ("Agreement") and has the required licensing from the applicable state medical review board to operate the Product purchased by this Agreement, and (ii) is entering into a binding agreement for the purchase of the Product and/or services described above and accepts all of the terms and conditions as stated in this document (including the following page(s)), and (iii) hereby acknowledges receipt and understands the content of the Cynosure Minimum Advertised Price Policy.  This Agreement is subject to Cynosure's terms and conditions of sale contained or referred to herein and the Customer expressly disclaims any additional and/or different terms and conditions or any terms and conditions on the Customer's purchase order.  Federal law restricts the sale of the products to a licensed practitioner.

| _____ 6/26/19 | _____ |
|---|---|
| Customer Signature (Authorized Representative) / Date | Cynosure Area Sales Manager Signature / Date |

**Delivery Date:** [_____]

934-SM03-004, Rev. E

*murphy    352-812-____*
*murphy    352-___-1773*

EXHIBIT A

Cynosure, Inc.
5 Carlisle Road
Westford, MA 01886
T: 800-886-2966
F: 855-282-1051

Terms

Prices are FCA, Hicksville, NY Incoterms 2000 in U.S. dollars

Payment Terms:      15% non-refundable deposit required with purchase order.
                    Balance due net 30 days with prior credit approval. (VISA/Mastercharge/American Express accepted.;
                    Payment is not contingent upon installation and/or acceptance.
                    1.5% interest due monthly on overdue balances.

**All Sales are final. Cynosure Grants no right of return.**

*Due to continuing improvements, prices and specifications are subject to change without notice.*

***Cynosure reserves and the Customer grants to us, a security interest in all Products sold and all proceeds to secure the full payment.***

*Warranty Information*

**Return Goods Authorization Service**

Product, damaged or otherwise, will not be accepted by return shipments without prior approval from Cynosure's Customer Service Department. Authorization for return is at the sole discretion of Cynosure. All returned Product must be accompanied by a RETURN MATERIALS AUTHORIZATION number issued by Cynosure.

**TempSure® RF System Warranty**

Cynosure, Inc., warrants to the original purchaser of any new generator system, except for generator consumable/accessories, that the equipment is free from defects in materials and workmanship, under normal use and service, for a period of twelve (12) months from the date of installation.    Generator consumables and accessories, handpieces, electrodes, forceps, probes and any additional replacement parts not stated are excluded from the warranty.

**TempSure® Envi & TempSure Firm Handpiece Warranty**

Cynosure, Inc., warrants that the TempSure Envi & TempSure Firm handpieces are free from defect for a period of 30 days or 25 hours of use, whichever comes first. All other parts of the device are covered for the remainder of the original warranty. When the TempSure Envi & TempSure Firm handpieces have exceeded 25 hours of use, they are considered consumed items to be replaced. Customer must contact Cynosure to purchase a replacement. Cynosure will remit a prorated credit to the original purchaser in the event of handpiece failure before expiration of the warranty period. The amount of credit will be based on the number of hours or the number of days remaining under the warranty period, whichever is less.

**TempSure® Vitalia Handpiece Warranty**

Cynosure, Inc., warrants that the TempSure Vitalia handpiece is free from defect for a period of 30 days or 100 uses, whichever comes first. All other parts of the device are covered for the remainder of the original warranty. When the TempSure Vitalia handpiece has exceeded 100 uses, it is considered consumed items to be replaced.  Customer must contact Cynosure to purchase a replacement. Cynosure will remit a prorated credit to the original purchaser in the event of handpiece failure before expiration of the warranty period. The amount of credit will be based on the number of uses or days remaining under the warranty period, whichever is less.

Cynosure is an Equal Opportunity Employer.

THE OBLIGATIONS OF CYNOSURE UNDER THIS WARRANTY ARE LIMITED, IN ITS EXCLUSIVE OPTION, TO REPAIR OR REPLACE PARTS AND MATERIALS WHICH PROVE TO BE DEFECTIVE.

These warranties are null and void a) where the Product is unpacked, installed, serviced, and/or repaired by person(s) other than an authorized Cynosure service representative; b) where service is required due to the Customer's failure to operate or maintain the Product in a manner consistent with the specifications and guidelines set forth in the Product's operator manual; and/or c) where service is required due to attempted or actual dismantling, disassembling, alteration, and/or modification of the Product by person(s) other than an authorized Cynosure service representative.

Additional services, including, but not limited to telephone support, repair, maintenance, and refurbishment of equipment, may be purchased.

THE FOREGOING WARRANTIES ARE THE SOLE AND EXCLUSIVE WARRANTY OBLIGATIONS OF CYNOSURE, AND THE REMEDY PROVIDED ABOVE IS IN LIEU OF ANY AND ALL OTHER REMEDIES. THERE ARE NO OTHER AGREEMENTS, GUARANTEES, OR WARRANTIES, ORAL, WRITTEN, EXPRESSED, IMPLIED, OR STATUTORY, INCLUDING, WITHOUT LIMITATION, WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. CYNOSURE SHALL NOT BE LIABLE FOR LOST PROFITS OR ANY INDIRECT, INCIDENTAL, SPECIAL, PUNITIVE OR CONSEQUENTIAL DAMAGES DUE TO ANY CAUSE WHATSOEVER EVEN IF ADVISED AS TO THE POSSIBILITY OF SUCH DAMAGES. THE CUSTOMER AGREES THAT CYNOSURE'S LIABILITY IS SO LIMITED.

This Agreement shall be governed by and construed under the substantive laws of the Commonwealth of Massachusetts. The Customer agrees to submit all disputes arising out of, or relating to, this Agreement to a court in Boston, Massachusetts.

AUTHORIZED USE

Use of the Product is permitted only for individuals who are: (i) authorized to treat patients, as defined by the applicable state medical review board in the jurisdiction in which the Product is operated; or, (ii) under the supervision of such licensed physicians.

The Customer is responsible to ensure that all operators have the requisite skill required to use the Products as defined by the applicable state medical review board in the jurisdiction in which the Product is operated. Customer will, at all times, ensure that it and its employees and agents are and remain in full compliance with all federal, state, and local laws and statutes, including without limitation state medical agencies and certification boards, relating to this Agreement or the Product or their use.

The Customer acknowledges that proper operation of the Product requires use of supplies specifically engineered to meet Cynosure's compatibility, quality and performance standards. Accordingly, the Customer Agrees to use only supplies provided by or expressly authorized by Cynosure and never to buy supplies from any other supplier for use with the Product.   Customer use of supplies not provided or expressly authorized by Cynosure will void all warranties and extended warranties on the Product.

EXHIBIT A

Cynosure

5 Carlisle Road, Westford, MA 01886
Telephone: **978**-256-4200 · Fax: 978-349-7443

**Customer Purchase Agreement**                                Date:

CUSTOMER INFORMATION

| | |
|---|---|
| Customer Name: | Ultimate Ship To: |
| Contact Person: | |
| Address: | |
| City/State/Zip: | Telephone/Fax: |
| Telephone/Fax: | |

**PRODUCT DESCRIPTION**

| | Quantity | Unit Price (USD) | Total Price (USD) |
|---|---|---|---|
| **I. TempSure® RF Generator with:** | 1 | $180,750 | $180,750 |
| **A. TempSure Envi face & body application that includes:** | | | |
| · On-site installation & clinical in-service, and one (1) year equipment warranty | | | |
| · Footswitch and power cord | | | |
| · Cart | | | |
| · 5 Treatment Handpieces (10mm, 15mm, 20mm, 25mm, 30mm) - 25hr life each handpiece | | | |
| · 2 Massage Heads and Handpiece Adapter | | | |
| · 1 box (6 containers) treatment gel (8 oz/container) | | | |
| · 4 boxes disposable neutral pads (25 pads/box) | | | |
| · 1 Cosmetic Treatment Package (50 Micro-insulated Needles, 1 Surgical Handpiece, 50 Surgical Brochures) | | | |
| · TempSure Envi Practice Marketing Kit : Printed marketing material support including: patient pamphlets, AMPS post-sale marketing support materials, treatment pads. | | | |
| · Freight | | | |
| **B. TempSure® Vitalia small area treatment application includes:** | 1 | | |
| · 1 TempSureVitalia Smart Handpiece (100 uses) | | | |
| · 1 box Vitalia disposable 18mm probes (5/box) | | | |
| · 1 (8 oz) container treatment gel | | | |
| · 1 box disposable plastic sleeves (25/box) | | | |
| · 1 Box of Neutral Pads (25/box) | | | |
| · 1 single-use Vitalia enable USB key | | | |
| · TempSure Vitalia Practice Marketing Kit : Printed marketing material support including: patient pamphlets, AMPS post-sale marketing support materials. | | | |

*10K Marketing*

*140,750*

Quoted Price Valid for 30 days from above date. Prices do not include sales, duty or excise taxes, including medical device taxes which are the responsibility of the Customer to pay and will be billed separately.                                                                           $180,750

**ACCEPTANCE OF AGREEMENT**

By signing below, the Customer (i) is representing to Cynosure, Inc. ("Cynosure") that it has the requisite corporate authority to execute and deliver this Customer Purchase Agreement ("Agreement") and has the required licensing from the applicable state medical review board to operate the Product purchased by this Agreement, and (ii) is entering into a binding agreement for the purchase of the Product and/or services described above and accepts all of the terms and conditions as stated in this document (including the following page(s)). This Agreement is subject to Cynosure's terms and conditions of sale contained or referred to herein and the Customer expressly disclaims any additional and/or different terms and conditions or any terms and conditions on the Customer's purchase order. Federal law restricts the sale of the products to a licensed practitioner.

| | |
|---|---|
| *Jose Avec M* 6-25-19 | |
| **Customer Signature (Authorized Representative)**          Date | **Cynosure Area Sales Manager Signature**                     Date |
| Delivery Date: | 934-SM03-004, Rev. E |

EXHIBIT A

# EXHIBIT 2



"We have been
working with the rock
star team at MMP
Capital for years. These
guys are fantastic. As an

By using this website, you agree to our use of cookies to provide you with a great experience and to help our website
run effectively.

OK

EXHIBIT A



gets the job done, is a crucial ingredient to our success. Look no further, these guys are the best!!"

— SCOTT, PRESIDENT - IRVINE,

CA

"JP and his entire team have been the reason why I have been able to advance my practice, increase my practice revenue, and not feel

By using this website, you agree to our use of cookies to provide you with a great experience and to help our website run effectively.

OK

EXHIBIT A



responsive and informative, but I can contact them at any point and know that I have the support I need for my business. The best part about it all is that they make it work for whatever your financial situation is at the moment. I have worked with a few financial institutions and I inevitably came back to only give them by business because they cant be surpassed in dedication, intelligence,

By using this website, you agree to our use of cookies to provide you with a great experience and to help our website run effectively.

OK

EXHIBIT A




colleagues and friends!"

— MIRA, FREEHOLD, NJ

"I use Mike McCaffrey and MMP Capital to finance all my equipment. They are fast, reliable and get me great rates!"

— CHUCK SMITH, PRESIDENT -

BALL GROUND, GA

By using this website, you agree to our use of cookies to provide you with a great experience and to help our website run effectively.

OK

EXHIBIT A



"My experience in working with MMP Capital has been nothing short of excellent. The customer service they provide and the trust I have in them makes all the difference compared with other equipment leasing companies. In particular, I enjoyed working with Jim Siederman, who truly seems to have my best interest at heart. Jim has always worked hard to meet my capital needs.

By using this website, you agree to our use of cookies to provide you with a great experience and to help our website run effectively.

OK

EXHIBIT A



extra mile in finding
creative programs
tailored for us. Its great
to have a a partner like
Jim and MMP Capital. I
cannot recommend
MMP Capital highly
enough."

— BILL RAMIREZ, VICE-

PRESIDENT - DALLAS, TX

"Working with MMP
Capital in one word
would be: Easy. These

By using this website, you agree to our use of cookies to provide you with a great experience and to help our website
run effectively.

OK

EXHIBIT A



deal done. Customer service is on point, and they work hard to get the client approved, regardless of their credit history. With all of the responsibilities us Sale Reps have on the floor as is, it is nice to work with a financial partner that can help take some of that work load away. I highly recommend giving MMP Capital a buzz next time you have a financing conversation with your client."

By using this website, you agree to our use of cookies to provide you with a great experience and to help our website run effectively.

OK

EXHIBIT A

 

S A R A S O T A ,   F L

"MMP Capital made my
Equipment Purchase
seamless and easy for
me."

—  N O R T H   P A R K   D E N T A L   P . C .

"My experience with MMP Capital
and particularly John Cipriano was

By using this website, you agree to our use of cookies to provide you with a great experience and to help our website run effectively.

OK

EXHIBIT A

 

experience. Efficient, effective, timely and with my best interest in mind. As we grow our business I am looking forward to working with John again in the near future. Thanks John!"

— DIAMOND CUT LAWNSCAPES





( 5 1 6 ) 4 5 4 - 4 5 7 0 • 1 9
E N G I N E E R S L N ,
F A R M I N G D A L E , N Y 1 1 7 3 5



By using this website, you agree to our use of cookies to provide you with a great experience and to help our website run effectively.

OK

EXHIBIT A

# EXHIBIT 3

| **From:** | Jack Gallagher |
| **Sent:** | Thursday, February 06, 2020 10:45 AM |
| **To:** | Rose Averill |
| **Subject:** | Hey |

Good Morning Dr. Averill,

     My name is Jack Gallagher and I'm your account manager here at MMP Capital. We're the ones that handled the financing for your SculpSure & TempSure workstations from CynoSure.  I was calling today to not only introduce myself and provide my contact information, but I also wanted to let you know that you're currently pre-approved for a $50,000.00 revolving line of credit. A lot of doctors take advantage of our line of credit program to ensure their investment as you only pay on what you borrow. If this is something you see value in, please give me a call.

     My job is not only to answer any and all questions pertaining to the financing but to also help you with any financing needs moving forward.  I want to be the only guy you call when you have any equipment purchases or working capital needs on the horizon.  I'm not your typical 9:00am – 5:00pm finance rep, I understand that you're busy running a practice so I will always make myself available including nights and weekends.

I'm excited for you and look forward to working together!

Thank you,
Jack



**Jack Gallagher**
Jr Account Executive

Apply Here
📞 (516) 262-3213      📱 (516) 655-4826
✉ jgallagher@mmpcapital.com      🖨 (516) 308-6967

"Today I will do what others won't, so tomorrow I can accomplish what others can't." - Jerry Rice

EXHIBIT A

| | |
|---|---|
| **From:** | Corey Aronoff |
| **Sent:** | Friday, June 19, 2020 1:30 PM |
| **To:** | Rose Averill |
| **Subject:** | Introduction |
| **Attachments:** | LOC Brochure.pdf; MMP Credit App - CAronoff.pdf; MMP + VIA Flyer (2).pdf |

Dear Dr. Averill,

My name is Corey Aronoff and I am your new account manager here at MMP Capital. I wanted to follow up and provide you with my contact information as I will be managing your account with us moving forward. We did the financing for your Cynosure equipment.

My job is to help you with all additional financing and working capital needs. I will be your direct contact for your existing agreement with us. My contact information is below and my personal cell is (516-660-0596).

Let me know when you are ready to look into your next equipment purchase.  Attached is our brochure for our Line of Credit Program. We can now offer 5-10 year term loans with a low monthly payment. In addition we have rolled out a new program that allows all insurance claims to be paid out the following day instead of waiting the normal 30-45 day period. I can get you approved in 48 hours.  I will need the following:

      - 6 months of business bank statements
      - Credit application ( I have attached an application, or you can fill out electronically by clicking "apply here" below)

Looking forward to working together!

Thank you,
Corey Aronoff



**Corey Aronoff**
Account Executive

Apply Here
📞 (516) 262-3426    📱 (516) 660-0596
✉ caronoff@mmpcapital.com    📠 (516) 308-6892

"Dont count the day; make the days count."
- Muhammad Ali

EXHIBIT A

# EXHIBIT 4

 

# About MMP Capital

MMP Capital was founded in 2013 with a mission to be the gold standard in equipment finance in the US. The ownership team has vast experience in sales, credit, and operations from several banks, leasing companies, and funding institutions. That diverse lending background has given MMP Capital a distinct advantage as a hybrid lender with it's ability to lend directly or utilize a vast syndication outlet. Our four pronged mission is to offer the best solutions to our employees, our customers, our vendor partners, and our key banking partners. Based on beautiful Long Island, MMP Capital is located 1 hour east from midtown Manhattan, and 1 hour west of the Hamptons. MMP Capital is not only the best place for all your financing needs, but is also a great place to start and build your career.

# Meet the Partners

EXHIBIT A

 

**Smolenski**



John-Paul M. Smolenski attended Purdue University, was nominated, and served as Captain of the Men's Track and Field Team in 2004-2005. Was Big Ten conference champion in 2005, an NCAA All American in 2005. Graduated with a Bachelors of Arts Degree in History, along with a Master's Degree in Educational Administration in 2006.

In 2007 Mr. Smolenski took the same principals of being an NCAA All American into the equipment finance industry, and took an entry level position at Direct Capital's new office on Long Island. After the recession of 2008, due to the economic turmoil from 2008- 2015 his time was invested in the financing of medical equipment. Spent 1 year as the East Coast Sales Manager at Baytree National Bank.

With the strong customer, vendor, and banking relationships that developed

EXHIBIT A



partnership of James Siederman, and Michael McCaffrey and their expertise in the printing, and direct to consumer business, MMP Capital was born. Since July of 2013 Mr. Smolenski has served as the President and CEO of MMP Capital.

When not at work, he is happily married to his beautiful wife, with 3 children, and an English bulldog. He is a member of the Brookville Country Club, as well as an active member at the Maria Regina parish.



### James Siederman

James Siederman is a proficient and proven Sr. Vice President with expertise in direct & indirect sales. Documented strength in pursuit of new business opportunities, client relationship management, channel partner relations, and negotiating. James is a



focus on relationship
building, sales
management and
operational
management.

After beginning his
career in 2007 at
Direct Capital he
partnered with John-
Paul Smolenski and
Mike McCaffrey to start
MMP Capital in August
of 2017. At Direct
Capital he regularly
exceeded goals
achieving 146% to plan
in 2008 and 200% to
plan in 2009. He and
his team members
launched a vendor
program strategy in the
commercial printing
space in 2010 that
ultimately resulted in
17MM of incremental
channel sales
companywide and has
been adopted since.
James utilizes past
success in areas such as
vendor program
management,
prospecting, new
business acquisition
and mentorship to build
exclusive lending
relationships and drive
sales. With over 12
years of experience in
the commercial printing
and direct to end user
finance industry James
understands what
drives business and
provides a tremendous



Economics from the University at Albany where he was also a member of the football program. North East Conference champions in 2002 & 2003. He is a devoted husband and proud father of 3 beautiful children. James enjoys sports and the opportunity to volunteer as the director of the local little league. He also coaches both basketball and football.

## Mike McCaffrey



Mike McCaffrey is an experienced Senior Vice President in the leasing industry. He is one of the founding partners of MMP Capital with Jim and John-Paul. In 2007, Mike graduated from University of Albany after being a member of the Football program. After graduation, he reconciled with his teammate, Jim, to get his start in the leasing

EXHIBIT A



name for himself in Graphics Arts industry providing leasing options for customers of all credit distinctions. Mike earned his stripes building Direct Capital's portfolio, consistently earning President's Club distinctions before joining a small broker company with John-Paul and Jim. Continuing to provide excellent service to both customers, leasing partners and vendors alike, John-Paul, Jim, and Mike formed MMP Capital in 2017.

Mike currently resides in Tampa, FL where he relishes golfing in the Winter as a member of the Feather Sound Country Club. In his spare time, Mike tries to travel as much as he can domestically and internationally. He always makes time for youth sports coaching basketball, baseball and football amidst his travels. An avid New York Giants fan, Mike is a season-ticket holder and doesn't miss a home game.

EXHIBIT A

  



Senior level equipment finance industry veteran skilled in operations and risk management, business planning, mergers and acquisitions, compliance and business development. 35 years of experience working with banks (Tokai Bank, Heartland Bank, Midland States Bank, State Bank), publicly traded specialty finance companies (Rockford Industries, Granite Financial) and private equity start-ups. Advanced degree from UCLA in Political Science and Government.





( 5 1 6 )  4 5 4 - 4 5 7 0  •  1 9
E N G I N E E R S  L N ,
F A R M I N G D A L E ,  N Y  1 1 7 3 5



EXHIBIT A

EXHIBIT A

# EXHIBIT 5



## EQUIPMENT ACCEPTANCE CERTIFICATE

| Customer Name | Customer Number | Transaction Number |
|---|---|---|
| ST. FRANCIS HOLDINGS, L.L.C. | | |

This certificate (the **Acceptance Certificate**) is entered into by the undersigned **Customer** (also **you** or **your**) in favor of **MMP Capital** (also **we**, **us** and **our**) in connection with the EFA, Lease, and/or other financing agreement identified by the Transaction Number above (the **Agreement**). Any defined term not otherwise described herein shall have the same meaning ascribed to it in the Agreement or the other documents related thereto.

> As of the Acceptance Date set forth below, you hereby confirm that (i) the equipment listed in the attached Schedule A (the **Equipment**) has been delivered to you, installed, and/or is operating as intended, (ii) you unconditionally and irrevocably accept such Equipment and (iii) you understand and agree to be responsible for, perform and comply with, all of the obligations, terms and conditions of the Agreement and related documents.

In connection with your acceptance of the Equipment, you acknowledge and agree to the following:

1. You selected the Equipment, accept it AS IS and WE MAKE NO EXPRESS OR IMPLIED WARRANTIES AS TO ITS MERCHANTABILITY AND/OR FITNESS FOR A PARTICULAR PURPOSE; you shall look only to the vendor/supplier of the Equipment (the **Vendor**) or manufacturer (not us) for any claim concerning the Equipment, which shall not relieve you from any obligations to us, including any payment obligations; and YOU HEREBY WAIVE AGAINST US, AND WE SHALL NOT BE LIABLE FOR ANY, CLAIM FOR LOSS, INJURY OR DAMAGE CAUSED BY THE EQUIPMENT, INCLUDING BUT NOT LIMITED TO, ALL SPECIAL, CONSEQUENTIAL, INCIDENTAL, PUNITIVE OR EXEMPLARY DAMAGES.

2. You selected any software included on and/or within the Equipment (collectively, the **Software**); you assume all liability related to any unauthorized access or use of the Software and any data collected, stored, used or accessed by the Equipment and/or Software (the **Data**); we do not own or license any Software or Data; and we have no duty to configure, maintain and/or otherwise safeguard the Software and/or Data.

3. Neither the Vendor nor any of its salespersons or other agents are agents of ours or are authorized to waive or modify any term or condition of this Acceptance Agreement, the Agreement and/or related documents. Any representation as to the Equipment or any other matter made by the Vendor shall not in any way affect your duty to make payments to us and perform all your other obligations as set forth in the Agreement or the other documents related thereto.

**Execution.** This document may be signed via digitally generated signatures and all signatures so generated, as well as those transmitted by facsimile, email, digital photography or other electronic means, shall for all purposes be deemed effective, binding, legally admissible and have the same effect as a manually applied ink signature.

ACCEPTANCE DATE: _26-June-2019_

CUSTOMER: ST. FRANCIS HOLDINGS, L.L.C.

ACCEPTED BY:

Signature:
Printed Name: Francis Averill
Title: Member

EXHIBIT A




# MMP CAPITAL

| Creditor ("we", "us" and "our"): MMP Capital<br>1061 N. Broadway, Suite B<br>Massapequa, NY 11758 | Debtor ("you" or "your"):<br>ST. FRANCIS HOLDINGS, L.L.C.<br>802 N BELCHER RD, CLEARWATER, FL 33765 |
|---|---|
| Equipment Supplier: CynoSure<br>5 Carlisle Rd., Westford, MA 01886 | Equipment Location:<br>802 N BELCHER RD, CLEARWATER, FL 33765 |

**Financed Equipment Description:** Tempsure Workstation
The Collateral as generally described above and herein which Creditor and Debtor agree that a more detailed description of said Collateral being financed shall be maintained by us among our books and records in whatever more detailed description of the Collateral being financed is received from the supplier of such Collateral and, absent manifest error, such detailed description shall be considered incorporated into this EFA and shall be provided to Debtor within a reasonable time upon request.

| Advanced Payment (if any): $ 99.00 | Monthly Installment Payment: 6 PAYMENTS @ $99.00; FOLLOWED BY 60 PAYMENTS @ $3,349.29 | Term: 66 (Mos.) |
|---|---|---|
| Documentation Fee (if any): $ 350.00 | | |

**Agreement.** Creditor agrees to lend to Debtor and you agree to borrower from us an amount for the financing of the Collateral. You authorize us to pay the supplier(s) for the Collateral. You authorize us to commence this EFA. You authorize us to insert or correct information in this EFA, including your proper legal name, address, serial numbers and any other information describing the Collateral. You acknowledge that the payment obligations hereunder have commenced notwithstanding that the Collateral may not been delivered, installed or accepted by you. Amounts received by us under this EFA shall be applied as we determine. Debtor promises to pay Creditor the Payments set forth above. Upon execution of this EFA, you will deliver to us the Advance Payment as set forth above, which you agree is non-refundable. To the extent permitted by law, we may charge you a fee not to exceed $350, plus any applicable sales/use tax, to cover documentation and credit investigation costs. Payments may be adjusted upward or downward no more than fifteen percent (15%) to reflect actual cost. The first Payment is due at the commencement of Creditor's applicable billing cycle as specified by the Creditor; each subsequent Payment is due on the same date of each preceding month until all Payments have been received by the Creditor. Each date a Payment is due is a "Due Date" and along with the Payment due on the first Due Date, Debtor agrees to pay us a prorated rent for an amount equal to 1/30th of the Payment amount for each day calculated from the date Creditor paid the vendor until the first Due Date (the "Prorated Rent"). The Prorated Rent shall be due upon execution of this EFA. Any amount not paid when due is subject to a late charge of the greater of fifty dollars ($50.00) or ten percent (10%) of such delinquent amount, but not more than the highest rate allowed by law. You acknowledge and agree that you shall bear sole responsibility for and shall have no claim against us and Lender shall have no liability in the event the Collateral is: (a) not delivered; (b) damaged during transit (c) not properly installed or functioning upon installation; (d) defective or otherwise fails to perform in accordance with Supplier's specifications; or (e) otherwise unacceptable to you for any other reason.

**Information; Credit Reports.** YOU AUTHORIZE US AND OUR ASSIGNEES TO OBTAIN CREDIT REPORTS AND MAKE CREDIT INQUIRIES AS WE DEEM NECESSARY. We will inform you upon request if we have sought a consumer credit report and the name and address of any credit reporting agency that provided a report. You agree that we may request and use additional credit reports to update our information without further notice to you as long as you have obligations under this Agreement. Upon our request, you agree to provide us with statements setting forth your financial condition and operations. You warrant that all information you have and will deliver to us, including the information in this Agreement, is true, accurate and correct and you acknowledge that we are relying on such information to enter into this Agreement.

**Grant of Security Interest.** You hereby grant us a perfected, first priority security interest in the Collateral, all accession and additions thereto, replacements or substitutions thereof, and all proceeds to secure all of your obligations under this EFA.

**Disclaimer of Warranties and Claims.** We make no representation or warranty to any matter whatsoever including the merchantability or fitness for particular purpose the Collateral. This EFA is irrevocable. **Your obligation to pay all amounts hereunder is non-cancellable, absolute, and unconditional and will not be subject to any reduction, setoff, defense, counterclaim, deferment or recoupment for any reason, even if the Collateral is damaged, destroyed or defective.** You acknowledge you selected the Collateral and the supplier and your supplier is not our agent, nor are they our agent. You acknowledge that no one, including the supplier, has been authorized to waiver or change any term or condition of this EFA. No representation by the supplier as to any matter shall bind us or affect your duty to pay all amounts and perform all obligations hereunder. You will use the Collateral for commercial purposes only, in compliance with the law and not for any personal, family or household use.

**Collateral.** You will not modify or change the location of the Collateral without our proper consent and allow us to inspect it upon our request. At your expense, you will maintain the Collateral in good operating condition and repair. You will keep the Collateral free and clear of all liens and encumbrances. Titled Collateral will be titled and/or registered as we direct. You are responsible for any damage or destruction to the Collateral. You will at our election repair the Collateral at your expense or pay to us all amounts then due and owing plus the total of all unpaid Payments for the Term, discounted at the lower of 3% or the then current discount rate of the Federal Reserve Bank of New York as calculated by us.

**Fees and Taxes.** You agree to pay when due and to hold us harmless from all taxes, interest and penalties relating to this EFA and the Collateral ("Taxes") and reimburse us for those Taxes we pay on your behalf. If we pay any of the above for you, you agree to reimburse us and pay us a processing fee for each payment we make on your behalf. In addition, you also agree to pay us any filing fees prescribed by the Uniform Commercial Code (UCC) or other law and reimburse us for all costs and expenses involved in documenting and servicing this transaction. You also acknowledge that in addition to the other obligations due under this EFA, we may assess and you may be required to pay additional taxes and/or fees including an invoice fee. Such fees may not only cover our costs, they may also include a profit.

**Insurance.** You agree to obtain and maintain at your expense property insurance for the full replacement value of the Equipment, protecting the Equipment against Loss, and liability insurance, in an amount acceptable to us, but in no event less than $500,000 covering any injury, death or third-party property damage arising out of or relating to use of the Equipment. If the Equipment that would be titled under title registration laws ("Mobile") then you shall obtain and maintain all risk physical damage insurance. All insurance policies must provide that no cancellation shall be effective without thirty (30) days' prior written notice to us. At our request, you agree to name any party who may have a security interest in the Equipment as Lender's Loss Payee. You agree to provide proof of insurance to us upon request. You hereby grant us a limited power of attorney allowing us to make a claim for, receive payment for, and endorse or execute for our benefit any instrument representing proceeds from any policy issued on the Equipment. IF YOU FAIL TO PROVIDE PROOF OF INSURANCE ACCEPTABLE TO US, WE HAVE THE RIGHT BUT NOT THE OBLIGATION TO SECURE INSURANCE IN SUCH FORM AND AMOUNT AS WE DEEM NECESSARY AND YOU AGREE THAT IN ADDITION TO INSURANCE PREMIUMS WE MAY CHARGE YOU INTEREST AT 25% PER MONTH AND/OR AN ADMINISTRATIVE FEE WHICH MAY RESULT IN A PROFIT TO US. YOU UNDERSTAND THAT IF WE PROCURE INSURANCE YOU MAY PAY MORE THAN IF YOU HAD PROCURED INSURANCE AND THE INSURANCE MAY NOT NAME YOU AS AN INSURED AND MAY NOT FULLY PROTECT YOU IN THE EVENT OF A LOSS. YOU AGREE THAT DISPUTES REGARDING INSURANCE OR FEES CHARGED FOR PROCURING INSURANCE WILL BE DETERMINED BY ARBITRATION CONDUCTED IN SEATTLE, WASHINGTON UNDER THE RULES OF THE AMERICAN ARBITRATION ASSOCIATION.

**Debtor Indemnification.** You hereby agree to defend, indemnify and hold us and our agents, successors, assignees and employees harmless from any and all liability, damage, penalty, claims, actions, expenses, disbursements or loss, including attorneys' fees and court costs, arising out of or relating to this EFA, including liabilities have been assessed hereunder, and the purchase, sale, financing, ownership, selection, installation, design, licensing, possession, operation, control, use, maintenance, servicing, repair, storage, shipment, transportation or delivery of the Collateral. The indemnities contained herein shall survive the expiration or other termination of this EFA.

**Default and Remedies.** If any one of the following occurs, you will be in default: (i) you fail to pay any amount under this EFA when due; (ii) you cease doing business, admit your inability to pay your debts, or you file or have filed against you a petition under the Bankruptcy Code; (iii) you breach any other obligation contained in this EFA; (iv) a writ or order of attachment or execution or other legal process is levied on or charged against the Collateral which is not released or satisfied within 10 days; or (v) any of the above events of default occur with respect to any guarantor. Upon your default, we may do any of the following: (a) terminate this EFA; (b) foreclose on our security interest and require you to immediately turn over the Collateral to us, or we may peaceably repossess the same without liability for trespass, and upon receipt of the Collateral, sell the Collateral at terms we determine at one or more private sales, and apply the net proceeds (after deducting any related expenses) to your payment obligations, and you will remain liable for any deficiency with any excess being retained by us; (c) declare all sums due and to become due hereunder immediately due and payable, all future Payments discounted at the lower of three percent (3%) or the then-current discount rate of the Federal Reserve Bank of New York as calculated by us; (d) sell, dispose of, hold, or lease the Collateral; (e) exercise any other right or remedy which may be available to us under applicable law. You shall reimburse us for all costs we incur in enforcing our rights (including our attorneys' fees) and costs of repossession, repair, storage and remarketing of the Collateral. A waiver of default will not be a waiver of any other subsequent default.

**General.** This EFA shall be governed and construed under the laws of the State of New York (NY), without reference to its principle of conflicts of laws and is deemed to have been performed in Nassau County, NY. You submit to the jurisdiction of NY and agree that the state and federal courts sitting in Nassau County, New York, shall have the exclusive jurisdiction over any action or proceeding to enforce this EFA or any action or proceeding arising under this EFA. You acknowledge the jurisdiction may change at the sole discretion of MMP Capital's successors and/or assigns. You waive any objection based upon improper venue and/or forum non-conveniens. You irrevocably grant us the right to make such filings under the UCC as we deem necessary. In addition to any late charges described herein, you agree to pay us interest on all past due amounts at the lower of 1.5% per month or the highest rate allowed by law. You will not assign your rights under this EFA, or permit the Collateral to be used by anyone but you. We may assign this EFA, in whole or in part, without notice to you or your consent. You agree that our assignee will have the same rights and benefits that we have now, but will not be subject to any claims, defenses or set offs that you may have against us. This EFA sets forth the entire understanding of the parties with respect to its subject matter and may only be amended in writing signed by both parties, except as otherwise stated in the section above titled "Agreement." You represent and warrant to us that (i) this EFA constitutes a legal, valid, and binding obligation, enforceable against you in accordance with its terms; (ii) you have the ability to perform all of your obligations under this EFA; and (iii) all information conveyed to us in connection with this EFA and all related documents whether by you, a guarantor, a supplier or any other person, is true, accurate, complete and not misleading. This EFA may be executed in separate counterparts, which together shall be the same instrument. You agree this EFA may be signed electronically pursuant to the Electronic Signatures in Global and National Commerce Act and other applicable law. All fees may not only cover our costs but may include a profit. As long as you are not in default under this EFA, you may repay this EFA by paying an amount equal to the sum of any and all remaining Payments and any and all other fees currently due and payable. If Debtor constitutes more than one person, the liability of each shall be joint and several. A copy of this EFA (whether delivered by facsimile, in portable document format (PDF) or otherwise) shall be deemed an original for all purposes. Any notice given hereunder shall be in writing and deemed given two business days after being deposited with the US Postal Service, first class postage prepaid, and addressed to the Debtor or Creditor (as the case may be) at its address set for above, or such other address given to the sender by written notice. MMP Capital Inc is a registered New York corporation. Each party waives any right to a jury trial.

EXHIBIT A



By signing below, Debtor hereby irrevocably accepts the Collateral under the EFA and irrevocably authorizes Creditor to pay the supplier on behalf of the Debtor. The person executing this EFA is authorized to do so, making this EFA the valid binding act of the Debtor.

| Debtor: ST. FRANCIS HOLDINGS, L.L.C. | | Accepted by MMP Capital | |
|---|---|---|---|
| By: | | By: | |
| Print Name: Francis Averill | | Print Name: JOHN-PAUL SMOLENSKI | |
| Title: Member | Date: | Title: PRESIDENT | |
| Debtor Tax ID: 42-1711873 | | Date: | |

**GUARANTY:** In consideration of Creditor entering into the EFA, the undersigned, together and separately, unconditionally, personally and irrevocably guarantee to Creditor the prompt payment and performance of all Debtor's obligations under the EFA. You agree that this is a guaranty of payment, not collection, and that Creditor can proceed directly against you without first proceeding against Creditor or the Collateral. You waive notice of acceptance, acceleration and default and all defenses, including protest, presentment and demand. Creditor may renew, extend or otherwise change the terms of the EFA without notice to you and you will be bound by such changes, and you will pay all of Creditor's costs of enforcement and collection, including reasonable attorneys' fees. This Guaranty is binding on your heirs, administrators, representatives, successors and assigns and survives the insolvency, bankruptcy or discharge from bankruptcy of Debtor. THIS GUARANTY WILL BE GOVERNED BY NEW YORK LAW. YOU AGREE TO JURISDICTION AND VENUE IN THE STATE AND FEDERAL COURTS AS SET FORTH IN THE EFA.

| Guarantor's Signature: | Print Name: Francis Averill | Date: |
|---|---|---|
| Guarantor's Signature: | Print Name: | Date: |

**AUTHORIZATION FOR ACH PAYMENTS:** Debtor hereby authorizes and requests MMP CAPITAL ("Creditor"), and/or its successors or assigns, to initiate electronic debit entries or effect a change by any other commercially accepted practice, to the account indicated below, and hereby authorize the named below financial institution ("Bank") to honor the debit entries initiated by Creditor or its assignee and debit the same to such account. This authorization is to remain in full force and effect until such time that Creditor has received written notification from Debtor of its termination in such time and in such manner as to afford Creditor and the Bank a reasonable opportunity to act on same. Debtor understands that the withdrawal of this authorization without the written consent of Creditor shall constitute default of the Equipment Finance Agreement for which this payment is being made.

| Debtor Bank Name: | | Bank Phone #: ( ) | | |
|---|---|---|---|---|
| Address: | | City: | State: | Zip: |
| Name on Account: | | ABA #: | Bank Account #: | |
| By: | Print Name: Francis Averill | | Title: Member | Date: |

### PLEASE COMPLETE THE BELOW STATEMENT OF AUTHORITY IF APPLICABLE.

#### CORPORATE OR LIMITED LIABILITY COMPANY STATEMENT OF AUTHORITY

This Statement of Authority is executed pursuant to the Business Corporations Act or Limited Liability Company Act (as the case may be) of the state of _____ FL _____
Regarding ST. FRANCIS HOLDINGS, L.L.C. (the "Company") (the "Company").

The following persons are the Directors or Officers of the Company or Members, Managers or Officers of the Company (as the case may be) and have full power and authority to act on behalf of the Company and execute all instruments on behalf of the Company and to any contract, including, but not limited to, this Equipment Finance Agreement.

| Print Name | Title | Signature |
|---|---|---|
| Francis Averill | Member | |
| | | |

The authority of the foregoing persons to bind the Company is not limited.

Executed this ____ day of _____, 20____

| By: | Print Name: Francis Averill | Title: Member |
|---|---|---|

## EXHIBIT A

# EXHIBIT 6

| | |
|---|---|
| **From:** | John-Paul M. Smolenski |
| **Sent:** | Wednesday, August 14, 2019 8:46 PM |
| **To:** | Frank Averill; Rose Averill |
| **Cc:** | John-Paul M. Smolenski |
| **Subject:** | Notice of Cancellation with Cynosure and MMP Capital |
| **Attachments:** | Legal Letter - Dr. Francis Averill.pdf |

Good evening Rose and Dr. Averill,

We received this letter from you in the mail on Monday asking to cancel the purchase, and financing of the Icon & Picosure workstations that you were looking to purchase from Cynosure. We have cancelled these purchases, and financing there of accordingly. I am reaching out to you via email to make sure you are fully aware that the 2 machines (Sculpsure & Tempsure) that you purchased in July from Cynosure, are both funded and non-cancellable. The Sculpsure Workstation was financed with our key banking partner, Pawnee Leasing. The Tempsure workstation was financed with another of our key banking partners, Amur Equipment Finance. The monthly payments will be drafted from your bank account respective to the payment date, and amount. Please let me know if there is anything else I can do to help provide clarity for you.

Thank you,
JP



EXHIBIT A

| **From:** | Jack Gallagher |
| **Sent:** | Wednesday, May 20, 2020 4:30 PM |
| **To:** | Rose Averill |
| **Subject:** | MMP Capital |

Good Afternoon,

My name is Jack Gallagher and I am your account manager here at MMP Capital, finance partners for CynoSure. I was calling today because we received a notice from Amur bank that you are currently behind on payments so I wanted to reach out to see what was going on and understand the situation and see if there is anything we can do to help. Please give me a call back whenever you get a chance and the contact information listed below. Thank you!

Jack,



**Jack Gallagher**
Jr Account Executive

Apply Here
(516) 262-3213       (516) 655-4826
jgallagher@mmpcapital.com       (516) 308-6967

"Today I will do what others won't, so tomorrow I can accomplish what others can't." - Jerry Rice

EXHIBIT A

# EXHIBIT 7

# ASSIGNMENT

THIS ASSIGNMENT (this "Assignment") is entered into as of the _____7/16/2019_____ , by **MMP CAPITAL INC a New York Corporation** ("Assignor"), in favor of AMUR EQUIPMENT FINANCE, INC. ("AMUR EQUIPMENT FINANCE, INC. "), a Nebraska corporation.

## Recitals

Assignor and AMUR EQUIPMENT FINANCE, INC. are parties to that certain Master Discounting Agreement dated as of 1/16/2019 (the "Master Agreement"), pursuant to which Assignor's right, title and interest in lease agreements, equipment finance agreements, secured loan agreements ("Contracts") entered into from time to time by Assignor with Assignor's customers and rights to the personal property acquired by or leased by such customers pursuant to Leases ("Collateral") may be assigned and conveyed to AMUR EQUIPMENT FINANCE, INC. pursuant to the terms and conditions of the Master Agreement and Assignments entered into pursuant thereto such as this Assignment.

Assignor desires to assign to AMUR EQUIPMENT FINANCE, INC. and AMUR EQUIPMENT FINANCE, INC. desires to acquire from Assignor the Payments, as hereinafter defined, due from the Lessee under that certain Lease Agreement, Lease ▮▮3658 ("Assigned Contract") between Assignor as Lessor and ST. FRANCIS HOLDINGS, L.L.C. as Lessee ("Obligor") The Assigned Contract is a True Lease as defined in the Master Agreement but Assignor is not making an absolute assignment of Assignor's right, title and interest therein but only a collateral assignment of such right, title and interest as hereinafter provided. Assignor hereby sells, assigns and transfers to AMUR EQUIPMENT FINANCE, INC. the Payments and assigns its other rights in the Assigned Contract pursuant to the following.

NOW, THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1. _____Definitions._ Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to such terms in the Master Agreement.

2. _____Assignment and Assumption._ Effective as of the date hereof, and in accordance with the terms and conditions of the Master Agreement (which are incorporated herein by this reference) and this Assignment, Assignor hereby irrevocably and unconditionally assigns, sells and transfers to AMUR EQUIPMENT FINANCE, INC. and its successors and assigns _66_ payments of Monthly Rent [the foregoing could change with each deal] as defined in the Assigned Contract each in the amount of ___6 PAYMENTS @ $99.00; FOLLOWED BY 60 PAYMENTS @ $3,349.29___ ("Payments") commencing with the Payment due and owing by the Obligor on _8/1/19_ (date), and Assignor's right to receive the same, as and when such Payments are payable by the Obligor under the terms of the Assigned Contract, together with any and all damages, late charges, indemnification payments, insurance payments, condemnation awards, payments arising out of the Loss or Damage of the Equipment[the foregoing could change with each deal] as defined in the Assigned Contract, proceeds arising out of the sale or other disposition of the Equipment, interest and reimbursements and any other sum payable or realized under the terms of the Assigned Contact arising out of (a) the loss or destruction of the Equipment, or (b) the late payment or non-payment of the Payments or other breach of the Assigned Contract by Lessee ("Assigned Interest"), Assignor acknowledges that AMUR EQUIPMENT FINANCE, INC. has not assumed and shall not be bound to perform any duty or obligation of Assignor under the Assigned Contract which Assignor shall be and remain responsible for and liable to perform. Assignor acknowledges and agrees that its rights in and to the Assigned Contract and the Equipment are subject and subordinate in all respects to those of AMUR EQUIPMENT FINANCE, INC. .

3. _____Grant of Security Interest._ To secure the obligations of (a) the Obligor under the Assigned Contract, including, without limitation its obligation to make the Payments and other amounts specified as part of the Assigned Interest, and (b) the obligations of Assignor under this Assignment, Assignor hereby: collaterally assigns and hereby grants in favor of AMUR EQUIPMENT FINANCE, INC. a first priority perfected lien and security interest in (i) Assignor's entire right, title, interest and remedies in and to the Assigned Contract (including all schedules, riders, exhibits, addenda, amendments, supplements to the Assigned Contract) and any other related documents including, without limitation, guarantees and other credit enhancements); and (ii) the Equipment as defined in the Assigned Contract, and any proceeds of the foregoing. By its execution below, AMUR EQUIPMENT FINANCE, INC. hereby purchases and assumes the Payments and the Assigned Interest.

4. _____Rights of AMUR EQUIPMENT FINANCE, INC. ._ Until such time as AMUR EQUIPMENT FINANCE, INC. has received all of the Payments in full together with all payments specified and in and constituting the Assigned Interest in the event of the late payment or non-payment of the Payments, AMUR EQUIPMENT FINANCE, INC. shall have and enjoy (a) all of the rights of a secured party under the Uniform Commercial Code and (b) the rights of Assignor under the Assigned Contract and Assignor shall exercise any such rights only with the prior written consent of AMUR EQUIPMENT FINANCE, INC. . Without limiting the generality of the foregoing, AMUR EQUIPMENT FINANCE, INC. shall have the right to (i) collect, compromise and release any and all Payments and other monies payable under the Assigned Contract, (ii) deal with the Assigned Contract, any related documents and the Equipment in such a manner as Assignor could have in the absence of this Assignment and at such times as AMUR EQUIPMENT FINANCE, INC. shall, in its sole discretion deem advisable, (iii) and take all legal or other proceedings which Assignor could have taken with respect to the Assigned Contract and related documents, including, without limitation the enforcement of rights and remedies under the Assigned Contract following an event of default thereunder. No exercise of the foregoing rights by AMUR EQUIPMENT FINANCE, INC. shall relieve Assignor of its obligation to perform its obligations under the Assigned Contract or its indemnification obligations to AMUR EQUIPMENT FINANCE, INC. set forth below and in the Master Agreement. Assignor shall authorize and irrevocably direct the Lessee under the Assigned Contract to make all Payments and other sums due from time to time under the Assigned Contract to or at the direction of AMUR EQUIPMENT FINANCE, INC. .

5. _____Indemnification by Assignor._ In addition to any other indemnification obligation of Assignor, Assignor shall indemnify, defend and hold AMUR EQUIPMENT FINANCE, INC. harmless against any loss, liability, damages, cost or expense (including, without limitation, reasonable attorneys' fees) incurred by AMUR EQUIPMENT FINANCE, INC. by reason of or arising out of any breach by Assignor of its obligations set forth in this Assignment or the Assigned Contract or any related document.

6. _____Release of Lien._ If and only if: (a) Obligor has indefeasibly paid to AMUR EQUIPMENT FINANCE, INC. all of the Payments in accordance with the provisions of the Assigned Contact, and (b) the Obligor is not then in default or in breach of any of its obligations under the Assigned Contract, AMUR EQUIPMENT FINANCE, INC. shall at the request of Assignor release its lien on the Assigned Contract, any related document and the Equipment and execute such documents as may be reasonably requested by Assignor to evidence such release.

EXHIBIT A

7.     Transfer. To facilitate the transfer provided by this Assignment, AMUR EQUIPMENT FINANCE, INC. shall have the right to endorse in its name or in the name of Assignor, and to deposit in any AMUR EQUIPMENT FINANCE, INC. account, all checks and drafts for payment made by Lessee or any guarantor under the Assigned Contract or any related guaranty plus applicable taxes and fees. Assignor agrees to take such further action at its expense to effectuate the assignment of its right to receive the Payments and its interest in the Assigned Contract as may be requested by AMUR EQUIPMENT FINANCE, INC. from time to time.. Assignor hereby authorizes AMUR EQUIPMENT FINANCE, INC. to execute and file all financing statements, title applications, registrations and any and all other documents deemed by AMUR EQUIPMENT FINANCE, INC. as necessary or convenient to accomplish or evidence the transfer of the Assigned Interest set forth herein and perfect the security interest granted pursuant to Section 3 above and all instruments necessary to reflect the assignment of any existing financing statements or other documents covering the related Collateral in favor of Assignor. Assignor agrees that a photocopy of this Assignment is sufficient as a financing statement. AMUR EQUIPMENT FINANCE, INC. is hereby granted a power of attorney to sign Assignor's name on any financing statements or other documents referenced above as Assignor's true and lawful attorney. The foregoing power of attorney is coupled with an interest and is irrevocable.

8.     Successors and Assigns. This Assignment shall inure to the benefit of AMUR EQUIPMENT FINANCE, INC. and its successors and assigns.

IN WITNESS WHEREOF, Assignor has executed this Assignment by its duly authorized officer as of the date first above written.

**AMUR EQUIPMENT FINANCE, INC.**

By: _____

Name: _____

Title: _____

Date: _____

**MMP CAPITAL INC.**

By: _____

Name: _JOHN-PAUL SMOLINSKI_

Title: _PRESIDENT_

Date: _7/16/2019_

EXHIBIT A

# EXHIBIT 8

## UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
CSC    1-800-858-5294

B. E-MAIL CONTACT AT FILER (optional)
SPRFiling@cscglobal.com

C. SEND ACKNOWLEDGMENT TO:   (Name and Address)

1670 46836

CSC
801 Adlai Stevenson Drive
Springfield, IL 62703

Filed In: Florida
(S.O.S.)

FLORIDA SECURED TRANSACTION REGISTRY

**FILED**

**2019 Jul 17 10:25 AM**

****** 201909161215 ******

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME St. Francis Holdings, L.L.C. | | | |
|---|---|---|---|
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS 802 N Belcher Rd | CITY Clearwater | STATE FL  POSTAL CODE 33765 | COUNTRY USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE  POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME Amur Equipment Finance, Inc. | | | |
|---|---|---|---|
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS 308 N. Locust Street Suite 100 | CITY Grand Island | STATE NE  POSTAL CODE 68801 | COUNTRY USA |

4. COLLATERAL: This financing statement covers the following collateral:
Florida Documentary Stamp Tax is not required.
TempSure workstation with the Vitalia Upgrade SN TSRF00005173

The equipment financed under Contract 948659listed above, whether now owned or hereafter acquired, together with all personal property installed in, affixed to or used in connection therewith and all present or future: (i) additions, accessories, accessions, attachments, parts, supplies, related software, intellectual property, rights, licenses and improvements thereto; (ii) substitutions, renewals, replacements and purchase options thereof; (iii) insurance, warranty, and other third-party claims; (iv) Debtor's rights in connection with a third-party's use of such equipment under a sublease, rental or similar agreement; (v) proceeds and product in any form (including but not limited to insurance and sale proceeds) of each of the foregoing, whether it be cash, non-cash or in any other form; and (vi) to the extent the equipment identified herein is construed as or deemed inventory, that inventory and all accounts, accounts receivable, cash proceeds and all other proceeds related thereto or derived therefrom.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction   ☐ Manufactured-Home Transaction   ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien   ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor   ☐ Consignee/Consignor   ☐ Seller/Buyer   ☐ Bailee/Bailor   ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:

1670 46836

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

EXHIBIT A

# EXHIBIT 9



000044
ST. FRANCIS HOLDINGS, L.L.C.
802 N BELCHER RD
CLEARWATER FL 33765-2103

RECEIVED

AUG 0 6 2019

# EXHIBIT A

ADDR



EXHIBIT A

 *Equipment Finance*

ST. FRANCIS HOLDINGS, L.L.C.
802 N BELCHER RD
CLEARWATER FL 33765-2103

07/31/19

**Re: Required Property Insurance Coverage on Your Equipment**
    Contract Number: 948659
    Quote Number: **AXI-0025945-00**

Thank you again for choosing **Amur Equipment Finance** to help you finance your equipment. Under the terms of your financing Contract with us, we would like to remind you that you are required to maintain property insurance coverage on the Collateral according to the Required Coverage described in the Insurance Requirement Agreement you already executed and returned to us. This document contains useful information to assist you in complying with this requirement as effortlessly as possible.

| | |
|---|---|
| **You Have Two Options to Insure the Collateral** | 1. Use your own insurance carrier. To confirm your insurance policy meets our requirements, please have your agent contact our Insurance Center at (866) 880-6611; fax a copy of your Insurance Certificate, Evidence of Insurance or Declaration Page to (305) 969-6814; *OR* email it to AmurEF@assurant.com. |
| | 2. Purchase property insurance coverage through our Managed Insurance Program. This coverage will be at your expense. |
| **Managed Insurance Program Coverage and Monthly Cost** | • Our Managed Insurance Program provides property insurance coverage against power surges, floods and acts of terrorism in addition to fire, theft, and other standard perils. |
| | • There is <u>no</u> deductible for losses over $100; losses under $100 are not covered. |
| | • If you choose our Managed Insurance Program, we will add   $77.41   to each Periodic Payment invoice (beginning in one or two billing cycles) to cover the expenses related to providing this service on your behalf, which may include handling fees and result in profit to us and/or our agents. |
| **Other Policy Reminders** | • Under our Managed Insurance Program, your company will not be the insured, additional insured or loss payee. |
| | • Regardless of what property insurance option you select, **you remain solely responsible for securing liability insurance meeting the corresponding Required Coverage level.** |
| **Proof of Insurance Due Within 15 Days** | If we do not receive, within 15 days from the date of this letter, evidence that your property insurance coverage meets the Required Coverage level, we will automatically insure it under Managed Insurance Program and add the   $77.41   charge to your monthly invoice. |
| **You Can Purchase Your Own Property Coverage at Any Time** | You retain the option, at any time, to purchase your own property insurance coverage, which may cost less than the insurance charge invoiced by us but must still meet our Required Coverage levels. |

Thank you for ensuring that the Collateral remains properly insured. If you have any questions, please refer to the enclosed FAQs or contact us directly.

Sincerely,

**Amur Equipment Finance**

000044 - 0002 of 0003 - NNNNN - 00131

# EXHIBIT A

AXISWEL.DOD-0917




**AMUR** *Equipment Finance*

<h1 style="text-align:center">Required Insurance Coverage</h1>

| | |
|---|---|
| **How We Should Be Named** | ▪ Amur Equipment Finance, Inc. and ISAOA<br>308 North Locust Street, Suite 100<br>Grand Island, NE 68801 |

| | |
|---|---|
| **Our Interest** | ▪ Property Insurance: Lender's Loss Payee<br>▪ Liability Insurance: Additional Insured |

**Coverage Requirements**

*Property Insurance*
- **Coverage:** No less than the invoice price of the Equiment we are financing and your current Insured Value for Additional Collateral.
- Include Special Form for Coverage for Theft.
- Make sure your policy includes the following information:
    o Contract Number located at the top of the prior page
    o Your full legal name, including d/b/a
    o Collateral location address(es)
    o Description of each Collateral item, including Serial Number/VIN, make, model and year

*Liability Insurance*
- **Coverage:** minimum $1,000,000 per occurrence

**Policy Coverage Period**
- If you are a first-time purchaser of insurance expressly for the Collateral, we require a minimum six-month term starting from our last Funding date.
- If you have purchased insurance before, we recommend you always sign up for at least a 12-month term.

**Notice Requirement**

Minimum thirty (30) days' written notice by your insurance carrier prior to any modification, cancellation or expiration of any of the Required Coverage.

<div style="text-align:center; font-size:larger">EXHIBIT A</div>





# Frequently Asked Questions

| If you select your own Property Coverage | If you select our Managed Insurance Program |
|---|---|
| **What is the Required Insurance Coverage under your financing contracts?**<br><br>Please refer to the list on the previous page describing the Required Coverage; it is the same list included in the Insurance Requirement Agreement you already received. | **What if I want to have Amur Equipment Finance obtain coverage under this program?**<br><br>Simply pay the insurance charge added to each of the invoices we send to you. There is nothing more for you to do. For future reference, your policy will be identified by the Quote Number listed on the first page. |
| **I have an Insurance Certificate, Evidence of Insurance or Declaration Page that I think meets your requirements. Where can I send it to confirm?**<br><br>Please send it to:<br>Amur Equipment Finance<br>c/o Commercial Tracking Services<br>P.O. Box 979285<br>Miami, FL 33197-9285<br>Fax: (305) 969-6814<br>Email: AmurEF@assurant.com<br><br>Please make sure to include (1) the Contract Number shown on the top of the first page of this letter and (2) contact information for your insurance agent. | **What if I incur an event reportable under your program?**<br><br>Please call our Insurance Manager's Claim Department at (800) 358-0600, Monday through Friday, 8 AM to 8 PM Eastern Time. |
| **Whom can I call if I have other questions about your Required Coverage for insurance?**<br><br>Please contact our Customer Care, Monday through Friday, 8 AM to 5 PM Central Time:<br>Amur Equipment Finance<br>Customer Care<br>308 N. Locust Street, Suite 100<br>Grand Island, NE 68801<br>Email: customercare@amuref.com<br>Phone: (800) 994-0016 | **Whom can I call if I have other questions about your program?**<br><br>Please call our Insurance Center at (866) 880-6611, Monday through Friday, 8 AM to 8 PM Eastern Time. |
| **What if I incur an event reportable under my insurance policies?**<br><br>Please call our Customer Care department (contact information above) as soon as possible to report it so that we can better assist you in dealing with it. | **Does your program offer liability insurance as well?**<br><br>No; obtaining the liability insurance coverage described in the the Required Coverage remains your own direct obligation. |
| **Do I have to contact you if I decide to make changes to my insurance policies covering the Collateral?**<br><br>Yes, you are required to notify us of any change to your policies at least 30 days in advance. Please contact Customer Care at the address above to let us know. | **How can I switch to my own property coverage program?**<br><br>Before finalizing it, please have your agent contact our Insurance Center at (866) 880-6611; fax a copy of your new Insurance Certificate, Evidence of Insurance or Declaration Page to (305) 969-6814; OR email it to AmurEF@Assurant.com to confirm it meets our requirements.<br><br>If you end up switching to your own policy, you may still see our insurance charge appear on our invoinces for one or two more billing cycles; don't worry, these charges relate exclusively to prior periods when you were still insured through us. |

EXHIBIT A

AXISWEL.DOD-0917



EXHIBIT A

# EXHIBIT 10

From:          Amuref
Sent:          Friday, August 16, 2019 1:46 PM
To:           Cassy Moreau
Subject:     119263 // ST. FRANCIS HOLDINGS, L.L.C.

Equip PD Insurance Requirements

| Contract Number(s) | Equipment Value | Equipment Description |
|---|---|---|
| 948659 | $149,267.00 | TEMPSURE WORKSTATION WITH TH |

Good Afternoon,

In order to remove the insurance charges from the contract(s) listed above, we must receive the following information:

Evidence of **Business Personal Property** to include:

- Contract number
- Insured name as: **ST. FRANCIS HOLDINGS, L.L.C.**
- Insurance company name
- Insurance company policy number
- Policy effective and expiration dates
- Equipment description
- Property coverage listing Special Form including Theft in the amount of
- Amur Equipment Finance **listed as Loss Payee:**

> **Amur Equipment Finance, ISAOA**
> c/o Lease Insurance Services
> P.O. Box 979285
> Miami, FL 33197-9285

Please email this information back to **amuref@assurant.com** or fax it to **(305) 969-6814**.  If you have any questions, please feel free to contact us at (866) 880-6611. Any one of our customer service representatives will be able to assist you.

Thank you,

Angel Kendall
Insurance Service Center

**Note:** *Once adequate verification is received, our records will be updated accordingly. If any adjustments need to be made, please allow 1 to 2 billing cycles to amend your invoice.*

This e-mail message and all attachments transmitted with it may contain legally privileged and/or confidential information intended solely for the use of the addressee(s). If the reader of this message is not the intended recipient, you are hereby notified that any reading, dissemination, distribution, copying, forwarding or other use

EXHIBIT A

of this message or its attachments is strictly prohibited. If you have received this message in error, please notify the sender immediately and delete this message and all copies and backups thereof. Thank you.

EXHIBIT A

| From: | Amuref |
| --- | --- |
| Sent: | Monday, October 07, 2019 10:31 AM |
| To: | Cassy Moreau; cat@aigfla.com |
| Cc: | Campbell, C. Philip; Frank Averill; Rose Averill |
| Subject: | ECP - FW: Amur: Contract # 948659 for  St. Francis Holdings LLC  //  119263 - 6 |
| Attachments: | image001.png; image002.png |
| | |
| Importance: | High |

948659

The insurance information was previously received and met all requirements. If an adjustment is necessary, it will be reflected within 1 to 2 billing cycles. Please disregard any letters that may have been mailed prior to this email.

If you have any questions, please feel free to contact us. Any of our customer service representatives will be able to assist you Monday through Friday, 8 a.m. to 8 p.m. Eastern Time.

Thank you. We appreciate your business.

Insurance Service Center
Phone: (866) 880-6611
Fax: (305) 969-6814
Email: amuref@assurant.com

------------------ Original Message ------------------
**From:** Cassy Moreau
**Received:** Wed Oct 02 2019 21:19:04 GMT-0400 (Eastern Daylight Time)
**To:** AMUREF; AMUREF@ASSURANT.COM; cat@aigfla.com
**Cc:** FAverill@stfrancismed.com; pcampbell@shumaker.com; raverill@stfrancismed.com
**Subject:** RE: ECP - FW: Amur: Contract # 948659 for St. Francis Holdings LLC // 119263 - 4

Hello:

Per the email below dated 10/1/19, you acknowledged receipt of our proof of insurance.
I noted we were assessed a $77.41 charge on fee today.
Please advise.


Kind regards,

Cassy Moreau, CFE, CAMS
*Director of Finance/ HR Manager*
St. Francis Medical Institute
802 N. Belcher Road, Clearwater, Florida 33765
Tel: (727) 447-3000 Fax: (727) 210-4600
www.StFrancisMed.com
*"Giving of ourselves...so you receive...excellent care."*

EXHIBIT A



THIS EMAIL AND ANY FILES TRANSMITTED WITH IT ARE CONFIDENTIAL AND ARE INTENDED SOLELY FOR THE USE OF THE INDIVIDUAL OR ENTITY TO WHOM THEY ARE ADDRESSED. This document may contain information covered under the Privacy Act, 5 USC 552(a), and/or the Health Insurance Portability and Accountability Act (PL 104-191) and its various implementing regulations and must be protected in accordance with those provisions. If you are not the intended recipient or the person responsible for delivering the email to the intended recipient, be advised that you have received this email in error and that any use, dissemination, forwarding, printing, or copying of this email is strictly prohibited. If you have received this email in error, please return immediately to the sender and delete this copy from your system. Thank you for your cooperation.

**From:** Amuref <amuref@assurant.com>
**Sent:** Tuesday, October 01, 2019 11:20 AM
**To:** cat@aigfla.com
**Cc:** Cassy Moreau <FinanceManager@stfrancismed.com>
**Subject:** ECP - FW: Amur: Contract # 948659 for St. Francis Holdings LLC // 119263 - 4
**Importance:** High

948659

Thank you for supplying us with insurance information for the leased/financed equipment.  The insurance information has been processed.  If any adjustments are to be made, it will be shown on the invoice within 1 to 2 billing cycles. Please disregard any letters that may have been mailed prior to this email.

If you have any questions, please feel free to contact us. Any of our customer service representatives will be able to assist you Monday through Friday, 8 a.m. to 8 p.m. Eastern Time.

Thank you. We appreciate your business.

Insurance Service Center
Phone: (866) 880-6611
Fax: (305) 969-6814
Email: amuref@assurant.com

------------------ Original Message ------------------
**From:** cat@aigfla.com
**Received:** Thu Sep 26 2019 15:03:50 GMT-0400 (Eastern Daylight Time)
**To:** AMUREF; AMUREF@ASSURANT.COM
**Cc:** Cassy Moreau
**Subject:** Amur: Contract # 948659 for St. Francis Holdings LLC

Re:  Amur: Contract # 948659 for  St. Francis Holdings LLC

Please find attached the proof of insurance coverage for our mutual client, St. Francis Holdings LLC.    If additional information is necessary, please contact our office.
Thank you!

Regards,

EXHIBIT A

**Catherine Stergeos**
*Commercial Lines Manager*



**Aegis Insurance Group, LLC**
2575 Ulmerton Road, Suite 350
Clearwater, FL 33762
**Office**: 727-216-4088
**Fax:** 727-608-5930
**Website:** www.aegisinsurance-group.com

Pursuant to the Electronic Communications Privacy Act, 18 18 U.S.C. §§ 2510-2522, the contents of this e-mail and the attachments hereto (if any) are confidential, privileged, and/or otherwise exempt from disclosure and are intended only for disclosure to and use by the intended recipient of this message. If you are not the intended recipient of this message, the receipt of this message is not intended to and does not waive any applicable confidentiality or privilege and you are hereby notified that any dissemination, distribution, printing, or copying of the contents of this e-mail is strictly prohibited. If you are not the intended recipient, please notify us by telephone or e-mail and delete this e-mail from your system. Further, e-mail transmissions are not guaranteed to be secure or error-free because information can be intercepted, corrupted, lost, destroyed, arrive late or incomplete, or contain viruses. WE THEREFORE EXPRESSLY DISCLAIM ANY REPRESENTATION OR WARRANTY REGARDING THE SAFETY AND INTEGRITY OF THIS E-MAIL AND FOR ANY ERRORS OR OMISSIONS IN THE CONTENTS OF THIS E-MAIL THAT ARISE AS A RESULT OF THIS TRANSMISSION OR ANY SUBSEQUENT RE-TRANSMISSION.

This e-mail message and all attachments transmitted with it may contain legally privileged and/or confidential information intended solely for the use of the addressee(s). If the reader of this message is not the intended recipient, you are hereby notified that any reading, dissemination, distribution, copying, forwarding or other use of this message or its attachments is strictly prohibited. If you have received this message in error, please notify the sender immediately and delete this message and all copies and backups thereof. Thank you.

EXHIBIT A

| | |
|---|---|
| **From:** | Lisa Blain |
| **Sent:** | Monday, January 20, 2020 5:44 PM |
| **To:** | Rose Averill |
| **Subject:** | Year End Balance Letter for St. Francis Holdings 119263/948659 |
| **Attachments:** | 948659-Yearend Balance Letter.pdf |

Good Afternoon,

Please see the attached Year End Balance Letter as requested.

Calculating Finance Charges
You can calculate your finance charges by using the following formula:
• Term x (times) Payment Amount(s) = Total Amount Financed
• Total Amount Financed – (minus) Equipment Cost = Total Finance Charges for the Contract
• Total Finance Charges for the Contract ÷ (divided by) Term = Finance Charges per Payment

Calculating Balance
• Total Amount Financed - (Subtract) Number of payments made= Estimated Balance on Account

Please let me know if you have any questions

Lisa Blain

| | |
|---|---|
| *direct* | 308-398-4232 |
| *fax* | 308-392-3332 |
| *toll free* | 800-994-0016 ext. 4232 |



Legal Disclaimer: The information contained in this message may be privileged and confidential and protected from disclosure. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify the Sender immediately by replying to the message and delete this email from your system.

EXHIBIT A



**BALANCE LETTER**

**Re:**     **Contract 948659**

January 20, 2020

St. Francis Holdings, L.L.C.
Attn.: Francis Averill
802 N Belcher Rd
Clearwater, FL 33765-2103

Dear Francis:

Please find below the information you requested about your payment obligations towards **Amur Equipment Finance, Inc.** with respect to the above-referenced Contract, current as of December 31, 2019.

| | |
|---|---|
| **Original Equipment Cost** | $149,267.34 |
| **Contract Start Date** | July 2019 |
| **Total Payment Obligations** | Periodic Payments:  6 Monthly @ $99.00<br>                                   60 Monthly @ $3,349.29 |
| **Remaining Payment Obligations** | Periodic Payments: 60 Monthly @ $3,349.29 |

We took over the servicing of this Contract in July 2019 from its initial Originator, MMP Capital Inc. with 66 payments remaining.  Please contact this initial Originator to confirm any other separate payment obligation you may have towards it.

If you have further questions, please do not hesitate to contact us at (800) 994-0016 or AEFCustomerCare@amuref.com.

Sincerely,


**Lisa Blain**
Customer Care Representative

P.O. Box 2555, 308 N. Locust St., Suite 100, Grand Island, NE 68801
*main tel*  +1 800 994 0016 *fax*  +1 308 398 4141
**www.amuref.com**

EXHIBIT A

| | |
|---|---|
| **From:** | Barb Kowalczyk |
| **Sent:** | Tuesday, May 19, 2020 10:07 AM |
| **To:** | Cassy Moreau |
| **Subject:** | 119263/948659 St. Francis Holdings, LLC - Amur Equipment Finance |

Good morning,

I am following up to see if the company is still interested is obtaining a payment deferral on the above mentioned contract. Please let us know if you would like to move forward or would like to make a payment on the account.

Thank you,

Barb
**Barb Kowalczyk**



| | |
|---|---|
| *fax* | 978-451-6660 |
| *toll free* | 800-994-0016 ext. 9891 |



Legal Disclaimer: The information contained in this message may be privileged and confidential and protected from disclosure. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify the Sender immediately by replying to the message and delete this email from your system.

1

EXHIBIT A

# EXHIBIT 11



Home  ›  Results

# Find a Provider

Ready to find your beautiful? Get started by locating a Cynosure provider near you.



COUNTRY *
United States

POSTAL CODE *
33602

DISTANCE
25

TREATMENT (0 SELECTED)
Any

SEARCH

Found **92 Practitioners** Near You

All products



EXHIBIT A






### Belleair Medi-Spa

Tampa, FL 33602

WITHIN 1 MILE

**MORE DETAILS**



### Indigo Dermatology

Tampa , FL 33602

WITHIN 1 MILE

**MORE DETAILS**



### Tampa Bay Plastic Surgery, Inc

Tampa, FL 33606

WITHIN 1.22 MILES

**MORE DETAILS**

# EXHIBIT A





### SpaTampa

Tampa, FL 33607
WITHIN 1.55 MILES

**MORE DETAILS**



### The Grand Beauty Spa

Tampa, FL 33609
WITHIN 1.80 MILES

**MORE DETAILS**



### South Tampa Dermatology

Tampa, FL 33609
WITHIN 1.87 MILES

**MORE DETAILS**

1   2   3   4   ...   16

## EXHIBIT A







5 Carlisle Road
Westford, MA 01886

**For Providers**

Products

Webcasts & Events

Partnership Information

**For Patients**

Treatments

Find a Provider

**About Us**

Leadership

Board of Directors

**Contact Us**

Terms and Conditions

Privacy Policy

California Supply Chain Act

Site Map

  

🌐  English (USA)                    ▾

EXHIBIT A





Home    ›    Results

# Find a Provider

Ready to find your beautiful? Get started by locating a Cynosure provider near you.



COUNTRY *
United States

POSTAL CODE *
33602

DISTANCE
25

TREATMENT (0 SELECTED)
Any

SEARCH

Found **92 Practitioners** Near You

All products

MINIMIZE MAP



EXHIBIT A





### Skin Savvy Rx

Tampa, FL 33609
WITHIN 1.91 MILES

**MORE DETAILS**



### Skin Savvy Rx

Tampa, FL 33609
WITHIN 1.91 MILES

**MORE DETAILS**



### Skin Savvy Rx

Tampa, FL 33609
WITHIN 1.91 MILES



**MORE DETAILS**

EXHIBIT A





### The Health Associates of Tampa

---

Tampa, FL 33609

WITHIN 1.92 MILES

**MORE DETAILS**



### Farrior Facial Plastic Surgery

---

Tampa, FL 33609

WITHIN 1.99 MILES

**MORE DETAILS**



### Dr. Nelson D. Castellano & Dr. Lisa Castellano-Howard

---

Tampa, FL 33609

WITHIN 2.08 MILES

**MORE DETAILS**

1  2  3  4  ...  16

EXHIBIT A





5 Carlisle Road
Westford, MA 01886

**For Providers**

Products

Webcasts & Events

Partnership Information

**For Patients**

Treatments

Find a Provider

**About Us**

Leadership

Board of Directors

**Contact Us**

Terms and Conditions

Privacy Policy

California Supply Chain Act

Site Map

  

 English (USA)

EXHIBIT A





Home › Results

# Find a Provider

Ready to find your beautiful? Get started by locating a Cynosure provider near you.



COUNTRY *
United States ▼

POSTAL CODE *
33602

DISTANCE
25 ▼

TREATMENT **(0 SELECTED)**
Any ▼

**SEARCH**

Found **92 Practitioners** Near You

All products ▼

MINIMIZE MAP








## Cosmetic Surgery Of Tampa Bay

Tampa Bay, FL 33609

WITHIN 2.30 MILES

**MORE DETAILS**



## (BODY BEAUTIFUL) ORC of Tampa bay

tampa, FL 33609

WITHIN 2.34 MILES

**MORE DETAILS**



## ImageLift™

Tampa, FL, FL 33609

WITHIN 2.42 MILES

**MORE DETAILS**

EXHIBIT A







**Bella Mia Medical Aesthetics and Laser Institute of Tampa**

Tampa, FL 33629

WITHIN 2.64 MILES

MORE DETAILS

**Aqualipo Body Sculpting Centers**

Tampa, FL 33603

WITHIN 2.73 MILES

MORE DETAILS



**Altogether Lovely**

Tampa, FL 33607

WITHIN 2.77 MILES

MORE DETAILS

EXHIBIT A







5 Carlisle Road
Westford, MA 01886

**For Providers**

Products

Webcasts & Events

Partnership Information

**For Patients**

Treatments

Find a Provider

**About Us**

Leadership

Board of Directors

**Contact Us**

Terms and Conditions

Privacy Policy

California Supply Chain Act

Site Map

  

🌐 English (USA) ▾

EXHIBIT A

# EXHIBIT 12

COVID-19 is an emerging, rapidly evolving situation.
Get the latest public health information from CDC: https://www.coronavirus.gov.
Get the latest research from NIH: https://www.nih.gov/coronavirus.
Find NCBI SARS-CoV-2 literature, sequence, and clinical content: https://www.ncbi.nlm.nih.gov/sars-cov-2/.

×

FULL TEXT LINKS

 WILEY Full Text Article

> Lasers Surg Med. 2017 Jul;49(5):480-489. doi: 10.1002/lsm.22625. Epub 2017 Jan 19.

# Subcutaneous adipose tissue response to a non-invasive hyperthermic treatment using a 1,060 nm laser

John W Decorato [1], Bo Chen [2], Rafael Sierra [2]

Affiliations
PMID: 28103642    DOI: 10.1002/lsm.22625

## Abstract

**Background:** We postulated that a hyperthermic treatment using a 1,060 nm laser can cause a controlled adipocyte injury resulting in non-invasive fat reduction. This three-part study identified treatment parameters for a safe and tolerable treatment, demonstrated short- and long-term tissue response, and assessed the potential of this treatment for non-invasive fat reduction.

**Methods:** In vivo temperature measurements were conducted prior to abdominoplasty via a thermal camera (for surface readings) and thermocouple needle (for subcutaneous readings). Short- and long-term tissue response was evaluated on the abdomen immediately post to 6 months post a 1,060 nm laser treatment. Laser dosage was varied to identify safe and effective parameters for fat reduction. Tissue biopsies for hematoxylin/eosin (H&E) staining were taken at weeks 1 and 2, as well as at 1, 2, 3, and 6 months (if applicable). Additionally, six subjects received a hyperthermic laser treatment to the flanks; four patients receiving laser treatment to one flank and cryolipolysis on the other, and two patients receiving laser treatment on one side with the other side as an untreated control. Efficacy measurements included ultrasound measurement of fat thickness at baseline, 2, and 6 months; Magnetic Resonance Imaging (MRI) to calculate fat volume at baseline, 3 and 6 months; and blinded photograph evaluation at baseline, 1, 2, 3, and 6 months.

**Results:** In vivo temperature measurements demonstrated that the hyperthermic temperature target (42-47°C) can be achieved and maintained in subcutaneous adipose tissue via a 1,060 nm laser in conjunction with surface cooling. Short- and long-term tissue responses were evaluated by tissue histology up to 6 months following treatment. Histological changes included inflammation, followed by macrophage infiltration starting at approximately 2 weeks, with evacuation of cellular debris completed by approximately 6 months. Clinical results demonstrated average fat thickness reduction at 14%, 18%, and 18% at 2, 3, and 6 months, respectively. Average fat volume reduction measured by MRI at 3 and 6 months was 24% and 21%, respectively. Blinded photo evaluation showed improvement starting at 1-month post-treatment and was maintained at 6 months. Adverse events were rare and included mild tenderness that resolved by 1-week post-treatment.

**Conclusion:** Parameters were identified that selectively injure and reduce adipocytes in subcutaneous tissue using a 1,060 nm externally applied laser. The treatment had an excellent safety profile and was well tolerated. The clinical study demonstrated that a 1,060 nm hyperthermic laser treatment for non-invasive fat reduction can be safe and effective. Lasers Surg. Med. 49:480-489, 2017. © 2016 Wiley Periodicals, Inc.

**Keywords:** body contouring; laser fat reduction; non-invasive body contouring; non-invasive fat reduction.

© 2017 Wiley Periodicals, Inc.

## Related information

MedGen

## LinkOut - more resources

**Full Text Sources**
Ovid Technologies, Inc.
Wiley

**Medical**

ClinicalTrials.gov

EXHIBIT A

# EXHIBIT 13





Home  ›  For Providers  ›  Products  ›  SculpSure®

# SculpSure®

The SculpSure device provides treatments for non-invasive body contouring that permanently reduces stubborn fat without surgery or downtime.

**REQUEST MORE INFORMATION**



⊕ Jump to:

| | |
|---|---|
| Resources | Before & After |
| How It Works | FAQs |
| Clinical Data | Safety Information |

EXHIBIT A





revolutionary SculpSure technology. Now you can provide patients with non-invasive body contouring that permanently reduces stubborn fat without surgery or downtime.

SculpSure is the world's first FDA-cleared laser device for non-invasive lipolysis of the abdomen, flanks, back, inner thighs, outer thighs and submental area.

## SculpSure Submental Treatment

Our Submental applicator design is perfect for providing precise and effective treatments resulting in a slimmer appearance of the chin and neck. The addition of the submental application makes the SculpSure device an all-encompassing, non-invasive body contouring system.

- 100% patient satisfaction rating in clinical study[1]
- FDA-cleared for individuals with a BMI up to 49
- Can affect the appearance of lax tissue**

**When using the petite mask for non-invasive lipolysis of the submental area



## What's in the update?


**Guided Mode Technology** for body treatments – provides an assisted treatment with measured and consistent power changes


**Petite Mask** software for submental – designed specifically for patients with a narrow jawline


**Updated GUI Screen** – more streamlined screen interface



### SculpSure Product Brochure

Faster treatments, high ROI, and a dedicated support team - the SculpSure device is designed for your success.

EXHIBIT A







### Sculpsure Physician Testimonials

SculpSure laser body contouring has reshaped practices all over the world. Find out how!

**DOWNLOAD**



### SculpSure vs Fat Freezing Whitepaper

See the advantages that SculpSure technology provides over fat freezing.

**DOWNLOAD**

## Before & After[+]



EXHIBIT A





After 2nd SculpSure series (Courtesy of B. Katz, MD)



†*Actual patients. Individual results may vary and are not guaranteed.*

## How SculpSure works

The 1060nm wavelength's specific affinity for adipose tissue, coupled with minimal absorption in the dermis, allows SculpSure to efficiently treat areas of troublesome fat in just 25 minutes per treatment. Over time, the body naturally eliminates the disrupted fat cells with results seen as quickly as 6 weeks and optimal results usually seen in as few as 12 weeks.

- Minimal absorption in the dermis leaves the skin's surface unharmed
- Advanced Contact Cooling™ enhances patient comfort
- Feathering of heat spread provides natural-looking results
- Mild and transient side effects

## Maximum results. Maximize success.

EXHIBIT A





- Dedicated SculpSure support team to ensure clinical and marketing success
- Direct to consumer marketing to drive awareness and leads

[1]Clinical data on file.

## SculpSure Hyperthermic laser in action



## See why physicians worldwide love SculpSure



## FAQs

EXHIBIT A



| How much fat will SculpSure eliminate? | + |
|---|---|

| How long will results from SculpSure last? | + |
|---|---|

| How soon will patients see results after a SculpSure treatment? | + |
|---|---|

| Will patients see results after one treatment? | − |
|---|---|

Most patients require a series of treatments to achieve the results they desire. Results can be seen at six weeks after treatment, with optimal results typically seen at 12 weeks.

## Clinical data

SculpSure is supported by extensive clinical data.



VIEW CLINICAL DATA

## Safety information

VIEW SAFETY INFORMATION

The SculpSure® device is a non-invasive laser body contouring system intended to permanently eliminate fat cells through non-invasive lipolysis of the chin (submental) area, abdomen, love handles (flanks), back, inner thighs and outer thighs. Individual results may vary and are not guaranteed. SculpSure® treatments are not intended for weight loss results or for people who are obese. Mild side effects may occur including temporary tenderness, swelling or tissue firmness in the treatment area. Please consult with your physician to see if SculpSure® treatments are right for you.

## Events

**14**
NOV
2020



**Cincinnati, OH**

The Westin Cincinnati, East 5th Street, Cincinnati, OH, USA

<div align="center">EXHIBIT A</div>





**NOV**
**2020**

The Breakers Palm Beach, South County Road, Palm Beach, FL, USA

## 05
**DEC**
**2020**

### Orlando, FL

14900 Chelonia Parkway, Orlando, FL, USA

## Testimonials

> "SculpSure offers a unique non-invasive method of damaging fat cells through laser energy, which are then removed naturally through the body's lymphatic system. We have seen good results with this modality for both the body as well as for the submental area."

David McDaniel, MD, Virginia Beach, VA



## Your Practice & Cynosure

Keep your practice on top with the latest best-in-class offerings along with dedicated support and turnkey solutions when you partner with Cynosure.

MORE INFO

CONTACT US

5 Carlisle Road
Westford, MA 01886

**For Providers**

Products

EXHIBIT A





For Patients

Treatments

Find a Provider

About Us

Leadership

Board of Directors

Contact Us

Terms and Conditions

Privacy Policy

California Supply Chain Act

Site Map

  

 English (USA)

EXHIBIT A

# EXHIBIT 14





# TempSure® Envi

Introducing our newest 300W monopolar radiofrequency platform with innovative handpieces to reduce wrinkles and tighten skin.*

**REQUEST MORE INFORMATION**



Jump to:

**Resources**       **Before & After**

**How It Works**       **FAQs**

## Multiple applications. Endless opportunities.

EXHIBIT A

 

epilation, telangiectasia, and milia.



### TempSure Envi Product Brochure

Deliver repeatable RF treatments with TempSure Envi, the world's 1st temperature-controlled RF platform

**DOWNLOAD**

## Before & After



Before TempSure Envi

EXHIBIT A







1 month after 2nd treatment (Courtesy of S. Doherty, MD)

 

## Taking the guesswork out of RF

Therapeutic Logic Control (TLC) activates a timer when tissue has reached therapeutic temperature, allowing for proper delivery of RF every time. Treatments are safe for all skin types, and 96% of patients described TempSure as comfortable.[1]

- Best-in-class temperature sensing with up to 100x faster response time than the competition[1]
- Safe, consistent and reliable RF skin tightening* treatments in any practitioner's hands[2]
- Powerful 300W generator with 4MHz RF delivery supports future applications.
- Three handpiece sizes ranging from 10mm to 20mm for customizable treatments
- Soothing spa tones delivered during treatment for enhanced patient satisfaction

[1]In-house study

[2]State laws vary with regard to delegation of RF treatments to non-physicians, and change over time. Please consult local regulations

*Through soft tissue coagulation

EXHIBIT A

 



## FAQs

Can I re-use the neutral pads that come with the machine?                    +

## Related Products

TempSure Firm                                                               +

TempSure Vitalia                                                            +

TempSure Surgical RF Technology                                            —

TempSure Surgical is the ideal choice for cutting and coagulation across a breadth of surgical applications.

**LEARN MORE**

EXHIBIT A







## Events

**27**
FEB
2021

<span style="color:orange">Live from the Ritz-Carlton, Dallas!</span>

## Testimonials

*"The thing that I think is such a differentiator about this device compared to other RFs on the market is that it doesn't start counting down the time until you get to temperature. And that's why it relates to results."*

Raminder Saluja, MD



## Your Practice & Cynosure

Keep your practice on top with the latest best-in-class offerings along with dedicated support and turnkey solutions when you partner with Cynosure.

MORE INFO

CONTACT US

EXHIBIT A

 

5 Carlisle Road
Westford, MA 01886

## For Providers

Products

Webcasts & Events

Partnership Information

## For Patients

Treatments

Find a Provider

## About Us

Leadership

Board of Directors

## Contact Us

Terms and Conditions

Privacy Policy

California Supply Chain Act

Site Map

  

 English (USA)



EXHIBIT A

# EXHIBIT 15



July 24, 2018

Connie Hoy
Official Correspondent
Cynosure, Inc.
5 Carlisle Road
Westford, MA 01886

Document Number: CPT1800139

Dear Ms. Hoy:

It has come to our attention that you may be marketing the DEKA SmartXide$^2$ Laser System (MonaLisa Touch), which meet the definition of a device as that term is defined in section 201(h) of the Federal Food Drug and Cosmetic Act (FD&C Act), in a manner that potentially violates the FD&C Act.

Specifically, the DEKA SmartXide$^2$ Laser System (MonaLisa Touch) was cleared (K133895) for incision, excision, ablation, vaporization and coagulation of body soft tissues in medical specialties including aesthetic (dermatology and plastic surgery), podiatry, otolaryngology (ENT), gynaecology, neurosurgery, orthopaedics, general and thorasic surgery (including open and endoscopic), dental and oral surgery and genitourinary surgery. However, we have conducted a review of our files and are unable to identify an additional Food and Drug Administration (FDA) clearance or approval supporting the use of the claims located http://www.smilemonalisa.com/ such as the following:

- "MonaLisa Touch is the only technology for vaginal and vulvar health with over 18+ published clinical studies."

- "MonaLisa Touch is a simple, safe, and clinically proven laser treatment for the painful symptoms of menopause, including intimacy."

- 'During a treatment, a vaginal probe is inserted into the patient's vagina, and delivers gentle, virtually painless laser energy to the vaginal wall, stimulating a healing response."

- "It penetrates the wall of the vagina, and stimulates cells that are important in creating fluid, improving collagen synthesis."

- "Fibroblasts activate biosynthesis of new collagen and produce main components of ground substance."

Also, the tip of the sterilized applicator that is inserted through the vulva and moved along the vaginal canal in an outward motion, applying the laser in a 360-degree pattern to the vaginal wall, appears to have been modified from the previous cleared device.

EXHIBIT A

We request that you provide us with the following information:

- FDA clearance or approval number for the DEKA SmartXide$^2$ Laser System (MonaLisa Touch) for the additional claims referenced above.

- The basis for your determination of whether or not you are required to obtain FDA clearance or approval for the DEKA SmartXide$^2$ Laser System (MonaLisa Touch) for the additional claims referenced above.

In addition, we request that a written response be submitted within 30 days of receipt of this letter. The response and any further correspondence regarding this matter should reference the Document Number, listed above, and should be submitted to:

> Complaints Program Manager, WO66-3684
> Division of Analysis and Program Operations
> Office of Compliance
> Center for Devices and Radiological Health
> 10903 New Hampshire Avenue
> Silver Spring, MD 20993

If you have questions relating to this matter, you may contact CDR Cesar Perez at 301-796-5770, or log onto our web site at www.fda.gov for general information relating to FDA device requirements.

Sincerely,

Cesar A. Perez - S

Digitally signed by Cesar A. Perez -S
DN: c=US, o=U.S. Government, ou=HHS, ou=FDA, ou=People, cn=Cesar A. Perez -S, 0.9.2342.19200300.100.1.1=2000613874
Date: 2018.07.24 12:42:34 -04'00'

CDR Cesar A. Perez, PhD
Chief
Surveillance and Enforcement Branch I
Division of Premarket and Labeling Compliance
Office of Compliance
Center for Devices and Radiological Health

# EXHIBIT A

# EXHIBIT 16



Markets    Product Development    Manufa

HOME  >  REGULATORY & QUALITY

# Hologic Heard FDA's Vaginal Rejuvenation Warning Loud and Clear

TAGS:   BUSINESS    NEWS



**The decision to suspend its TempSure Vitalia system based on FDA concerns about vaginal rejuvenation procedures is expected to hurt Hologic's fourth-quarter revenue projections by $15 million.**

Amanda Pedersen | Sep 13, 2018



FDA recently began cracking down on manufacturers of laser and energy-based devices that, in some cases, have been inappropriately marketed for vaginal rejuvenation procedures. In July the agency sent

EXHIBIT A



Supplier Directory      Events      Subscribe      Advertise

Markets      Product Development      Manufa

single-use probes, even though the agency's letter didn't specifically mention the Vitalia product. The MonaLisa Touch, on the other hand, is still on the market. Both products are sold by Hologic's Cynosure division.



**SPONSORED CONTENT**

### Metal Injection Molding

This 60-minute Webinar examines metal injection molding (MIM), a unique process that eliminates the need for complex, expensive machining when producing small, intricate steel and stainless steel components.

It may seem odd that the company took this action on a product that was not specifically mentioned in FDA's letter (Vitalia) while leaving the product that was the subject of the letter (MonaLisa Touch) on the market, but the decision likely was based on clinical evidence and how each device is typically used. There is much less clinical data for Vitalia than for the MonaLisa Touch, according to Mike Matson, a medtech analyst at Needham & Co. He also noted that Vitalia is typically used for "vaginal laxity" whereas the MonaLisa Touch is more often used for vaginal dryness.

"Despite the near-term financial impact, we think that the Vitalia suspension was the right thing to do and over the longer run, this should serve to improve [Hologic's] image and brand in the aesthetics market," Matson said in a report Thursday.



This week Hologic updated investors on the anticipated financial impact of its decision to suspend the Vitalia products. The company disclosed on an SEC filing that the TempSure Vitalia system suspension could impact fourth-quarter Cynosure revenue by $15 million due to refunds. The good news for the company and investors is that strong performance in Hologic's other businesses should keep the company's fourth-quarter revenue within the previously guided range of $800 million to $815 million.

Hologic acquired Cynosure last year for about $1.65 billion. Back when that deal was first announced, Hologic CEO Steve MacMillan told investors that one of the things that attracted the company to Cynosure was that it had used business development smartly to add to its portfolio. "For example,

EXHIBIT A



Markets     Product Development     Manufac

ensures treatment timing will begin only when the target tissue is at a therapeutic temperature. This helps deliver repeatable treatment results, the company noted.

"TempSure Vitalia responds to customers who expressed a need for a consistent and effective intimate wellness therapy that takes the guesswork out of radiofrequency treatments," said Kevin Thornal, president of the Cynosure division. "It also expands the offerings on our TempSure radiofrequency platform. We are pleased that in just six months, we were able to launch an additional handpiece while simultaneously providing a solution to patients who have experienced changes in their vaginal health over time."

## 0 COMMENTS

## RELATED

| | |
|---|---|
| **BIOMEDevice Boston 2021** | **Disruption in Medical Device and Diagnostic Manufacturing: 3** <br> DEC 22, 2020 |
| **Biggest Medtech Wins in 2020** <br> DEC 18, 2020 | **This Is a 'Genuine Breakthrough' in COVID-19 Testing** <br> DEC 15, 2020 |

## Producing 'Unmoldable' Parts with 3D Printing



Image by Gerd Altmann from Pixabay

EXHIBIT A



MEDICAL DEVICE AND DIAGNOSTIC INDUSTRY

**Markets**     **Product Development**     **Manufac**

story of producing a difficult-to-mold consumer product using 3D printing technology was told from three perspectives—the product OEM, the component manufacturer and printer, and the 3D printing technology supplier.

Gage Cutler, owner of FinMan Fishing Innovations, had a great idea for a new product that would help address concerns people encounter when fishing. This is no fish tale—it is the story of additive manufacturing technology delivering a flexible, durable, intricate product that may not have been possible with traditional manufacturing.

The FinMan Original is a rod-mounted tool that slices, snips, and stows gear. It has an intricate design, which made manufacturing a challenge. "For reference, the parts are around 1¾ in. long, around ½ in. tall, and just by looking at it, you can see there's a ton of detail," Cutler said. Another big requirement for the product is that it be flexible, yet strong.

Aesthetics were also a consideration as the product is meant to look like a fish.

When it came to manufacturing the FinMan, Cutler said he and his engineer did not want to be limited by traditional manufacturing constraints that would have taken away from both the functionality and the aesthetic qualities of the product.

"That's really what pushed me in the 3D printing," he said. "For example, from the financial point of view, I didn't want to have to spend $15-, $20-, $25 thousand for a Gen 1 part and then immediately want to go to a Gen 2, and have to pay for another $20,000 mold," he explained. "With 3D printing it was a $250 non-recurring engineering charge to change the digital file," he said, enabling Gen 2 parts to be processed the next day, if needed.

---

**READ MORE**
⌄

---

**0 COMMENTS**

**RELATED**

| | |
|---|---|
| BIOMEDevice **BIOMEDevice Boston 2021** |  **Overcoming the Limitations of Additive Manufacturing** <br> DEC 18, 2020 |
| **BellaSeno Takes a No-Touch Approach for New High-** | **3D Printing Helps J&J's Ethicon Design Prisma Health's Ventilator** |

EXHIBIT A



Markets    Product Development    Manufac

Email address          Select Country          GO

About                              MD&M West
Advertise                          MD&M East
Subscribe                          MD&M Minneapolis
Design News                        BIOMEDevice Boston
PlasticsToday                      BIOMEDevice San Jose
Packaging Digest                   Sitemap
Powder & Bulk Solids

Follow us:

Copyright © 2020. All rights reserved. Informa Markets, a
trading division of Informa PLC.

Accessibility  |  Privacy Policy  |  Cookie Policy  |  Terms of Use  |  Visitor Terms and Conditions

EXHIBIT A

# EXHIBIT 17

 🔍 Search

     | Try Premium Free for 1 Month

**Service you can count on. -** **Get fast 75 Mbps Internet & add Phone for $25 m**



🔒 Message

 Cynosure, Inc.

  University of Washing Michael G. Foster Sch

## Kris Huston · 3rd

We are meant to have amazing lives!

Tampa, Florida, United States · 477 connections · Contact info

## About

I have had the honor of working at Cynosure for over the last 12 years, and have achieved Presidents Club 12 consecutive years. After starting in Seattle as a rep and achieving 3M in sales, I was moved to Nor Cal where I sh all records achieving 12 Million in sales. After one year in Nor Cal I was moved to LA, where I was promo ... s

## Experience



**Director of Sales Growth**
Cynosure, Inc.
Jul 2007 – Present · 13 yrs
Tampa, Florida, United States

Presidents Club- 2007-2019
Presidents Club 2018- Named Cynosure's: Director of the Year
Hold all company's sales records
#1 out of (25-115) Reps at the company from 2010-2017
Grew from 1.5 Million in 2007 to 41M in 2016
Promoted from Sales Rep to District Sales Manager

 Messaging  11

EXHIBIT A

     

Q Search

Try Premium Free
for 1 Month

Feb 2005 – Jun 2007 · 2 yrs 5 mos
Greater Seattle Area

Pharmaceutical Rep
Took my territory from #244 to #2 year one
President Clubs 2005-#2/244
Presidents Club 2006- #7/244

**Account Executive**
INTERCALL
Sep 2003 – Jan 2005 · 1 yr 5 mos
Greater Seattle Area

Sold Audio, Web and Video Conferencing
Sold to V and C Level Mid to Large Companies in th

 **Sales Recruiter**
Sales Talent Inc.
Aug 2002 – Aug 2003 · 1 yr 1 mo
Greater Seattle Area

I worked for an elite sales recruiting firm, and realize

## Education

 **University of Washington - Michael G. Foste**
Bachelor's degree, Business Administration and Mar
2000 – 2002

**Green River College**
Associate's degree, Business Administration and Management, General, 3.56
1999 – 2000

## Skills & Endorsements

**Inspiring Leadership** · 15

 Endorsed by **10 of Kris' colleagues at Cynosure, LLC.**

**Business Transformation** · 11

 Messaging  11

EXHIBIT A



Search

Try Premium Free
for 1 Month

**Exceed Sales Goals** · 12

Endorsed by **9 of Kris' colleagues at Cynosure, LLC.**

Show more

## Interests

| | | |
|---|---|---|
| W FOSTER | University of Washington - Michae...<br>37,832 followers | |
| FPC Better together. | Financial Partners Corporation<br>205 followers | CYN |
| CYNOSURE | Cynosure Australia<br>784 followers | H SUR |

Messaging  11

EXHIBIT A

# EXHIBIT 18

**From:** John-Paul M. Smolenski
**Sent:** Wednesday, August 14, 2019 8:46 PM
**To:** Frank Averill; Rose Averill
**Cc:** John-Paul M. Smolenski
**Subject:** Notice of Cancellation with Cynosure and MMP Capital
**Attachments:** Legal Letter - Dr. Francis Averill.pdf

Good evening Rose and Dr. Averill,

We received this letter from you in the mail on Monday asking to cancel the purchase, and financing of the Icon & Picosure workstations that you were looking to purchase from Cynosure. We have cancelled these purchases, and financing there of accordingly. I am reaching out to you via email to make sure you are fully aware that the 2 machines (Sculpsure & Tempsure) that you purchased in July from Cynosure, are both funded and non-cancellable. The Sculpsure Workstation was financed with our key banking partner, Pawnee Leasing. The Tempsure workstation was financed with another of our key banking partners, Amur Equipment Finance. The monthly payments will be drafted from your bank account respective to the payment date, and amount. Please let me know if there is anything else I can do to help provide clarity for you.

Thank you,
JP



John-Paul M. Smolenski

Apply Here

📱 (516) 606-8354        📞 (516) 454-4570
✉️ jp@mmpcapital.com        📠 (516) 706-2005

"Success is not owned, it's leased, and rent is due everyday." - J.J. Watt

EXHIBIT A

# EXHIBIT 19

Marked Confidential by Cynosure, Inc. -- Redacted Pursuant to Protective Order.

Marked Confidential by Cynosure, Inc. -- Redacted Pursuant to Protective Order.

Marked Confidential by Cynosure, Inc. -- Redacted Pursuant to Protective Order.

# EXHIBIT 20

| From: | Federico, Donald |
| --- | --- |
| **Sent:** | Tuesday, January 08, 2019 10:44 AM |
| **To:** | Angie Otero |
| **Subject:** | Re: Dietary Guidelines |

I'm sorry I'm unfamiliar with this lunch? I do not call on these type of people practices? I am in aesthetics

## Donnie W Federico
*Territory Manager*



[www.cynosure.com](http://www.cynosure.com)
*M (732) 895 9465*
[Donald.Federico@hologic.com](mailto:Donald.Federico@hologic.com)

On Jan 8, 2019, at 10:41 AM, Angie Otero <[OfficeSupport@stfrancismed.com](mailto:OfficeSupport@stfrancismed.com)> wrote:

Attached.

*Have a Blessed Day!*

**Angie Otero**
*Clinic Supervisor*
**St. Francis Sleep, Allergy & Lung Institute**
802 N. Belcher Road, Clearwater, Florida 33765
Tel: (727) 447-3000 Fax: (727) 210-4600
[www.StFrancisMed.com](http://www.StFrancisMed.com)
*"Giving of ourselves…so you receive…excellent care."*

*"Whom have I in heaven but You? And there is nothing on earth that I desire besides You. My flesh and my heart may fail, but God is the strength of my heart and my portion forever."*
(Psalms 73:25-26)

THIS EMAIL AND ANY FILES TRANSMITTED WITH IT ARE CONFIDENTIAL AND ARE INTENDED SOLELY FOR THE USE OF THE INDIVIDUAL OR ENTITY TO WHOM THEY ARE ADDRESSED. This document may contain information covered under the Privacy Act, 5 USC 552(a), and/or the Health Insurance Portability and Accountability Act (PL 104-191) and its various implementing regulations and must be protected in accordance with those provisions. If you are not the intended recipient or the person responsible for delivering the email to the intended recipient, be advised that you have received this email in error and that any use, dissemination, forwarding, printing, or copying of this email is strictly prohibited. If you

EXHIBIT A

have received this email in error, please return immediately to the sender and delete this copy from your system. Thank you for your cooperation.

<Dietary Guidelines.pdf>

EXHIBIT A

# EXHIBIT 21

**NOTICE: This Lease is a non-cancelable legal commitment. You will be required to pay taxes, fees, and other charges in addition to Rent. Some charges are in amounts greater than our actual costs, risks, or exposure.**

## LEASE AGREEMENT

**PAWNEE LEASING CORPORATION 3801 Automation Way Suite 207 Fort Collins, CO 80525 (Lessor)**

**Customer (Lessee): Complete Legal Name, if a corporation, LLC, or legal entity, use exact registered legal name.**

Company Name: ST. FRANCIS HOLDINGS, L.L.C.                    Contract#:

| Billing Address: 802 N BELCHER RD CLEARWATER, FL 33765 County: Phone: 727-447-3000 | Vendor of Equipment: **See Attached Schedule "A"** |
|---|---|

**EQUIPMENT DESCRIPTION (Include Quantity, Make, Model, and Serial Numbers): See Attached Schedule "A"**

| Equipment Location: 802 N BELCHER RD CLEARWATER FL 33765 | Equipment Cost: | $205,750.00 |
|---|---|---|

### SCHEDULE OF RENTAL PAYMENTS

| Monthly Rent. | See Schedule B | | |
|---|---|---|---|
| Term of Lease (in months): | See Schedule B | Rent with Tax (Tax Rate 7.000%): | See Schedule B |
| Total Number of Rental Payments: | See Schedule B | Advance Payment (# Advance Payments 0): | $0.00 |
| | | Total Initial Payment (Advance Payment + | |
| Administration Fee: | $350.00 | Adm Fee): | $350.00 |

(Lessee authorizes Lessor to adjust rental payments by no more than 10% to reflect actual final costs, including additional sales tax, delivery and installation charges, and cost increases due to alterations requested by the Lessee.)

**DO NOT SIGN THIS LEASE UNLESS YOU UNDERSTAND AND AGREE TO ALL OF ITS TERMS (INCLUDING PAGES 2-3).**

Lessee: ST. FRANCIS HOLDINGS, L.L.C.                    Accepted by Lessor: Pawnee Leasing Corporation

Member 26 - Jun - 2019

| Signature Francis Averill | Title | Date | Signature | Title | Date |
|---|---|---|---|---|---|

## GUARANTY

For the purpose of this Guaranty "you" means the undersigned Guarantors. You have an interest in the Lessee named above ("Lessee"), and we, the Lessor, would not enter into this Lease (the "Lease") without this Guaranty. You jointly and severally unconditionally guaranty the full and prompt payment and performance of all Lessee's obligations under the Lease even if we change or renew the Lease, or if any payments made by Lessee are rescinded or voided due to the insolvency, bankruptcy or reorganization, as if the payment had not been made. We do not have to notify you if the Lessee is in default under the Lease. If Lessee defaults, you will immediately pay in accordance with the default provisions of the Lease all obligations due thereunder. You agree that you will not be released or discharged if we: (i) fail to perfect a security interest in the Equipment or any other property that secures the obligations of Lessee or any of you ("Collateral"); (ii) fail to protect the Collateral; or (iii) abandon or release any Collateral. You agree that we do not have to proceed first against Lessee, any Collateral or any other guarantor. You waive notice of acceptance of this Guaranty and of all other notices or demands and suretyship defenses of any kind. You will reimburse us for all expenses we incur in enforcing our rights against Lessee or any of you, including without limitation, attorneys' fees and costs. You authorize us to obtain credit bureau reports for credit and collection purposes and to report your performance to any credit bureau or similar entity. This is an irrevocable, continuing Guaranty and binds your heirs, administrators and representatives. YOU AGREE THAT THE AGREEMENTS REGARDING JURISDICTION, VENUE, SERVICE OF PROCESS, AND INTENT TO TRANSACT ELECTRONICALLY CONTAINED IN THE LEASE APPLY TO THIS GUARANTY. YOU WAIVE, INSOFAR AS PERMITTED BY LAW, TRIAL BY JURY.

**DO NOT SIGN THIS GUARANTY UNLESS YOU UNDERSTAND AND AGREE TO ALL OF ITS TERMS AND THE TERMS OF THE LEASE (INCLUDING PAGES 2-3).**

Guarantor: Francis Averill                    Guarantor:

26 - Jun - 2019

| Signature | Date | Signature | | Date |
|---|---|---|---|---|
| Social Security: ###-##-6305 Phone: 727-447-3000 | | Social Security: Phone: | | |
| Home Address: 2140 LONG BOW LN CLEARWATER, FL 33764 | | Home Address: | | |

EXHIBIT A

**1. Lease:** WE (the Lessor) lease to YOU (the Lessee) the Equipment described above or in any schedule hereto (hereinafter called "Equipment") for the number of months (the "Term") and the rental payments (the "Rent") shown on page 1 and on the terms and conditions stated herein and on page 3, Schedule "A", and any and all Addenda. The Term begins when you accept the Equipment or when we determine that you have begun using the Equipment (either is called the "Acceptance Date"). You must notify us in writing immediately if you reject the Equipment when it is delivered and if so, we may cancel this Lease and require you to refund any amounts we have expended. Upon the Acceptance Date, you will be deemed to have agreed that the Equipment is satisfactory and is in good working condition and this Lease will become your ABSOLUTE UNCONDITIONAL OBLIGATION THAT YOU CANNOT CANCEL OR TERMINATE, except that if you are not in default you may terminate this Lease on any Rent date by paying all amounts then due (including accrued taxes) together with all unpaid Payments for the remaining Term and the Residual Value (as defined below), each discounted to present value at 4% per annum. One of your officers or representatives will be asked to confirm acceptance by telephone or other means. This confirmation will be binding on you and we will rely on it in paying the Vendor. Rent is due monthly on the first (1st) or fifteenth (15th), as we select, beginning on the first payment date on or after the Acceptance Date. All amounts due hereunder are payable at our office or such other place as we designate without invoice or demand. You will pay additional Rent (interim rent) in an amount equal to 1/30th of the monthly Rent per day, from the date we buy the Equipment to the first monthly Rent payment date. If this Lease is not finalized other than due to our wrongful action, you agree that we may, at our option, retain the Security Deposit, Advance Rent, and Administration Fee as liquidated damages. Your Security Deposit and Advance Rent will not earn interest and, unless applied to your obligations, will be returned at the end of this Lease promptly, less any amounts you owe to us. If Advance Rent is indicated above, the Advance Rent shall be applied first to the first Rent payment due hereunder and any additional Advance Rent shall be applied to the last Rent payments due under this Agreement, in reverse order. Any calculation involving Rent payments will be increased by taxes on the payment(s).

**2. Disclaimers of Warranties; Limitation of Remedies:** WE MAKE NO (AND DISCLAIM ALL) WARRANTIES EITHER EXPRESS OR IMPLIED AS TO THE CONDITION OF THE EQUIPMENT, ITS MERCHANTABILITY, ITS FITNESS OR SUITABILITY FOR ANY PARTICULAR PURPOSE, ITS DESIGN, ITS CAPACITY, ITS QUALITY, OR WITH RESPECT TO ANY CHARACTERISTICS OF THE EQUIPMENT. Do not accept the Equipment unless you have inspected the Equipment and it is in good condition and satisfactory to you AS IS WHERE IS and with all faults. You agree that your obligations under this Lease are ABSOLUTE AND UNCONDITIONAL and you agree to pay and perform your obligations hereunder without offset, counterclaim or defense, all of which are hereby waived to the fullest extent permitted by law. Neither the vendor of the Equipment nor any salesman is our agent or authorized to waive or alter any terms or conditions of this Lease. No representations as to the Equipment or any other matter by the vendor or salesman effect your obligations to us. Unless you are in default we assign to you any warranties made by the vendor or the manufacturer of the Equipment.

**3. Use/Assignment:** You will use the Equipment only in the conduct of your business in a careful and proper manner and only for commercial or business purposes and not for personal, family, household, consumer, or agricultural purposes; maintain the Equipment in the same condition as when delivered, subject only to reasonable wear and tear, and replace any damaged parts, not make any alterations to the Equipment without our prior written consent. All additions, replacements, parts, or accessories immediately become our property. The Equipment cannot be moved from the location specified on page 1 without our prior written consent, except mobile Equipment can move within the continental United States if it returns regularly to the specified location. We may inspect the Equipment during normal business hours. You may not assign this Lease or lend or sublease the Equipment. We may assign our rights without notice and our assignee will not be subject to any defense or claim you have against us.

**4. Late Payment/Other Charges:** If you fail to pay any Rent or other amount within five (5) days of when it is due, you will pay a late payment fee equal to 15% of the delinquent Rent or other amount. You will also pay interest on any overdue amount calculated from the due date at the rate of 24% percent per annum or the maximum interest rate permitted by applicable law, whichever is lower. If payments are made by ACH or check, you will pay a $30 fee if a payment is returned unpaid. There are fees of $30 for single or $55 for a permanent change if you request a change in Rent payment dates. If we engage an attorney or collection agency to collect any amount you will pay collection fees. On expiration or earlier termination of this Lease you will pay a termination fee of $95.00

**5. Loss, Damage, and Indemnification:** You have all risk of loss of the Equipment upon shipment and for the Term, including any extension. If any Equipment is lost, stolen, destroyed, damaged beyond repair, or otherwise rendered permanently unfit for use, you will promptly pay the remaining Rent plus the "Residual Value" (which means the end of lease purchase option, if one was specified, otherwise 20% of the Equipment Cost), each discounted to present value at 4% per annum, together with any other amounts then due hereunder. You agree to defend, indemnify and hold us harmless from all liability, claims, damages, or other losses, including costs and reasonable attorneys' fees, arising out of or in any manner connected with this Lease or the Equipment.

**6. Taxes and Fees:** You will promptly reimburse us for and hold us harmless against all state, federal, or other fees, assessments, charges and taxes (including penalties and interest but excluding taxes on our taxable income), which now or hereafter may be imposed on or with respect to this Lease, the Equipment, or amounts payable hereunder. You authorize us to file personal property tax and other tax returns on your behalf. You will pay a tax-filing fee of $55.00 for each tax return filed with regard to the Equipment. Upon termination or expiration, or a default under this Lease, you will pay us 2% of the Equipment Cost for any assessed but unpaid taxes or other post closing costs we may incur.

**7. Insurance:** You will maintain: current physical damage (property) insurance for the amount of Equipment Cost or replacement value, whichever is higher, naming us as a "Loss Payee" on a "Lender's Loss Payable" endorsement; and acceptable public liability insurance naming us as an "Additional Insured". Specific minimum liability amount may be required for specific types of equipment. Each policy must be with an insurer and in a form satisfactory to us. You must provide us with written evidence of effective insurance on an ACORD 23 or equivalent document within 30 days of our request. If you do not provide evidence of required insurance to us when due, we may, but have no obligation to, obtain insurance from an insurer of our choosing in such forms and amounts as we deem reasonable to protect our interests ("Lease

**Initials**

Francis Avenl

EXHIBIT A

Insurance"). Lease Insurance covers the equipment, us and our interests only; Lease Insurance does not name you as an insured or loss payee. You agree to pay us periodic charges for Lease Insurance ("Insurance Charges"), any portion of which may generate a profit to us and/or our agents, and which include: premiums that may be higher than the premiums for required insurance if you maintained required insurance separately, administration fees and experience based premium refund credits that may not be shared with Lessee; and a finance charge on any premium advances made by or on our behalf, that will not exceed the maximum lawful interest rate under applicable law. After our receipt of evidence of required insurance, your Insurance Charge payment obligation will cease. You agree to arbitrate any dispute with us or with our agents regarding Equipment Insurance or Insurance Charges under the rules of the American Arbitration Association in Larimer County, Colorado; that arbitration shall be the exclusive remedy for such disputes; and that class arbitration is not permitted. This arbitration requirement does not apply to any other provision of this Agreement.

**8. Title/UCC/Power of Attorney:** We own and have title to the Equipment. This is a "true lease" and not intended as a security agreement. In case it is determined to be a security agreement you grant to us a security interest in the Equipment and all additions, attachments, accessories and accessions thereto. You will keep the Equipment free and clear from liens and security interests of all kinds. You appoint us attorney-in-fact to file UCC financing statements; to take any other actions we deem necessary or desirable to protect our interest; and to correct information entries in this Lease.

**9. Return of Equipment:** On termination or expiration of the Term of this Lease, or upon demand following an event of default, you will, at your expense, return the Equipment to us at an address we specify in the same condition as originally received by you, except for reasonable wear and tear. Unless you (a) notify us in writing sixty (60) days prior to the scheduled expiration of the Term that you will purchase the Equipment (which such notice shall be irrevocable) and do so or (b) you promptly return the Equipment upon the expiration of the Term, the Term will continue and you will pay rent at 50% of the monthly Rent until you return the Equipment or exercise the purchase option. We do not waive any other rights under law with respect to your failure to notify us or to return the Equipment.

**10. Default:** It will be an event of default if: (a) you fail to pay Rent or any sum within five (5) days of when it is due; (b) you fail to perform any other agreement in this Lease or any other agreement with us; (c) you or any guarantor dies, becomes insolvent, merges, consolidates, or suffers a deterioration of financial health; or (d) you or any guarantor file or have filed against you or it a petition for reorganization, liquidation, or similar relief under the federal bankruptcy laws, or a trustee or receiver is appointed over your or its assets. Upon an event of default you owe us: (a) the amount of all accrued unpaid Rent and other amounts payable under this Lease; plus (b) the amount of all unpaid Rent for the remaining Term of this Lease discounted to present value from the date due at the rate of 4% per annum, plus; (c) the Residual Value discounted to present value from the anticipated end of the Lease Term as provided on Page 1, at the rate of 4% per annum. In addition, we may terminate this Lease without releasing you and you will deliver the Equipment to us as required by this Lease or we may disable, repossess and sell or lease the Equipment. You will also pay interest on any unpaid damages at the lower of 24% per year or the maximum rate permitted by applicable law. We may proceed by court action to enforce this Lease. You shall pay all costs and expenses, including legal fees, collection fees or commissions, travel, or any other cost we incur enforcing our remedies. No remedy given in this paragraph is intended to be exclusive, and each shall be cumulative. These remedies are in addition to any other permitted at law or in equity.

**11. Miscellaneous:** This is a finance lease under Article 2A of the Uniform Commercial Code as adopted by the State of Colorado (the "UCC"). Any interest or fee collected under this Lease will not exceed the highest amount permitted by applicable law and any overcharge will be refunded. We may report your performance to any national credit bureau and access business and consumer credit bureau reports for credit and collection purposes. Captions are intended for convenience or reference only and shall not alter the text. This Lease contains the entire agreement between the parties and may not be amended except in writing by one of our executive officers. Your agreements shall survive expiration or termination of this Lease. You agree to perform additional acts we request to protect our interests. Any notice to us must be in writing and must be delivered by U.S. Mail, Return Receipt Requested, or another means generating a written receipt. You authorize us to communicate with you through electronic means, including emails and/or text messages to your cellular telephone number or other wireless device, which you recognize may result in your incurring access or other fees. We are not obligated to communicate with you in this manner and you may not give any notice to us electronically. Time is of the essence of this Lease. This Lease shall be binding upon and shall inure to the benefit of each party's successors and assigns (subject to paragraph 3). The Equipment Cost stated on page 1 or the list price quoted by the vendor may not represent the actual amount financed. It is the intention of the parties that the Equipment shall remain personal property and not be a fixture even if affixed to real property. This Lease shall be governed by the laws of Colorado. You agree that legal actions may only be brought in the state or federal courts in Larimer County, Colorado, except that we may file any action where the equipment is or has been located at any time. You waive objection to venue and agree to accept service of process at your (the Lessee's) address above. You hereby waive, insofar as permitted by law, trial by jury. This Lease may be executed, communicated, and retained electronically and a facsimile or other electronic version shall be admissible. For purposes of perfecting a security interest in chattel paper by possession, only the counterpart of this Lease that bears our (lessor's) manually-applied "wet ink" signature constitutes chattel paper. The electronic counterpart of this Lease stored under our control shall be the authoritative copy under U.C.C. 9-105. To the extent this Lease is electronic chattel paper, no security interest may be created or perfected and no assignment effective except through control of such authoritative copy. You will have access to the authoritative copy for purposes of making a duplicate. Any Equipment that is subject to title registration laws may be titled and registered as directed by us. Anything herein to the contrary notwithstanding, certificates of title for the Equipment may be held by a trust designated by us and such circumstance shall not affect your obligations or rights hereunder, except that (1) all of your obligations to indemnify and provide insurance for the benefit of us shall apply equally to such trust and the party acting as trustee or servicer, and (2) as used herein, the terms "we", "us", "our", "Lessor" and similar references shall mean such trust, acting through its trustee, or servicer. Any officer/owner/partner executing this document hereby affirms that all your shareholders/owners/partners have been identified to us in writing.

**If you request in writing we will send you a copy of this Lease in larger type.**

Initials

Francis Avera

$\partial \theta$ - Jun - 2019

EXHIBIT A

# Lease Schedule "A"

Contract #:

## EQUIPMENT

| Quantity | Equipment Description | Serial # | Supplier Name and Contact |
|---|---|---|---|
| 1 | 2019 Sculpsure Workstation | | Cynosure, Inc |
| | | | |
| | | | 5 CARLISLE RD |
| | | | WESTFORD, MA 01886 |
| | | | 978-256-4200 |

## PURCHASE OPTION

At the end of the lease term, you may purchase the Equipment if you have (1) satisfactorily complied with all terms and conditions of the Lease (2) not been in default at any time during the Lease and (3) notified us in writing at least 60 days prior to the end of the Term that you want to purchase the Equipment. You are not required to purchase the Equipment but if you purchase any of it, you must purchase all of it.

The Purchase Price will be what you and we agree is the fair market value of the Equipment at the end of the Term (which is an amount that a willing buyer, who is neither a lessee in possession nor a used equipment dealer, would pay for such equipment in an arm's-length transaction to a willing seller under no compulsion to sell assuming the equipment is in the condition in which it is required to be maintained and returned under this Lease). However, if you decide to purchase the equipment, you will pay the Purchase Price of 5 equal additional monthly payments, PLUS any applicable sales tax.

Once we receive the full Purchase Price we will give you a bill of sale providing that the Equipment is being sold to you AS IS, WHERE IS, WITH ALL FAULTS AND DEFECTS, BOTH LATENT AND PATENT, WITH NO REPRESENTATION OR WARRANTIES WHATSOEVER, EITHER EXPRESSED OR IMPLIED OF ANY KIND, INCLUDING BUT NOT LIMITED TO WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE except that we will warranty the Equipment has no liens arising by through or under us.

This purchase option supersedes any contrary terms of the Lease. Notwithstanding Section 9 of the Lease, unless you notify us in writing sixty (60) days prior to the expiration of this Lease that you will return the Equipment and you promptly do so when the Lease term ends, you will automatically exercise your option to purchase all of the Equipment as provided above.

## CERTIFICATION OF LESSEE OWNERSHIP AND AUTHORIZATION

**IMPORTANT: DO NOT SIGN BELOW UNTIL THIS SECTION IS FILLED OUT. YOU (THE SIGNER, PERSONALLY AS WELL AS THE LESSEE) ARE RESPONSIBLE FOR THE CORRECTNESS OF THIS SECTION.**

The person signing this agreement individually and in his/her capacity as an officer/owner of the Lessee and/or the Guarantor represents and warrants that (1) this Lease is duly executed and the equipment financed under this Lease will be used in the ordinary course of the business of the Lessee; (2) he or she has the legal right, power and authority to sign this Lease with all necessary authority from the managing member(s), directors, senior officers or other management of the Lessee and/or Guarantor and their shareholders, members, partners or other owners; (3) the following is a complete list of the owners of the Lessee and (4) the transaction is to the direct financial benefit of any Guarantor and good consideration for this guaranty:

| Name | Ownership % | Name | Ownership % |
|---|---|---|---|
| Francis Averill | 100 | | |

## AUTHORIZATION

If this Schedule "A" is executed by Lessee and thereafter sent to Lessor by facsimile transmission, then such facsimile transmission shall, upon acceptance and execution by Lessor in its offices, be admissible for all purposes as an original Schedule "A". Lessee agrees to promptly forward to Lessor this Schedule "A" with Lessee's manual signature thereon. **DO NOT SIGN THIS SCHEDULE "A" UNLESS YOU UNDERSTAND AND AGREE TO ALL OF ITS TERMS AND CONDITIONS.**

LESSEE: ST. FRANCIS HOLDINGS, L.L.C.

LESSOR: Pawnee Leasing Corporation

26-Jun-2019

Authorized Signer on behalf of Lessee and Guarantor

Authorized Signer

Francis Averill

Print Name

Print Name

Member

Title                                      Date

Title                                      Date

EXHIBIT A

## AUTHORIZATION AGREEMENT FOR AUTOMATIC WITHDRAWAL

As a convenience to Lessee, by completing this section Lessee hereby authorizes Lessor to initiate debit entries and to initiate, if necessary, credit entries and adjustments for any debit entries in error to the account indicated below (the "Account") with the bank named below (the "Bank") for all amounts due under the referenced Lease Agreement and all Schedules and Addenda thereto (collectively, the "Lease"), including without limitation, all Rental Payments and purchase option payments, late fees, taxes, non-sufficient funds charges, reimbursements and other amounts due under the Lease. Lessee further authorizes Lessor or any such designee to deliver a copy of this Addendum to the Bank as evidence of Lessee's authorization.

Business Name on Account: _____

Bank Name: _____     Phone: _____

Commercial Checking Account Number: _____

Transit / ABA Number (lower left corner of check, 9 digits): _____

## TOTAL INITIAL PAYMENT

Lessee agrees to pay and authorizes Lessor to debit the Account for the "Total Initial Payment" ("TIP") shown in the Schedule of Rental Payments on Page 1 of the Lease immediately upon execution of the Lease and this Agreement by Lessee, whether or not prior to Lease commencement, delivery or acceptance of the leased equipment or funding by Lessor. If the TIP is not paid to Lessor by Lessee's bank for any reason, Lessor may in its sole discretion cancel the Lease and have no obligations under or with respect to the Lease. Lessee confirms that the Account is a commercial account in the name of the Lessee and contains ample funds to pay the TIP on the date Lessee executes this Agreement.

## TERMS AND CONDITIONS

This authority is to remain in full force and effect until Lessor and the Bank have received written notification from Lessee of its termination in such time and in such manner as to afford Lessor and the Bank a reasonable opportunity to act on it, it expressly being understood that a minimum of 15 business days prior written notice is required. Lessee represents, warrants, covenants and agrees that, until all of its obligations under the Lease are satisfied in full: (a) the account identified by account name, account number and bank name and address that is shown on the face of the voided check that Lessee provides to Lessor by attaching to this Addendum is the Account set forth above; (c) Lessee will maintain the Account in good standing with the Bank throughout the term of the Lease, except as provided herein; and (d) Lessor or its designee may, at any time and from time to time, issue a pre-notification to the Bank with respect to such Account.

## AUTHORIZATION

LESSEE: ST. FRANCIS HOLDINGS, L.L.C.          LESSOR: Pawnee Leasing Corporation

26 Jun 2019

_____          _____
Authorized Signer                            Authorized Signer

Francis Averill
_____          _____
Print Name                                    Print Name

Member
_____  _____   _____  _____
Title                        Date       Title                        Date

Revised Mar 2018

EXHIBIT A

**Please provide the following document to your insurance agent to assure proof of insurance is received on your lease.**

Contract #:

| INSURANCE COVERAGE |
|---|

Lessee: ST. FRANCIS HOLDINGS, L.L.C.
Equipment Location: 802 N BELCHER RD
CLEARWATER FL 33765

Attn: _____
Phone: _____
Fax: _____

We have entered into a lease agreement with Pawnee Leasing Corporation for the following equipment with a value of $205,750.00.

| Quantity | Equipment Description | Serial # |
|---|---|---|
| 1 | 2019 Sculpsure Workstation | |

This is a net lease. We are responsible for the cost of the insurance as well as providing proof of coverage as identified below. Please see that we have immediate coverage indicating therein the standard 10-day notice of cancellation clause and provide our funding source proof of insurance in the form of an ACORD 23 or equivalent document. They are to be listed on the policy as certificate holder and any name required by the lease, as follows:

**Pawnee Leasing Corporation ISAOA, c/o
American Lease Insurance
654 Amherst Road, Suite 320
Sunderland, MA 01375**

**WITHIN 15 DAYS OF THE LEASE INCEPTION**, if no proof of coverage is provided, we will be contacted to furnish evidence of insurance. If evidence of coverage is not received within given time period, they may, but have no obligation to, obtain insurance from an issuer of their choosing in such forms and amounts as they deem reasonable to protect their interests, and premiums will be assessed to our bank account.

[X] **PHYSICAL DAMAGE**: Insurance is to be provided for fire, theft, extended coverage, vandalism and malicious Mischief for the full value of the equipment. Pawnee Leasing Corporation is to be named **LENDERS LOSS PAYEE, AS ITS INTERESTS MAY APPEAR**.

X _____ **LIABILITY**: Coverage should be written with minimum limits of $500,000 for bodily injury. Pawnee Leasing Corporation is to be named **ADDITIONAL INSURED.**

_____ **LIABILITY**: Coverage should be written with minimum limits of $1,000,000 per occurrence for bodily injury.

Maximum deductible $1,500. Pawnee Leasing Corporation is to be named **ADDITIONAL INSURED.** **\*\*This level of Liability coverage is required on gymnastic, playground, inflatable and scaffolding equipment as well as any other equipment types as determined by Pawnee Leasing Corporation.**

| AUTHORIZATION |
|---|

If you have any questions, please do not hesitate to call American Lease Insurance at (800) 625-8348.

_____  2b Jun 2019

Authorized Signature - Francis Averill          Member

Title          Date

19 - L INS - V190419

EXHIBIT A

## Addendum to Lease Agreement (Pre-delivery and Installation)

**Lessor:** Pawnee Leasing Corporation

**Lessee:** ST. FRANCIS HOLDINGS, L.L.C.

**Vendor(s) Amounts:** Cynosure, Inc        $205,750.00

## EQUIPMENT

See attached Lease Agreement / Schedule 'A' / Invoice(s)

## TERMS AND CONDITIONS

For good and valuable consideration, the receipt and sufficiency of which is acknowledged by both parties, this Addendum to Equipment Lease Agreement between Lessee and Lessor (the "Lease") shall serve to amend the Lease as indicated herein. All other terms and conditions of the Lease not inconsistent with this Addendum shall be and remain in full force and effect.

1. Pre-delivery and Installation Acceptance of Equipment. In lieu of the delivery of any portion or all of the leased equipment referred to above ("Equipment"), Lessee hereby agrees to assume full responsibility for the delivery and installation of the Equipment. Lessee requests that Lessor accept the Lease and pay the above vendor ("Vendor") based upon Lessee's complete satisfaction of the Equipment as it's now. Lessee also agrees that the Equipment is irrevocably accepted for all purposes under the Lease. Lessee acknowledges that Lessor will not be liable for any loss or injury to Lessee or any other person or property caused by the Equipment, its installation or its failure to properly operate.

2. Advance Request. Lessee hereby acknowledges that the total cost of the Equipment described in the Equipment Lease Agreement is $205,750.00, per the attached Invoice(s). Lessee hereby requests that Lessor sign the Lease and pay Vendor(s) an advance request of $205,750.00.

3. **REAFFIRMATION OF LEASE TERMS. LESSEE HAS READ AND AGREES TO ALL TERMS AND CONDITIONS OF THE LEASE, INCLUDING ALL ATTACHMENTS AND ADDENDA IF ANY. LESSEE UNDERSTANDS THAT THE EQUIPMENT IS LEASED TO LESSEE "AS IS", THAT LESSOR DISCLAIMS ALL WARRANTIES, EXPRESS AND IMPLIED; THAT LESSOR IS NOT RESPONSIBLE FOR INSTALLATION, DELIVERY, SERVICE, TRAINING OR REPAIRS; THAT THE LEASE CANNOT BE CANCELED FOR ANY REASON; AND THAT LESSEE'S OBLIGATION TO MAKE THE LEASE PAYMENTS AND PERFORM ITS OTHER OBLIGATIONS UNDER THE LEASE ARE ABSOLUTE, UNCONDITIONAL, INDEPENDENT OF, AND NOT SUBJECT TO ANY COUNTERCLAIM, SETOFF OR DEFENSE. THIS PARAGRAPH SHALL NOT BE CONSTRUED TO ALTER OR LIMIT THE TERMS AND CONDITIONS OF THE LEASE.**

4. Rental Payments to Commence. Lessee acknowledges that rental payments, including interim rent, shall commence upon the payment of this Advance Request and shall continue thereafter to be paid as specified and set forth in the Lease and "Authorization Agreement for Automatic Withdrawal".

5. Facsimile: If this Agreement is executed by you and thereafter sent to us by facsimile transmission, then until such time as we have received this Agreement with your manual signature thereon, such facsimile transmission shall constitute, upon acceptance and execution by us in our officers, the original Agreement and shall be admissible for all purposes as the original Agreement. You agree to promptly forward to us the Agreement with your manual signature thereon and upon receipt by us this Agreement with your manual signature thereon shall constitute the original Agreement in lieu of such facsimile transmission.

## AUTHORIZATION

**IN WITNESS, WHEREOF,** the parties hereto have set their hands and seals to this Addendum and acknowledge receipt of a true copy hereof on the date(s) indicated below.

LESSEE: ST. FRANCIS HOLDINGS, L.L.C.      LESSOR:     Pawnee Leasing Corporation

By: _____   26 Jun 2019   By: _____

Francis Averill
Print Name                          Print Name
Member

Title            Date            Title                Date

EXHIBIT A

## Schedule B

Date:

**Lessee:** ST. FRANCIS HOLDINGS, L.L.C.
**Lessor:** Pawnee Leasing Corporation

This addendum is made part of the lease agreement dated  between Lessor and Lessee (the "Agreement"). For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree that the Lessee desires to make the following changes to the Agreement:

| | | | |
|---|---|---|---|
| Contact Payments (Payments 1-6) | $99.00 | Monthly Rent (Payments 7-61) | $4,357.12 |
| | | Monthly Rent with 7.00% Tax (Payments 7-61) | $4,662.12 |

## TERMS AND CONDITIONS

The Lessee hereby agrees to this change. Except as expressly amended hereby, the Agreement and all other documents executed in connection with the Agreement are and shall be unmodified and remain in full force and effect, and nothing contained herein shall constitute or be deemed a waiver of any of the rights or obligations of the parties prior to the date hereof. Facsimiles or other electronic transmissions of this Agreement shall be admissible as originals for purposes of evidence. This Schedule B may be executed in counterparts, and all parties need not execute the same counterpart; however, to the extent this Agreement constitutes chattel paper, the counterpart of this Schedule B containing Lessor's manually applied signature and marked "Original" shall be the sole original counterpart of the chattel paper for purposes of possession under the UCC.

This Schedule B, the Agreement and the other documents executed in connection with the Agreement represent the final agreement between the parties and may not be contradicted by evidence of any oral or prior agreement.

## AUTHORIZATION

LESSEE: ST. FRANCIS HOLDINGS, L.L.C.

26 Jun - 2019

Authorized Signor

Francis Averill
Print Name

Member
Title                                    Date

LESSOR: Pawnee Leasing Corporation

Authorized Signor

Print Name

Title                                    Date

V190214

EXHIBIT A

# EXHIBIT 22

## Law Offices of
# Averill
# Law Firm

**Francis J. Averill, Attorney at Law**

Frank Averill, M.D., J.D.
802 North Belcher Road
Suite A
Clearwater, FL 33765

Phone 727.447.3000
Fax 727.210.4609
www.FLLegalMed.com
FAverill@FLLegalMed.com

August 7, 2019

TO: Cynosure, a Hologic Company and related entities including Pawnee Leasing Corporation; MMP Capital

Re: Cynosure sales and/or lease of consumer goods or services solicited at Miami Conference ending August 4, 2019 and earlier solicitation made at my medical practice in Clearwater, Florida.

## NOTICE OF CANCELLATION OF ALL CONTRACTS FOR SERVICES WITH CYNOSURE AND ANY RELATED ENTITY

Florida Statute 501.021 gives all Florida consumers the right to cancel, within three business days, a sale, lease or rental of consumer goods or services in excess of $25 in which the sale occurs in a personal solicitation at a place other than the seller's fixed location business establishment and the buyer's agreement to purchase is consummated at a place other than the seller's fixed location business establishment.

We are exercising our rights under Florida law to cancel all purchases made at the hotel conference in Miami Beach, Florida over the Aug. 3-4, 2019 weekend.

Further, in light of the nature of the presentations and solicitations at the hotel conference, we find that the solicitations made at our medical practice were unconscionable, deceptive and unfair in their misrepresentations about the suitability of the Cynosure products for a practice such as ours and were intended only to deceive and induce us into a purchase.

The Sculpsure and Tempsure equipment have not been used and will be returned to Cynosure as per your instructions. No delivery was scheduled for the remaining equipment including Icon, Picosure and Nitronox. You are hereby notified not to ship the equipment. DHL has already been notified that we will not be accepting delivery of the equipment.

Hopefully, this issue can be resolved amicably, and all parties can be returned to their prior position. We do not want to become involved in litigation, involving these issues or any similar claims that have been filed against Cynosure, but we will defend our position with all legal and non-legal remedies available if this issue is not resolved between all affected parties.

Respectfully,

Francis Averill, M.D., J.D.

EXHIBIT A

**Cassy Moreau**

| | |
|---|---|
| **From:** | Cassy Moreau |
| **Sent:** | Wednesday, August 07, 2019 2:36 PM |
| **To:** | 'patrick.ryan@hologic.com'; 'khouston@cynosure.com'; 'mike.russo@cynosure.com'; 'info@cynosure.com'; 'kristopher.huston@hologic.com' |
| **Cc:** | Frank Averill; Rose Averill; Cesar Fernandez |
| **Subject:** | URGENT- Cancellation Notice |
| **Attachments:** | signed-CynosureCancellationNotice.pdf |
| | |
| **Importance:** | High |

| Tracking: | **Recipient** | **Delivery** | **Read** |
|---|---|---|---|
| | 'patrick.ryan@hologic.com' | | |
| | 'khouston@cynosure.com' | | |
| | 'mike.russo@cynosure.com' | | |
| | 'info@cynosure.com' | | |
| | 'kristopher.huston@hologic.com' | | |
| | Frank Averill | Delivered: 8/7/2019 2:36 PM | |
| | Rose Averill | Delivered: 8/7/2019 2:36 PM | |
| | Cesar Fernandez | Delivered: 8/7/2019 2:36 PM | Read: 8/8/2019 12:16 PM |

Good afternoon:

Attached please find our official Cancellation Notice.

Thank you for your prompt attention.

Kind regards,

Cassy Moreau, CFE, CAMS
*Director of Finance*
St. Francis Medical Institute
802 N. Belcher Road, Clearwater, Florida 33765
Tel: (727) 447-3000 Fax: (727) 210-4600
www.StFrancisMed.com
*"Giving of ourselves...so you receive...excellent care."*



THIS EMAIL AND ANY FILES TRANSMITTED WITH IT ARE CONFIDENTIAL AND ARE INTENDED SOLELY FOR THE USE OF THE INDIVIDUAL OR ENTITY TO WHOM THEY ARE ADDRESSED. This document may contain information covered under the Privacy Act, 5 USC 552(a), and/or the Health Insurance Portability and Accountability Act (PL 104-191) and its various implementing regulations and must be protected in accordance with those provisions. If you are not the intended recipient or the person responsible for delivering the email to the intended recipient, be advised that you have received this email in error and that any use, dissemination, forwarding, printing, or copying of this email is strictly prohibited. If you have received this email in error, please return immediately to the sender and delete this copy from your system. Thank you for your cooperation.

1

EXHIBIT A

## Cassy Moreau

| | |
|---|---|
| **From:** | Cassy Moreau |
| **Sent:** | Wednesday, August 07, 2019 3:00 PM |
| **To:** | 'eric.anderson@hologic.com' |
| **Cc:** | Frank Averill; Rose Averill; Cesar Fernandez; 'patrick.ryan@hologic.com'; 'khouston@cynosure.com'; 'mike.russo@cynosure.com'; 'info@cynosure.com'; 'kristopher.huston@hologic.com' |
| **Subject:** | URGENT- Cancellation Notice (Cynosure) |
| **Attachments:** | signed-CynosureCancellationNotice.pdf |

**Importance:** High

**Tracking:**

| Recipient | Delivery | Read |
|---|---|---|
| 'eric.anderson@hologic.com' | | |
| Frank Averill | Delivered: 8/7/2019 3:01 PM | |
| Rose Averill | Delivered: 8/7/2019 3:01 PM | |
| Cesar Fernandez | Delivered: 8/7/2019 3:01 PM | Read: 8/8/2019 12:16 PM |
| 'patrick.ryan@hologic.com' | | |
| 'khouston@cynosure.com' | | |
| 'mike.russo@cynosure.com' | | |
| 'info@cynosure.com' | | |
| 'kristopher.huston@hologic.com' | | |

Good afternoon:

Attached please find our official Cancellation Notice.

Thank you for your prompt attention.

Kind regards,

Cassy Moreau, CFE, CAMS
*Director of Finance*
St. Francis Medical Institute
802 N. Belcher Road, Clearwater, Florida 33765
Tel: (727) 447-3000 Fax: (727) 210-4600
www.StFrancisMed.com
*"Giving of ourselves...so you receive...excellent care."*



THIS EMAIL AND ANY FILES TRANSMITTED WITH IT ARE CONFIDENTIAL AND ARE INTENDED SOLELY FOR THE USE OF THE INDIVIDUAL OR ENTITY TO WHOM THEY ARE ADDRESSED. This document may contain information covered under the Privacy Act, 5 USC 552(a), and/or the Health Insurance Portability and Accountability Act (PL 104-191) and its various implementing regulations and must be protected in accordance with those provisions. If you are not the intended recipient or the person responsible for delivering the email to the intended recipient, be advised that you have

1

EXHIBIT A

received this email in error and that any use, dissemination, forwarding, printing, or copying of this email is strictly prohibited. If you have received this email in error, please return immediately to the sender and delete this copy from your system. Thank you for your cooperation.

EXHIBIT A

| From: | Cassy Moreau |
| --- | --- |
| Sent: | Wednesday, August 07, 2019 3:03 PM |
| To: | 'INFO@MMPCAPITAL.COM' |
| Cc: | Frank Averill; Rose Averill; Cesar Fernandez |
| Subject: | URGENT- Cancellation Notice (MMP Capital) |
| Attachments: | signed-CynosureCancellationNotice.pdf |

| Importance: | High |
| --- | --- |

| Tracking: | **Recipient** | **Delivery** | **Read** |
| --- | --- | --- | --- |
| | 'INFO@MMPCAPITAL.COM' | | |
| | Frank Averill | Delivered: 8/7/2019 3:03 PM | |
| | Rose Averill | Delivered: 8/7/2019 3:03 PM | |
| | Cesar Fernandez | Delivered: 8/7/2019 3:03 PM | Read: 8/8/2019 12:16 PM |

Good afternoon:

Attached please find our official Cancellation Notice.

Thank you for your prompt attention.

Kind regards,

Cassy Moreau, CFE, CAMS
*Director of Finance*
St. Francis Medical Institute
802 N. Belcher Road, Clearwater, Florida 33765
Tel: (727) 447-3000 Fax: (727) 210-4600
www.StFrancisMed.com
*"Giving of ourselves...so you receive...excellent care."*



THIS EMAIL AND ANY FILES TRANSMITTED WITH IT ARE CONFIDENTIAL AND ARE INTENDED SOLELY FOR THE USE OF THE INDIVIDUAL OR ENTITY TO WHOM THEY ARE ADDRESSED. This document may contain information covered under the Privacy Act, 5 USC 552(a), and/or the Health Insurance Portability and Accountability Act (PL 104-191) and its various implementing regulations and must be protected in accordance with those provisions. If you are not the intended recipient or the person responsible for delivering the email to the intended recipient, be advised that you have received this email in error and that any use, dissemination, forwarding, printing, or copying of this email is strictly prohibited. If you have received this email in error, please return immediately to the sender and delete this copy from your system. Thank you for your cooperation.

EXHIBIT A

## Cassy Moreau

| | |
|---|---|
| **From:** | Cassy Moreau |
| **Sent:** | Wednesday, August 07, 2019 2:47 PM |
| **To:** | 'arrow@pawneeleasing.com' |
| **Cc:** | Frank Averill; Rose Averill; Cesar Fernandez |
| **Subject:** | URGENT- Cancellation Notice (Pawnee Leasing corporation) |
| **Attachments:** | signed-CynosureCancellationNotice.pdf |

**Importance:**          High

| **Tracking:** | **Recipient** | **Delivery** | **Read** |
|---|---|---|---|
| | 'arrow@pawneeleasing.com' | | |
| | Frank Averill | Delivered: 8/7/2019 2:48 PM | |
| | Rose Averill | Delivered: 8/7/2019 2:48 PM | Read: 8/7/2019 8:36 PM |
| | Cesar Fernandez | Delivered: 8/7/2019 2:48 PM | Read: 8/8/2019 12:16 PM |

Good afternoon:

Attached please find our official Cancellation Notice.
Re: contract# 369964

Thank you for your prompt attention.

Kind regards,

Cassy Moreau, CFE, CAMS
*Director of Finance*
St. Francis Medical Institute
802 N. Belcher Road, Clearwater, Florida 33765
Tel: (727) 447-3000 Fax: (727) 210-4600
www.StFrancisMed.com
*"Giving of ourselves...so you receive...excellent care."*



THIS EMAIL AND ANY FILES TRANSMITTED WITH IT ARE CONFIDENTIAL AND ARE INTENDED SOLELY FOR THE USE OF THE INDIVIDUAL OR ENTITY TO WHOM THEY ARE ADDRESSED. This document may contain information covered under the Privacy Act, 5 USC 552(a), and/or the Health Insurance Portability and Accountability Act (PL 104-191) and its various implementing regulations and must be protected in accordance with those provisions. If you are not the intended recipient or the person responsible for delivering the email to the intended recipient, be advised that you have received this email in error and that any use, dissemination, forwarding, printing, or copying of this email is strictly prohibited. If you have received this email in error, please return immediately to the sender and delete this copy from your system. Thank you for your cooperation.

EXHIBIT A



EXHIBIT A





EXHIBIT A

# EXHIBIT 23

| | |
|---|---|
| From: | Joseph Siederman [joseph@mmpcapital.com] |
| Sent: | 6/26/2019 4:26:07 PM |
| To: | Huston, Kristopher [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=83eb5dc0761e4196b3fc322a51522ba2-Huston, Kri]; krismhuston@gmail.com; Chambers, Chris [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=cd86efe6107a4c3fa5b1a48c051f4aa1-Chambers, C] |
| CC: | John-Paul M. Smolenski [jp@mmpcapital.com] |
| Subject: | RE: Finance Docs - 66 mon - Dr. Francis Averill - 205K Sculpsure & 130K Tempsure |
| Attachments: | FedEx Label - Dr. Francis Averill.pdf |

---

**External Mail**

---

FedEx Label attached for Amur originals



Apply Here [mmpcapital.com]

(516) 382-1311        (516) 454-4572
joseph@mmpcapital.com    (516) 350-5817

"The difference between a successful person and others is not a lack of strength, not a lack of knowledge, but rather a lack of will." - Vince Lombardi

**Joseph Siederman**
Sr Account Executive

**From:** Joseph Siederman
**Sent:** Wednesday, June 26, 2019 12:03 PM
**To:** Huston, Kristopher <Kristopher.Huston@hologic.com>; krismhuston@gmail.com; Chambers, Chris <Christopher.Chambers@hologic.com>
**Cc:** John-Paul M. Smolenski <jp@mmpcapital.com>
**Subject:** Finance Docs - 66 mon - Dr. Francis Averill - 205K Sculpsure & 130K Tempsure

Kris,

Docs attached.  We need the following to issue PO and fund:

EXHIBIT A

- Original signed docs for Amur (MMP), scanned copies for Pawnee
- Drivers license
- Voided business check from "ST. FRANCIS HOLDINGS, L.L.C."

Thank you,

# EXHIBIT 24

Marked Confidential by Cynosure, Inc. -- Redacted Pursuant to Protective Order.

Marked Confidential by Cynosure, Inc. -- Redacted Pursuant to Protective Order.

# EXHIBIT 25

**To:**        Rose Averill[raverill@stfrancismed.com]
**Cc:**        John-Paul M. Smolenski[jp@mmpcapital.com]
**From:**    John-Paul M. Smolenski[jp@mmpcapital.com]
**Sent:**    Thur 7/25/2019 9:28:47 PM (UTC)
**Subject:** Cynosure Sculpsure Financing

Dr. Averill,

I received a call from Pawnee leasing today stating that you were planning to stop making payments since you have not been satisfied with the equipment that you chose to finance. I just wanted to reach out to you as a friendly reminder that Pawnee Leasing is independent of the manufacturer. Regardless of any dissatisfaction with the equipment, you are still responsible to make all payments as promised and guaranteed. I also left you a voicemail earlier, please feel free to call me back if there is any ambiguity.

Thank you,
JP



**John-Paul M. Smolenski**



Apply Here

📱 (516) 606-8354       📞 (516) 454-4570
✉ jp@mmpcapital.com     📠 (516) 706-2005

"Success is not owned, it's leased, and rent is due everyday." - J.J. Watt

EXHIBIT A

# EXHIBIT 26



## Will this put people to sleep?

No, when using Nitronox, the device always administers 50% nitrous oxide AND 50% oxygen ensuring that patients are getting the appropriate amount of nitrous oxide needed for pain or anxiety relief. This ratio is not strong enough to provide anesthesia.

## Is nitrous oxide safe?

Nitrous oxide and oxygen have been used for over 100 years and have a long-standing safety record. When the Nitronox device is used — patients are awake (conscious), responsive, and breathing on their own.

## What safety mechanisms does the Nitronox device have?

- Oxygen fail-safe preventing flow of nitrous oxide without oxygen (will not work without oxygen)
- Diameter indexed gas line connections (can't cross connect hoses)
- Pin-Indexed cylinder regulators (can't cross connect regulators to cylinders)
- Visual pressure gauges for real time visual confirmation of gas and mixture supply
- Audible alarm for mixture pressure failure
- Dual seal diaphragm block reduces risk for leak or failure
- Nitrous oxide regulator check valve (when removing $N_2O$ regulator to change cylinders, check valve prevents flow back out into the room from the hose and device)
- Oxygen enrichment feature increases $O_2$% if repetitive pattern of shallow breathing (unlikely in a patient self-administered protocol)
- Patient-self administered
- No settings or adjustments (fixed 50/50 nitrous oxide and oxygen)
- Ability to secure / lock out the system

EXHIBIT A

## Is nitrous oxide flammable?

No, neither $N_2O$ or $O_2$ are flammable. However, they are both oxidizers which support combustion. If you have a fuel source, heat source and add an oxidizer – there is potential for hazard. An open firing laser should not be fired at the same time as when Nitronox is being used.

## Are there risks?

Nitrous oxide is a "drug" with contraindications for use. There are also occupational concerns and risks to be aware of. Contraindications are very well documented and easy to assess. Occupational risks can be monitored and managed effectively. Additional risks could include combining $N_2O$ / $O_2$ with other drugs and medications.

## What are the typical side effects that one might see?

Side effects are usually minimal. With a self-administered protocol the patient is in control, which minimizes side effects. Dizziness, nausea – if left unmanaged may result in vomiting. During patient self-administered application – if the patient does not like how they are feeling – they stop, breathe room air, which should quickly reverse any negative effects.

## Who can administer?

Typically, you will not find a specific regulation saying who can administer nitrous oxide and oxygen. It is the treating clinician's responsibility to ensure that the use of nitrous oxide and oxygen are within their scope of practice. You should review guidelines from your governing body or state medical board. What you would want to look for – is it within your scope of practice to administer pain management medications, minimal conscious sedation, anxiolysis, analgesia, etc. If the answer is yes – $N_2O$ / $O_2$ is no different. For the most part, use of nitrous oxide and oxygen fall under the same umbrella as administering a local anesthetic.

## Does this effect malpractice?

In most cases the answer is no – as you are already covered for pain management, minimal sedation, analgesia, etc. That said – the treating clinician may wish to notify your malpractice carrier if you have concerns.

## Are there regulations for use?

Typically, you will not see a regulation specific to the use of nitrous oxide and oxygen for physicians or nurses. This falls under the same umbrella as utilizing pain medications, local anesthetics, analgesia, minimal sedation.

EXHIBIT A

## Are there patient monitoring requirements?

With just nitrous oxide and oxygen – typically the answer is no. You should follow any guidelines set forth within your scope of practice that may define what is required when administering pain management medications, analgesia, minimal sedation etc.

## Do I need to be in the room with the patient?

This is related to the standard of care within your practice. The prudent answer would be that a patient shouldn't be left alone in a room if they are medicated.

## Risks of patient falling during use of nitrous oxide?

For safety, it is always a good idea to be sure the patient is sitting or lying down for the procedure if using Nitronox. As with the use of any pain medication there is risk that a patient may be unsteady, light-headed or dizzy which could be a fall risk. You and your staff should evaluate potential risks prior to treatment and make sure the patient is not in a position where there is potential for falling / injury.

## Is there an insurance code?

Outside of dental and anesthesia – there are no codes for nitrous oxide used as an analgesic. Most physicians will charge an out of pocket fee or incorporate into their overall treatment fee. Some will use this as a marketing tool to help assist with attracting patients as well as improve case acceptance – offer it at no charge to their patients. It is not uncommon to see cash fees range from $50 to $150.

## How fast does nitrous oxide take effect and last?

For most patients they will feel the effects of nitrous oxide within a minute or two. As with any medication the effects may vary from patient to patient. For some it will work great and for others it may either not be enough or they will not like how it is making them feel. Once the patient stops inhaling the gas mixture it will be completely out of their system within 5-10 minutes. They will start feeling back to normal almost immediately.

## Does nitrous oxide eliminate pain?

No. Nitrous oxide and oxygen do not eliminate pain. This is important for educating patients and setting expectations. This will also not replace a local anesthetic (if required). Nitrous oxide is intended to take the edge off, help the patient relax, make them more comfortable, distract them, reduce anxiety. This is not something you would use for extremely painful procedures or procedures where you need the patient to not be able to move.

## What does it feel like?

Most will say it makes them feel relaxed, arms and legs feel light, tingling in extremities (hands / feet), floating feeling, sinking into a chair feeling, etc.

EXHIBIT A

## Do patients use nitrous oxide for the duration of the procedure – or just for a minute or two before the procedure?

The effects of nitrous oxide wear off very quickly, so the patient will need to utilize nitrous oxide and oxygen to maintain comfort during the procedure. If using nitrous oxide as an adjunct to local anesthesia, the patient may use the nitrous oxide until the effects of the local anesthetic are felt and stop using the nitrous oxide. If your patient is using the nitrous oxide during a laser procedure it is very important to remember to only allow the patient to use the nitrous oxide when the laser is not firing. A good practice to adopt is replace the laser handpiece to the unit and allow the patient to use the Nitronox, replace the breathing circuit to the cart and resume treatment.

## Can patients drive home after using nitrous oxide?

This is dependent on the procedure performed, other medications administered etc. The effects of nitrous oxide and oxygen are completely out of the patient's system within a few minutes. It is reasonable (assuming all other discharge criteria is met) that a patient can safely go home about 10 minutes after ceasing use of nitrous oxide and oxygen.

## Are there safety concerns for me or my staff?

Nitrous oxide is a medical gas, and OSHA has guidelines for workplace safety. The main concern is for chronic (frequent) and long-term exposure to high levels of nitrous oxide. Depending on duration of use and frequency of use this may or may not be an area of concern for you and your staff. You should be educated and aware of potential risks and how to manage them. You can easily monitor exposure by periodically wearing nitrous oxide dosimeter testing badges that will verify the parts per million (PPM) of exposure.

## Do you need to scavenge waste gas?

Scavenging is the term for removal of waste / exhaled gas and venting it directly to the outside. Nitrous oxide is not metabolized in the body. Basically, the amount the patient inhales is nearly the same amount they exhale. There is no law or regulation on the use of scavenger systems. OSHA has standards of care with regard to use of medical gas – and recommend providing workplace environments below 50ppm over an 8-hour time weighted average (TWA) – per American Conference of Government Industrial Hygienists (ACGIH). Aside from scavenging you can lower exposure levels by having good room air circulation, fans, open windows, not using in confined spaces, avoiding direct contact, etc.

## Where do I get the gas – and how much do I need to order?

The gas itself is available from most medical gas suppliers. There are large national suppliers like Praxair® (www.praxair.com) and Airgas® (www.airgas.com) – and smaller regional / local ones. If you have a supplier for oxygen – more than likely you will have access to nitrous oxide. You should shop around as suppliers will have various fees and charges added on. You will need to source size "E" cylinders with a "standard post valve" (not cylinders with integrated regulators). You should order enough gas so that you have 1 of each gas for use as well as a few spare cylinders of each gas on hand. You will go

through more $O_2$ vs. $N_2O$ as there is more $N_2O$ in one cylinder. $O_2$ = 625 Liters, $N_2O$ = 1500 Liters. A good question to ask the gas supplier – how long will it take for delivery after you order? If it is a longer period of time, factor that in as you may want to hold additional reserve cylinders.

## How long does a cylinder of $O_2$ and $N_2O$ last?

A full $O_2$ cylinder will last approximately 2 hours of continual use. A full $N_2O$ cylinder will last about 6 hours of continual use.

## How much does a cylinder of $O_2$ and $N_2O$ cost?

One cylinder of $O_2$ typically costs around $25 whereas one cylinder of $N_2O$ typically costs anywhere from $35-$40. Prices will vary depending on the supplier.

## When looking at the regulator gauges – why doesn't the $N_2O$ gauge move as the gas is being used?

$O_2$ is a true gas and as it is used you will see the gauge move. A full $O_2$ cylinder is 2000 psi, half full = 1000 psi, etc. $N_2O$ is in the cylinder as a liquid, and as it is released turns into a gas. Because of this, it maintains the same amount of pressure in the cylinder right up until it is just about empty (similar to a propane cylinder for a gas grill). A full cylinder of $N_2O$ is 750 psi, a half full cylinder of $N_2O$ is 750 psi, and a quarter full cylinder of $N_2O$ is 750 psi. You can't look at the gauge and tell how much is left. This is why you should keep an estimate / track of use and have a spare(s) reserve on hand. The only way to know how much is in an $N_2O$ cylinder is to weigh it before and after use (which is not practical). Remember that you will get about 6 hours of use – so it should last for quite a few patients. Cylinders can be swapped out quickly and takes less than 2 minutes to complete.

## How do you handle staff abuse concerns?

Just like any drug or controlled substance in an office – you have a zero-tolerance policy. This is no different. With the Nitronox system there is a convenient "lock out" mechanism. You can detach the demand valve from the Nitronox system and secure the demand valve. Without the demand valve the system cannot be used. Spare cylinders should be secured appropriately.




© 2018. Hologic, Inc. Cynosure is a registered trademark of Cynosure, Inc. Nitronox is a trademark of Porter Instrument, Parker Hannifin Corporation. Hologic, Inc. owns exclusive rights to photography. Use of photography without written permission of Hologic is prohibited. PB-00669 R1 8/18

EXHIBIT A

# EXHIBIT 27



## Patient Selection for Nitronox

When screening patients, use the following guidelines:

- Patients should not use Nitronox if they have one or more of the following conditions: Recent ophthalmic procedure/surgery, congestive heart failure, coronary artery disease, COPD, air embolism, pneumothorax, recent pneumoencephalogram, intracranial air, lung cysts, active sinus or middle ear problems, pulmonary hypertension, bowel obstructions, chemotherapy with bleomycin, sickle cell anemia, pregnancy first trimester, B12 deficiency, decompression sickness, head injury, anemia, post gastrectomy, or any other condition or illness.
- The following possible side effects should be disclosed: nausea, vomiting, excessive sweating, euphoria (feelings of happiness), excitement, deep sedation, drowsiness, sleep, dizziness, lightheadedness, dysphoria (feelings of sadness), amnesia (not remembering what has just occurred), and headaches.

## Nitronox Training

Training for the Nitronox system will consist of a PowerPoint presentation, Clinical and Technical videos, and a Brainshark Video for certification. You can access these training tools in the AMPS portal (https://customer.cynosure.com) under the Nitronox tab.

## Have the following supplies available:

- Breathing circuits
- Facial masks or mouthpieces
- Nitrous Oxide & Oxygen tanks from gas supplier of choice
- Nitronox Medical History, Consent, and Treatment forms
- Nitronox Quick Start Card
- Dosimeters

**Per Cynosure policy, video or audio recording of the training session is strictly prohibited.**

EXHIBIT A

# EXHIBIT 28



A Hologic Company

5 Carlisle Road
Westford, MA 01886
www.cynosure.com

August 30, 2019

**VIA FEDERAL EXPRESS AND E-MAIL**

Rose Averill, CEO
St. Francis Sleep, Allergy & Lung Institute
802 North Belcher Road
Clearwater, FL 33765
RAverill@StFrancisMed.com

Re:   Cynosure Devices

Dear Ms. Averill:

I am writing on behalf of Cynosure, LLC (f/k/a Cynosure, Inc.) ("Cynosure") in response to your various correspondence to employees at both Cynosure and Hologic, Inc. regarding your purchase of a SculpSure Non-Invasive Body Contouring Platform ("SculpSure System") and a TempSure RF System ("TempSure System"). As you are aware, the terms of your signed Customer Purchase Agreements for the SculpSure System and the TempSure System, dated June 26, 2019 and June 25, 2019, respectively, state clearly that **"All Sales are final. Cynosure Grants no right of return."** Accordingly, we remain unable to accept a return of your SculpSure System or TempSure System. Additionally, because Cynosure is not a party to the financing arrangements with Pawnee Leasing or Amur Equipment Finance, Cynosure is unable to amend the terms or otherwise release you from any obligations thereunder.

We are understanding of the trepidation that often comes with developing a new medical aesthetics practice because we have partnered with hundreds of practices similar to yours. We are excited to provide the expertise and know-how to help ensure that you can successfully leverage your SculpSure System and TempSure System. We remain ready and able to provide our world-class training so that your staff is equipped with the tools necessary to achieve the best results for your patients. In addition to the resources afforded to you through our Practice Transformation Plan, we'd also like to work with you to discuss additional marketing opportunities, including leveraging materials and press highlighting our new celebrity partnership with Brooke Shields, which has been a huge hit with practices and patients alike.

I apologize for our delay in issuing your marketing rebate check negotiated as part of you SculpSure System and TempSure System purchase. I've instructed our finance team to move forward with processing your rebate in the amount of $26,750. You should expect a check within the next 7-10 business days.

EXHIBIT A

In closing, I hope that we can move forward together to help build your practice. I've seen firsthand what a partnership with Cynosure has done to bolster other practices and cannot wait to get started with St. Francis.

Sincerely,

Erik Anderson
President