UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------

ST. FRANCIS HOLDINGS, LLC and FRANCIS J.
AVERILL, M.D.,

                      Plaintiffs,

       v.

MMP CAPITAL, INC.,

                    Defendant.
---------------------------------------------------------------

**MEMORANDUM & ORDER**
20-CV-4636 (MKB)

MARGO K. BRODIE, United States District Judge:

      Plaintiffs St. Francis Holdings, LLC and Francis J. Averill, M.D. filed the

above-captioned action on June 12, 2020, against Defendant MMP Capital, Inc. ("MMP"),

alleging that (1) a sales agent acting on behalf of Defendant fraudulently induced Plaintiffs to

enter into a finance agreement, (2) Defendant violated the Florida Deceptive and Unfair Trade

Practices Act (the "FDUTPA"), (3) Plaintiffs canceled and/or rescinded the finance agreement,

and (4) Defendant committed civil conspiracy.[1] (Am. Compl. ¶¶ 94–105, 116–52, Docket Entry

No. 21.)  Plaintiffs allege that they executed a finance agreement with Defendant following a

---

[1] Plaintiffs commenced the initial action on December 30, 2019 against Cynosure, LLC ("Cynosure") in the Sixth Judicial Circuit of Florida, (Compl., annexed to Notice of Removal as Ex. B, Docket Entry No. 1-2), and Cynosure removed the case to the Middle District of Florida on May 12, 2020, (Notice of Removal, Docket Entry No. 1).  On June 12, 2020, Plaintiffs filed an Amended Complaint asserting claims against Defendant, Cynosure, Pawnee Leasing Corp., and Amur Equipment Finance, Inc. ("Amur").  (Am. Compl., Docket Entry No. 21.)  Defendant moved to transfer venue to the Eastern District of New York based on a forum-selection clause in the parties' finance agreement.  (Mot. to Change Venue, Docket Entry No. 55.)  Judge William F. Jung of the Middle District of Florida granted Defendant's motion and transferred the claims against Defendant and Amur to this Court.  (Order dated Sept. 23, 2020, Docket Entry No. 81.)  On February 10, 2022, Plaintiffs voluntarily dismissed their claims against Amur. (Notice of Voluntary Dismissal dated Feb. 10, 2022, Docket Entry No. 108.)

"cold call[]" from a sales agent attempting to sell them on the idea of purchasing equipment to start a new aesthetics practice and a June 26, 2019 sales meeting, (*id.* at ¶¶ 35–36, 48), and further allege that the agent made a number of "inflated claims and material misrepresentations and omissions" concerning the efficacy and operation of the equipment, (*id.*at ¶¶ 37–44, 66, 75–79). Plaintiffs seek rescission of the agreement and disgorgement of amounts paid to purchase the equipment. (*Id*. at ¶¶ 105, 130–39.)

Defendant moves to dismiss the Amended Complaint for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure and Plaintiffs oppose the motion.[2] Plaintiffs also seek leave to further amend the Complaint.[3] For the reasons explained below, the Court grants Defendant's motion to dismiss in part and denies it in part. The Court grants Plaintiffs leave to file a second amended complaint.

## I.   Background

The Court assumes the truth of the factual allegations in the Amended Complaint for the purpose of deciding Defendant's motion.

### a.   Factual background

#### i.   June 2019 "cold call" and agreements

In or around June of 2019, Kristopher Huston, the Director of Sales Growth of Cynosure, LLC, ("Cynosure"), a manufacturer of aesthetic medical devices, "cold called" Plaintiffs' office

---

[2] (Def.'s Mot. to Dismiss ("Def.'s Mot."), Docket Entry No. 100; Def.'s Mem. in Supp. of Def.'s Mot. ("Def.'s Mem."), Docket Entry No. 100-2; Pls.' Mem. in Opp'n to Def.'s Mot. ("Pls.' Opp'n"), Docket Entry No. 104.)

[3] (Pls.' Mot. to File Second Am. Compl. ("Pls.' Mot."), Docket Entry No. 103; Def.'s Reply to Pls.' Opp'n. and Opp'n to Pls.' Mot. ("Def.'s Reply and Opp'n"), Docket Entry No. 101.)

seeking to sell Plaintiffs on the idea of establishing a new aesthetics practice.[4]  (Am. Compl.

¶¶ 4–6, 35.)  Huston recommended that Plaintiffs purchase Cynosure's (1) SculpSure Contouring

Platform ("SculpSure System") — a non-invasive body-contouring device that eliminates

unwanted fat cells without surgery — and (2) TempSure Envi System ("TempSure System") —

a device that purportedly reduces the appearance of wrinkles — for the new aesthetic practice.

(*Id.* at ¶¶ 4, 33–35.)  On June 26, 2019, Huston visited Plaintiffs' office and conducted a

presentation on the SculpSure and TempSure Systems.  (*Id.* at ¶ 36.)  Dr. Averill, a

board-certified physician and managing member of St. Francis Holdings, LLC, attended the

presentation.  (*Id.* at ¶¶ 2, 36.)

     During the presentation, Huston described the SculpSure System as "virtually painless"

for patients and claimed that the device could be used "hands free" or without a trained staff

member present during most of the treatment.  (*Id.*  at ¶¶ 40–41, 95.)  In addition to stating that

the SculpSure and TempSure Systems were well-suited for a new aesthetics practice and likely to

be highly profitable, (*id.* at ¶¶ 38–42), Huston also represented that Cynosure would provide

financing for the equipment, including a six-month payment deferral after signing, and a

$26,750.00 "marketing rebate check" within six to eight weeks after purchase, (*id*. at ¶¶ 43–45).

     Based on Huston's representations, Plaintiffs entered into four agreements to procure

both systems.  (*Id.* at ¶¶ 48–49.)  First, they executed two purchase agreements with Cynosure—

a purchase order for the SculpSure System and a purchase order for the TempSure System (the

"Purchase Agreements").  (*Id.*; Purchase Agreements at 2–3, annexed to Am. Compl. as Ex. 4,

Docket Entry No. 21.)  Second, Plaintiffs signed a finance agreement contract with Defendant,

---

     [4]  Plaintiffs already maintained a medical practice specializing in pulmonary care prior to
Huston's call; Plaintiffs did not offer aesthetic or cosmetic services.  (Am. Compl. ¶ 38.)

an equipment finance company, for the financing to procure the TempSure System (the "Finance Agreement"). (Am. Compl. ¶¶ 21, 48; Def.'s Mem. at 10.) Lastly, Plaintiffs signed an equipment leasing agreement with Pawnee Leasing Corp., ("Pawnee"), an equipment financing company, allowing St. Francis to lease the SculpSure System from Pawnee (the "Leasing Agreement"). (*Id.* at ¶¶ 13, 16, 48; Def.'s Mem. at 1 n.1.) Huston presented the agreements to Plaintiffs predated and preprinted with Dr. Averill's personal identifying information. (*Id.* at ¶ 48.)

### ii. The Purchase Agreements with Cynosure

The Purchase Agreements list the SculpSure and TempSure Systems for $205,750 and $140,750, respectively. (*Product Descriptions*, Purchase Agreements at 2–3.) They also provide a $26,750 marketing rebate as a part of the purchase. (*Id*; Am. Compl. ¶ 44; Cynosure Letter dated Aug. 30, 2019 at 1, annexed to Am. Compl. as Ex. 12, Docket Entry No. 21.) However, in a letter Cynosure sent to Plaintiffs after Plaintiffs attempted to return the equipment, Cynosure stated that it was unable to amend the terms of the Leasing Agreement or the Finance Agreement — or otherwise release Plaintiffs from their obligations thereunder — because it "is not a party to the [agreements]." (Cynosure Letter dated Aug. 30, 2019 at 1.) The Purchase Agreements promise "on-site installation" and "clinical in-service" to train Plaintiffs on how to utilize the SculpSure and TempSure Systems. (*Product Descriptions*, Purchase Agreements at 2–3; Am. Compl. ¶¶ 63–64.) They also limit cancellation of purchase, stating that "[a]ll [s]ales are final [and] Cynosure [g]rants no right of return." (Purchase Agreements at 1; Cynosure Letter dated Aug. 30, 2019 at 1.)

4

### iii.  The Finance Agreement with Defendant for TempSure System

The Finance Agreement states that "[Defendant] agrees to lend to [Plaintiffs] and [Plaintiffs] agree to borrow[] from [Defendant] an amount for the financing of the [TempSure System]" and that Plaintiffs "authorize [Defendant] to pay [Cynosure] for the [TempSure System]." (*Agreement*, Finance Agreement at 2, annexed to Am. Compl. as Ex. 10, Docket Entry No. 21.)  It requires Plaintiffs to make monthly installment payments of $99 for the first six months, followed by sixty monthly payments of $3,349.29. (*Monthly Installment Payment*, Finance Agreement at 2; Am. Compl. at ¶¶ 55–56.)  It also requires Plaintiffs to make an advanced payment of $99 and a documentation fee of $350. (*Advanced Payment (if any)* and *Documentation Fee (if any)*, Finance Agreement at 2.)  The Finance Agreement does not specify the principal amount to be financed. (Am. Compl. ¶ 57.)

The Finance Agreement includes, among others, (1) a choice-of-law provision, (2) a warranty disclaimer provision, and (3) an agency disclaimer provision.  The choice of law provision states:

> This [Finance Agreement] shall be governed and construed under the laws of the State of New York (NY), without reference to its principle of conflicts of laws and is deemed to have been performed in Nassau County, NY.  [Plaintiffs] submit to the jurisdiction of NY and agree that the state and federal courts sitting in Nassau County, New York, shall have the exclusive jurisdiction over any action or proceeding to enforce this [Finance Agreement] or any action or proceeding arising under this [Finance Agreement].

(*General*, Finance Agreement at 2.)  With respect to the warranty disclaimer, the Finance Agreement states:

> **Disclaimer of Warranties and Claims**.  We make no representation or warranty to any matter whatsoever including the merchantability or fitness for particular purpose the [TempSure System]. This [Finance Agreement] is irrevocable. **Your obligation to pay all amounts hereunder is non-cancellable, absolute, and unconditional and will not be subject to any reduction, setoff,**

> **defense, counterclaim, deferment or recoupment for any reason,
> even if the [TempSure System] is damaged, destroyed or
> defective**.

(*Disclaimer of Warranties and Claims*, Finance Agreement at 2 (emphasis in original).)  The

Finance Agreement also includes two agency disclaimer provisions.  One is included on the face

of the Finance Agreement in the warranty disclaimer provision and states:

> You acknowledge you selected the [TempSure System] and the
> supplier and your supplier is not our agent, nor are we their agent.
> You acknowledge that no one, including the supplier, has been
> authorized to waiver or change any term or condition of this
> [Finance Agreement].  No representation by the supplier as to any
> matter shall bind us or affect your duty to pay all amounts and
> perform all obligations hereunder.  You will use the [TempSure
> System] for commercial purposes only, in compliance with the law
> and not for any personal, family or household use.

(*Id.*)  The second disclaimer provision is included in an Equipment Acceptance Certificate[5] (the

"Acceptance Certificate"), incorporated into the Finance Agreement, which states:

> Neither the Vendor nor any of its salespersons or other agents are
> agents of ours or are authorized to waive or modify any term or
> condition of this Acceptance Agreement, the Agreement and/or
> related documents.  Any representation as to the Equipment or any
> other matter made by the Vendor shall not in any way affect your
> duty to make payments to us and perform all your other obligations
> as set forth in the Agreement or the other documents related thereto.

(*Acceptance Certificate* ¶ 3, Finance Agreement at 1.)  The Acceptance Certificate also provides

that Plaintiffs "irrevocably accept[ed]" the TempSure System "AS IS" and Defendant made "NO

EXPRESS OR IMPLIED WARRANTIES AS TO ITS MERCHANTABILITY AND/OR

FITNESS FOR A PARTICULAR PURPOSE."  (*Acceptance Certificate* ¶ 1, Finance Agreement

at 1–2 (emphasis in original).)  The Acceptance Certificate also instructs Plaintiffs to "look only

to the vendor/supplier of the Equipment (the Vendor) or manufacturer (not [Defendant]) for any

---

[5]  The Acceptance Certificate is a one-page document attached to the Finance Agreement
that confirms Plaintiffs' acceptance of the TempSure System.

claim concerning the Equipment, which shall not relieve [Plaintiffs] from any obligations to [Defendant], including any payment obligations." (*Id.* at 1.)

Defendant subsequently assigned its interest in the Finance Agreement to Amur. (Am. Compl. ¶¶ 25, 102, 146; Def.'s Mem. at 20.)

### iv. The Leasing Agreement with Pawnee for SculpSure System

The Leasing Agreement directs Pawnee to pay Cynosure for the SculpSure System and allows Plaintiffs to rent the SculpSure System from Pawnee for sixty-one months, with the option for Plaintiffs to purchase the equipment from Pawnee. (*Schedule A*, Leasing Agreement at 4, annexed to Am. Compl. as Ex. 6, Docket Entry No. 21; Leasing Agreement 1, 5.) The Leasing Agreement requires Plaintiffs to pay $99 per month for the first six months and $4,662.12 per month for months seven to sixty-one to rent the equipment. (*Schedule B*, Leasing Agreement at 5; Am. Compl. ¶¶ 16, 56.) It also requires Plaintiffs to pay an administration fee of $350. (*Schedule of Rental Payments*, Leasing Agreement at 1.) In addition, it disclaims all warranties as to the condition of the equipment and states that "[n]either the vendor of the [SculpSure System] nor any salesman is [Pawnee's] agent or authorized to waive or alter any terms or conditions of [the Leasing Agreement]" and that "[n]o representations as to the [SculpSure System] or any other matter by the vendor or salesman effect [Plaintiffs'] obligations to [Pawnee]." (*Disclaimers of Warranties; Limitation of Remedies*, Leasing Agreement at 2.)

After Plaintiffs executed the four agreements, Huston attempted to leave Plaintiffs' offices without providing Plaintiffs with copies of the agreements. (Am. Compl. ¶ 50.) Plaintiffs did not receive fully executed copies of the Leasing Agreement or the Finance Agreement until after the June 26, 2019 meeting. (*Id.*)

### v.   Attempts to return the SculpSure and TempSure Systems

Both the SculpSure and TempSure Systems were delivered, assembled and installed in Plaintiffs' office in early July of 2019.  (Am. Compl. ¶ 62.)  Plaintiffs claim that they were unable to use either the SculpSure or TempSure Systems because Cynosure failed to send a representative to train Plaintiffs on their use.  (*Id.* at ¶¶ 63–64.)  Not long after the equipment was delivered, Plaintiffs attempted to cancel the Finance Agreement and the Leasing Agreement and to return the SculpSure System to Pawnee and the TempSure System to Defendant.  (*Id.* at ¶¶ 67–68.)  Plaintiffs claim that return of the equipment was warranted after they learned that the system was not "virtually 'pain free.'"  (*Id.* at ¶ 68.)  Defendant refused to cancel the Finance Agreement or accept return of the TempSure System.  (*Id.*)  Pawnee also refused to cancel the Leasing Agreement and accept return of the SculpSure System.  (*Id.* at ¶ 67.)  John-Paul Smolenski, President of Defendant, claimed that he had received treatment using the SculpSure System and that he did not consider the treatment to be painful.  (*Id.* at ¶¶ 68, 120.)

A Cynosure manager, Mike Russo offered to discuss cancelling the purchase of the SculpSure and TempSure Systems if Plaintiffs were still not satisfied after attending a conference where Cynosure would demonstrate the use of the equipment.  (*Id*. at ¶¶ 69, 72.)  At the conference, Plaintiffs learned that the SculpSure and TempSure Systems require the use of anesthesia and that patients would need to be monitored by a physician during procedures.  (*Id*. at ¶¶ 75, 78–79.)  Plaintiffs also learned that the SculpSure and TempSure Systems were not suitable for starting an aesthetics practice and that instead, these systems were more suitable for established aesthetics practices, in part because procedures using the systems were expensive and "only a relatively small subset of patients would elect or even be able to regularly afford procedures."  (*Id*. at ¶¶ 83–85.)  Immediately after the conference, Plaintiffs sent Cynosure a

notice cancelling the Purchase Agreements.  (*Id.* at ¶ 87.)  The cancellation notice stated that the SculpSure and TempSure Systems had not been used and tendered return of the equipment.  (*Id.*) Cynosure refused to cancel the Purchase Agreements or to accept the return of the SculpSure and TempSure Systems.  (*Id.* at ¶ 88.)

### b. Procedural background

Plaintiffs commenced the action on December 30, 2019 against Cynosure in the Sixth Judicial Circuit of Florida, (Compl.), and Cynosure removed the case to the Middle District of Florida on May 12, 2020, (Notice of Removal).  On June 12, 2020, Plaintiffs filed an Amended Complaint asserting claims against both Defendant, Cynosure, Pawnee, and Amur.  (Am. Compl.)  Defendant moved to sever and transfer the claims against it to the Eastern District of New York based on a forum-selection clause in the Finance Agreement.  (Mot. to Change Venue, Docket Entry No. 55.)  Cynosure also moved to sever and transfer the claims against it to the District of Massachusetts in accordance with a forum-selection clause found in the Purchase Agreements.  (Cynosure Mot. to Change Venue, Docket Entry No. 49.)  The Middle District of Florida severed and transferred the claims against Defendant and Cynosure to the relevant courts pursuant to their forum-selection clauses.  (Order dated Sept. 23, 2020, Docket Entry No. 81.)

On February 20, 2022, Plaintiffs voluntarily dismissed all claims against Amur.  (Notice of Voluntary Dismissal dated Feb. 10, 2022.)  Only the claims against Defendant for fraudulent inducement, violation of the FDUTPA, rescission, and civil conspiracy were transferred to the Court, and the issues concerning Plaintiffs' obligations to Cynosure and Pawnee were voluntarily dismissed in parallel proceedings in other federal judicial districts.  *See* Order dated Sep. 23, 2020; Notice of Settlement, ECF No. 109, *St. Francis Holdings, LLC v. Pawnee Leasing Corp.*,

No. 20-CV-1101 (M.D. Fla. July 21, 2021); Stipulation of Dismissal, ECF No. 131, *St. Francis Holdings, LLC v. Cynosure, Inc*., No. 20-CV-11747 (D. Mass. July 22, 2021).

## II.   Discussion

### a.   Standard of review

In reviewing a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a court must construe the complaint liberally, "accepting all factual allegations therein as true and drawing all reasonable inferences in the plaintiffs' favor." *Sacerdote v. N. Y. Univ.*, 9 F.4th 95, 106–107 (2d Cir. 2021); *Vaughn v. Phoenix House N.Y. Inc.*, 957 F.3d 141, 145 (2d Cir. 2020) (same). A complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Bacon v. Phelps*, 961 F.3d 533, 540 (2d Cir. 2020) (quoting *Twombly*, 550 U.S. at 570). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Matson v. Bd. of Educ.*, 631 F.3d 57, 63 (2d Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)); *Cavello Bay Reinsurance Ltd. v. Shubin Stein*, 986 F.3d 161, 165 (2d Cir. 2021) (quoting *Iqbal,* 556 U.S. at 678). Although all allegations contained in the Amended Complaint are assumed to be true, this tenet is "inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678; *Vaughn*, 957 F.3d at 145 (same).

### b.   Only the Finance Agreement between Plaintiffs and Defendant is before the Court

Defendant argues that Plaintiffs improperly "lump" the Purchase Agreements, the Finance Agreement, and the Leasing Agreement together as "one" throughout their general allegations, making it virtually impossible for Defendant to formulate a response to Plaintiffs' claims. (Def.'s Mem. at 11–12.) In support, Defendant argues that at times in the Amended Complaint, Plaintiffs make allegations regarding the operability, tolerability, and economic

10

viability pertaining to both systems, and at other times Plaintiffs limit the same allegations to only the SculpSure System, making it difficult to ascertain what allegations relate to the TempSure System specifically.  (*Id*. at 12.)

Plaintiffs contend that the agreements should be construed together as one document because Huston presented each on the same day, as part of the same transaction, and each concerns the same subject matter — "the acquisition of equipment Huston marketed to Plaintiffs using deceptive sales tactics."  (Pls.' Opp'n at 11.)

"Under New York law, 'all writings which form part of a single transaction and are designed to effectuate the same purpose [must] be read together, even though they were executed on different dates and were not all between the same parties.'"  *TVT Recs. v. Island Def Jam Music Grp.*, 412 F.3d 82, 89 (2d Cir. 2005) (alteration in original) (quoting *This is Me, Inc. v. Taylor*, 157 F.3d 139, 143 (2d Cir. 1998)); *accord Nau v. Vulcan Rail & Constr. Co.*, 286 N.Y. 188, 197 (1941); *see also Commander Oil Corp. v. Advance Food Serv. Equip.*, 991 F.2d 49, 53 (2d Cir. 1993) ("Generally, separate writings are construed as one agreement if they relate to the same subject matter and are executed simultaneously."); *Prod. Res. Grp., L.L.C. v. Martin Pro., A/S*, 907 F. Supp. 2d 401, 413 (S.D.N.Y. 2012) ("Under general principles of contract law, separate agreements executed contemporaneously by the same parties, for the same purposes, and as part of the same transaction, are to be construed together." (quoting *Neal v. Hardee's Food Sys., Inc.*, 918 F.2d 34, 37 (5th Cir. 1990))); *Polner v. Monchik Realty Co.*, 803 N.Y.S.2d 370, 376 (N.Y. Sup. Ct. 2005) ("These two documents were executed at substantially the same time by the same parties, concern the same subject matter, and refer to each other. Consequently, they were contemporaneous writings, forming part of the same transaction and their provisions must be read and interpreted together and harmonized.").  Whether contracts

should be viewed as one agreement depends upon the intent of the parties. *TVT Recs.*, 412 F.3d at 89. The legally operative question is "whether the contracts were part of a single transaction intended to effectuate the same purpose." [6] *Id.* at 90.

The Court does not construe the contracts as one agreement because they were not designed to effectuate the same purpose. While all four agreements were for the TempSure System and the SculpSure System, Plaintiffs signed the four agreements with three different entities; Plaintiffs signed the Purchase Agreements with Cynosure, the Finance Agreement with Defendant as to the TempSure System, and the Leasing Agreement with Pawnee as to the SculpSure System. (Am. Compl. ¶ 48; Purchase Agreements; Finance Agreement; Leasing Agreement.) Plaintiffs do not allege that Defendant signed the Purchase Agreements or the Leasing Agreement. In addition, the intent of the parties, as demonstrated through the agreements, indicates that each agreement was entered into for a different purpose. *See Torres v. Walker*, 356 F.3d 238, 245 (2d Cir. 2004) ("If a contract is clear, courts must take care not to alter or go beyond the express terms of the agreement, or to impose obligations on the parties that are not mandated by the unambiguous terms of the agreement itself." (quoting *Red Ball Interior Demolition Corp. v. Palmadessa*, 173 F.3d 481, 484 (2d Cir. 1999))). The Finance Agreement solely related to the financing of the TempSure System, (*see generally* Finance Agreement), while the Leasing Agreement related to the lease of the SculpSure System, and the Purchase Agreements with Cynosure concerned the purchase of both systems. (Am. Compl. ¶ 48; Purchase Agreements; Leasing Agreement.) Indeed, the Finance Agreement contains an

---

[6] The Second Circuit has clarified that although the question of whether multiple writings should be construed as one agreement is "typically a question of fact for the jury," "if the documents in question reflect no ambiguity as to whether they should be read as a single contract, the question is a matter of law for the court." *TVT Recs. v. Island Def Jam Music Grp.*, 412 F.3d 82, 89 (2d Cir. 2005).

integration clause expressly disclaiming any additional terms or conditions.  (*Disclaimer of Warranties and Claims*, Finance Agreement at 2; *Acceptance Certificate* ¶ 3, Finance Agreement at 1.)  In view of the fact that the Amended Complaint does not contain any allegations regarding the Defendant's intent to construe the Finance Agreement in line with or inclusive of the other three agreements, the Court declines to construe these agreements as a single contract.  *See Grand Manor Health Related Facility, Inc. v. Hamilton Equities Inc.*, 941 F. Supp. 2d 406, 420 (S.D.N.Y. 2013) (declining to construe two contemporaneous contracts as one agreement because the "agreements were between different parties and were entered into for different reasons"); *Schonfeld v. Thompson*, 663 N.Y.S.2d 166, 167 (N.Y. App. Div. 1997) (declining to construe separate written agreements involving different parties, serving different purposes and not referring to each other as a unitary contract, notwithstanding oral misrepresentations); *see also Geller Biopharm, Inc. v. Amunix Pharms., Inc.*, No. 20-CV-4334, 2021 WL 4155015, at *5 (S.D.N.Y. Sept. 13, 2021) ("[E]ven if the parties entered into certain contracts in pursuit of one ultimate goal, that does not transform every agreement in pursuit of that goal into one agreement."); *Snyder v. Wells Fargo Bank, N.A.*, No. 11-CV-4496, 2011 WL 6382707, at *5 (S.D.N.Y. Dec. 19, 2011) (holding that "while multiple documents executed at the same time and concerning the same subject-matter are required to be read together under New York law, this does not mean that . . . any [ ] particularized [promises] . . . can be lifted from one document and transferred to another").

Accordingly, the Court declines to construe the four agreements together and analyzes Plaintiffs' claims against Defendant based on the Finance Agreement between Plaintiffs and Defendant.

### c.   Florida law governs Plaintiffs' fraudulent inducement and FDUTPA claims

The parties dispute the law that governs Plaintiffs' fraudulent inducement and FDUTPA claims.  Defendant argues that based on the choice-of-law provision in the Finance Agreement — which submits to the jurisdiction of New York any action or proceeding arising under the contract, (*General*, Finance Agreement at 2) — New York law should govern all claims related to the Finance Agreement because it is "sufficiently broad" to encompass the entire relationship between the contracting parties.  (Def.'s Reply and Opp'n at 5–6 (quoting *Turtur v. Rothschild Registry Int'l, Inc.*, 26 F.3d 304, 309–10 (2d Cir. 1994)).)

Plaintiffs argue that while New York law governs the interpretation of the Finance Agreement, Florida law governs the fraudulent inducement and FDUTPA claims.  (Pls.' Opp'n at 4–5.)  In support, Plaintiffs argue that the choice-of-law provision contained in the Finance Agreement is too narrow to extend to tort claims and assert that because the alleged fraudulent conduct occurred during a meeting at Plaintiffs' offices in Florida, and Plaintiffs are domiciled in Florida, Florida has the "greatest interest" in the case and therefore Florida law governs.  (*Id*. at 5–6.)

 "Under New York's choice of law rules, it is clear that 'in cases involving a contract with an express choice of law provision . . . a court is to apply the law selected in the contract as long as the state selected has sufficient contacts with the transaction,' unless there is fraud, violation of public policy, or no 'reasonable basis for choosing the law of the jurisdiction designated by the parties.'"  *Aramarine Brokerage, Inc. v. OneBeacon Ins. Co.*, 307 F. App'x 562, 564 (2d Cir. 2009) (alteration in original) (quoting *Hartford Fire Ins. Co. v. Orient Overseas Containers Lines (UK) Ltd.*, 230 F.3d 549, 556 (2d Cir. 2000)); *see also Currier, McCabe & Assocs., Inc. v. Pub. Consulting Grp., Inc.*, No. 13-CV-729, 2017 WL 4842023, at

14

*11 (N.D.N.Y. Oct. 24, 2017) ("Generally, courts will honor a contract's express choice of law provision unless there is an allegation of fraud . . . . Under New York law, such tort claims are outside the scope of contractual choice-of-law provisions that specify what law governs construction of the terms of the contract.").  However, "in order for a choice-of-law provision to apply to claims for tort arising incident to the contract, the express language of the provision must be 'sufficiently broad' as to encompass the entire relationship between the contracting parties." *Mayagüez S.A. v. Citigroup, Inc*., No. 16-CV-6788, 2018 WL 1587597, at *8 (S.D.N.Y. Mar. 28, 2018) (quoting *Krock v. Lipsay*, 97 F.3d 640, 645 (2d Cir. 1996)); *see Yak v. BiggerPockets, L.L.C.*, No. 20-CV-3498, 2022 WL 67740, at *3 (2d Cir. Jan. 7, 2022) ("Under New York law, a choice-of-law provision indicating that the contract will be governed by a certain body of law does not dispositively determine that law which will govern a claim of fraud arising incident to the contract." (quoting *Krock*, 97 F.3d at 645)); *G.L.M. Sec. & Sound, Inc. v. LoJack Corp*., No. 10-CV-04701, 2011 WL 4594825, at *4 (E.D.N.Y. Sept. 30, 2011); *Drenis v. Haligiannis*, 452 F. Supp. 2d 418, 425–26 (S.D.N.Y. 2006) (finding that a choice-of-law provision "governs only a cause of action sounding in contract, not one sounding in tort, unless the express language of the choice-of-law provision is sufficiently broad as to encompass the entire relationship between the contracting parties" (quoting *H.S.W. Enters., Inc. v. Woo Lae Oak, Inc.*, 171 F. Supp. 2d 135, 141 n.5 (S.D.N.Y. 2001))).

"New York courts confronted with a choice of law issue in torts conduct an 'interest analysis,' assessing which of the competing jurisdictions has the greatest interest in seeing its law applied to the matter at issue." *Stichting Ter Behartiging Van de Belangen Van Oudaandeelhouders In Het Kapitaal Van Saybolt Int'l B.V. v. Schreiber*, 407 F.3d 34, 50 (2d Cir. 2005) (quoting *Padula v. Lilarn Props. Corp*., 84 N.Y.2d 519, 521 (1994)); *see Toretto v.*

15

*Donnelley Fin. Sols., Inc.*, No. 20-CV-2667, 2022 WL 348412, at *7 (S.D.N.Y. Feb. 4, 2022)

(quoting *GlobalNet Financial.Com, Inc. v. Frank Crystal & Co.*, 449 F.3d 377, 384 (2d Cir.

2006)); *see also Kinsey v. N.Y. Times Co.*, 991 F.3d 171, 176 (2d Cir. 2021) ("In tort cases, New

York 'applies the law of the state with the most significant interest in the litigation.'" (quoting

*Lee v. Bankers Tr. Co.*, 166 F.3d 540, 545 (2d Cir. 1999))).  "[T]he interest analysis is applied

differently depending on whether the rules in question are conduct-regulating rules that 'people

use as a guide to governing their primary conduct,' or loss-allocating rules that 'prohibit, assign,

or limit liability after the tort occurs.'"  *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 739

F.3d 45, 49 (2d Cir. 2013).

 Claims of fraud are conduct-regulating rules.  *VeroBlue Farms USA Inc. v. Canaccord

Genuity LLC*, No. 20-CV-4394, 2021 WL 3913555, at *11 (S.D.N.Y. Sept. 1, 2021); *see Reed

Constr. Data Inc. v. McGraw-Hill Cos., Inc*, 49 F. Supp. 3d 385, 425 (S.D.N.Y. 2014) (noting

that fraud "is generally a conduct-regulating doctrine"), *aff'd*, 638 F. App'x 43 (2d Cir. 2016);

*H.S.W. Enters., Inc.*, 171 F. Supp. 2d at 142 ("[F]raudulent inducement is a conduct-regulating

law."); *La Luna Enters. v. CBS Corp.*, 74 F. Supp. 384, 389 (S.D.N.Y. 1999) (claims of fraud

are conduct-regulating); *see also Fargas v. Cincinnati Mach.*, *LLC*, 986 F. Supp. 2d 420, 423

(S.D.N.Y. 2013) ("Conduct-regulating rules are defined as those that 'have the prophylactic

effect of governing conduct to prevent injuries from occurring.'" (quoting *Padula*, 84 N.Y.2d at

522)).  When a conduct-regulating rule is at issue, "the law of the jurisdiction where the

[allegedly tortious acts] occurred will generally apply because that jurisdiction has the greatest

interest in regulating behavior within its borders."  *Licci*, 739 F.3d at 49 & n.3 (alteration in

original) (collecting cases); *see also Bullock v. Caesars Ent. Corp.*, 83 F. Supp. 3d 420, 423

(E.D.N.Y. 2015) (noting that when a conduct-regulating rule is at issue, "the law of the place of

the tort 'will usually have a predominant, if not exclusive, concern'" (quoting *Padula*, 84 N.Y.2d

at 522)).  "In cases involving conduct-regulating laws, like fraudulent inducement, '[w]here the

parties are domiciled in different states, the locus of the tort will almost always be

determinative.'"  *H.S.W. Enters., Inc.*, 171 F. Supp. 2d at 142 (quoting *Krock*, 97 F.3d at 646);

*Chigirinskiy v. Panchenkova*, No. 14-CV-4410, 2015 WL 1454646, at *6 n.7 (S.D.N.Y. Mar. 31,

2015) (same); *see also Cooney v. Osgood Mach., Inc.*, 81 N.Y.2d 66, 72 (1993) ("If conflicting

conduct-regulating laws are at issue, the law of the jurisdiction where the tort occurred will

generally apply because that jurisdiction has the greatest interest in regulating behavior within its

borders.").

The Finance Agreement's choice-of-law provision is not "sufficiently broad" to cover

Plaintiffs' tort claims.  *Krock*, 97 F.3d at 645 (stating that a "sufficiently broad" choice-of-law

clause would reach claims of tort arising incident to the contract).  While the provision includes a

broad *forum* clause, (*see General*, Finance Agreement at 2 ("[Plaintiffs] submit to the

jurisdiction of NY and agree that the state and federal courts sitting in Nassau County, New

York, shall have the exclusive jurisdiction over any action or proceeding to enforce this [Finance

Agreement] or any action or proceeding arising under this [Finance Agreement].")), the

choice-of-law provision is narrow and therefore does not extend to tort claims, (*see id.* ("This

[Finance Agreement] shall be governed and construed under the laws of the State of New

York.")).  *See Fin. One Pub. Co. Ltd. v. Lehman Bros. Special Fin., Inc.*, 414 F.3d 325, 335 (2d

Cir. 2005) ("Under New York law . . . tort claims are outside the scope of contractual choice-of-

law provisions that specify what law governs construction of the terms of the contract, even

when the contract also includes a broader forum-selection clause."); *TransPerfect Glob., Inc. v.

Lionbridge Techs., Inc.*, No. 19-CV-3283, 2020 WL 1322872, at *7 (S.D.N.Y. Mar. 20, 2020)

17

("Where a choice-of-law clause specifies only that the contract will be 'governed by and construed in accordance with' the law of a certain state, New York courts hold that the clause does not control the law that applies to tort claims."); *see also Arnone v. Aetna Life Ins. Co.*, 860 F.3d 97, 108 (2d Cir. 2017) (noting that while "[c]ontractual choice of law provisions are generally enforceable under both New York law and federal common law[,] . . . New York courts are 'reluctan[t] to read choice-of-law clauses broadly'" (alteration in original) (quoting *Fin. One Pub. Co.*, 414 F.3d at 335); *Twinlab Corp. v. Paulson*, 724 N.Y.S.2d 496, 497 (N.Y. App. Div. 2001) (holding that a Florida civil Racketeer Influenced and Corrupt Organizations Act claim fell outside of the scope of the contractual choice-of-law and forum-selection provisions that "designated New York as the forum for any actions 'relating directly or indirectly' to the consultant agreement").

With respect to the interest analysis, the contacts between Florida and the underlying allegations are strong, while contacts with New York are virtually nonexistent. The alleged fraudulent conduct occurred during a meeting in Plaintiffs' office in Florida, where Plaintiffs are domiciled. (*See* Am. Compl. ¶¶ 1, 36.) The equipment at issue was delivered to Florida and remains in Florida. (*Id.* ¶¶ 22, 51.) In addition, Plaintiffs learned additional information about the TempSure System at a conference in Florida. (*Id.* ¶ 72.) Defendant's principal place of business is the only New York connection. (*Id.* ¶ 18.) Both Plaintiffs have no apparent contact with New York other than their relationship with Defendant. (*Id.* ¶¶ 1–2.) In view of the minimal contacts with New York and the fact that the locus of the fraud and FDUPTA claims are in Florida, the Court applies Florida law for the purposes of analyzing Defendant's motion to

dismiss Plaintiffs' fraudulent inducement and FDUTPA claims.[7]  *See Fin. One Public Co.*, 414

F.3d at 339 (rejecting choice-of-law clause designating New York law as governing law and

applying Thai law because the issues implicated Thai interests and the parties had minimal

contacts or transactions to New York).

> **d.   Plaintiffs sufficiently allege a claim for fraudulent inducement**

Defendant argues that Plaintiffs fail to state a claim for fraudulent inducement because

they are not liable for any of Huston's misrepresentations.  In support, Defendant argues that (1)

the Finance Agreement plainly disclaims an agency relationship between Defendant and

Cynosure, and (2) Plaintiffs have failed to sufficiently allege an agency relationship between

Defendant and Huston.  (Def.'s Mem. at 7–11.)  In addition, Defendant claims that Plaintiffs

improperly rely on Huston's oral representations because the Finance Agreement "specifically

disavows the incorporation of non-written representations."  (*Id.* at 13–15.)  Lastly, Defendant

argues that Plaintiffs' claims for fraud in the inducement are barred by the economic loss rule in

---

[7]  Defendant cites to *Turtur v. Rothschild Registry Int'l, Inc.*, 26 F.3d 304 (2d Cir. 1994), to suggest that the Finance Agreement's choice-of-law provision is sufficiently broad to encompass Plaintiffs' tort claims, but the Court is not persuaded.  In *Turtur*, the case was transferred from Texas to New York for the convenience of the parties and witnesses, pursuant to 28 U.S.C. § 1404(a).  The Second Circuit applied Texas choice-of-law rules to determine the validity and scope of the contractual choice-of-law clause at issue because "[f]ollowing such a transfer, 'the transferee court must follow the choice-of-law rules that prevailed in the transferor court.'"  *Fin. One Pub. Co. Ltd. v. Lehman Bros. Special Fin., Inc.*, 414 F.3d 325, 333 (2d Cir. 2005) (quoting *Ferens v. John Deere Co.*, 494 U.S. 516, 519 (1990)).  Unlike in *Turtur*, the Middle District of Florida did not transfer this case for the convenience of the parties, but to enforce a valid forum-selection clause, and therefore the Court must apply the choice-of-law rules of the forum state, i.e., New York law.  Thus, *Turtur* is not binding authority because it applied Texas law, rather than New York law to determine the scope of the contractual choice-of-law clause at issue.  *See Fin. One Pub. Co.*, 414 F.3d at 334 (recognizing that *Turtur* is not binding when applying New York law to determine the scope of a contractual choice-of-law clause); *see also Atl. Marine Constr. Co., Inc. v. U.S. Dist. Ct. for W. Dist. of Tex.*, 571 U.S. 49, 64 (2013) ("[W]hen a party bound by a forum-selection clause flouts its contractual obligation and files suit in a different forum, a § 1404(a) transfer of venue will not carry with it the original venue's choice-of-law rules").

that the allegations pertain to product performance and are also barred by the Finance

Agreement's "hell or high water" clause.  (*Id.* at 16–17.)

Plaintiffs allege that Huston is an agent of Defendant, (Am. Compl. ¶¶ 97, 123–24, 134,

142), because the agency disclaimer provision in the Finance Agreement is not controlling and

Huston had express or implied authority to act on behalf of Defendant.  (Pls.' Opp'n at 8–11.)  In

addition, Plaintiffs argue that the misrepresentations made by Huston during the June 26, 2019

meeting at Plaintiffs' office are false statements or omissions concerning material facts.  (*Id.* at 3,

14.)  Plaintiffs further argue that under Florida law, justifiable reliance is not a necessary element

of fraudulent misrepresentation and the economic loss rule only applies to product liability

claims.  (*Id*. at 12–16.)

### i.   Defendant's agency disclaimer provision is not controlling

Defendant argues that all claims against it must be dismissed because the Finance

Agreement disclaims an agency relationship between it and Cynosure and Plaintiffs are

attempting to circumvent the "clear language" of the Finance Agreement, which states that

Huston was not an agent of Defendant and bars Plaintiffs from raising claims against Defendant

for any representations made by Huston.  (Def.'s Mem. at 7–8.)  In support, Defendant highlights

sections of the Finance Agreement, including the section entitled "Disclaimer of Warranties,"

which states that "[Cynosure] is not [Defendant's] agent" and that "[n]o representation by

[Cynosure] as to any matter shall bind [Defendant] or affect [Plaintiffs'] duty to pay all amounts

and perform all obligations hereunder."  (*Disclaimer of Warranties and Claims*, Finance

Agreement at 2.)  In addition, Defendant relies on the Acceptance Certificate which states that

"[n]either [Cynosure] nor any of its salespersons or other agents are agents of [Defendant's]" and

"[a]ny representation as to the [TempSure System] or any other matter made by [Cynosure] shall

not in any way affect [Plaintiffs'] duty to make payments to [Defendant] and perform all

[Plaintiffs'] other obligations as set forth in the Agreement or the other documents related

thereto." (*Acceptance Certificate* ¶ 3, Finance Agreement at 1.)

Plaintiffs contend that Defendant's generic agency disclaimer does not apply to Huston's

conduct because "conclusory no-agency clauses cannot trump the actual conduct of the parties

evidencing express or implied authority." (Pls.' Opp'n at 8 (citing *Rensselaer Polytechnic Inst.*

*v. Amazon.com, Inc.*, No. 18-CV-549, 2019 WL 3755446, at *12 (N.D.N.Y. Aug. 7, 2019).)

"Under New York law, an agency relationship 'results from a manifestation of consent by

one person to another that the other shall act on his behalf and subject to his control, and the

consent by the other to act.'"[8] *Steinbeck v. Steinbeck Heritage Found.*, 400 F. App'x 572, 575

(2d Cir. 2010) (quoting *New York Marine & Gen. Ins. Co. v. Tradeline (L.L.C.)*, 266 F.3d 112,

122 (2d Cir. 2001)).  A principal's ability to exercise control over its agent is an essential

element of agency.  *Id.*; *see also In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278, 290 (S.D.N.Y.

2005) ("The element of control often is deemed the essential characteristic of the principal-agent

---

[8]  As noted above, the Court finds that Florida law applies to the alleged non-contract
claims.  On the issue of agency however, Defendant and Plaintiffs cite to Second Circuit cases
applying New York law.  *See* Def.'s Mem. at 7–9; Pls.' Opp'n at 8–9.  While "such 'implied
consent . . . is sufficient to establish choice of law,'" *Santalucia v. Sebright Transp., Inc.*, 232
F.3d 293, 296 (2d Cir. 2000) (alteration in original) (quoting *Tehran-Berkeley Civ. & Env't
Eng'rs v. Tippetts-Abbett-McCarthy-Stratton*, 888 F.2d 239, 242 (2d Cir. 1989)), a choice-of-
law analysis is not necessary because, as relevant to Defendant's motion to dismiss, there are no
substantial conflicts between New York and Florida agency law.  Under both New York and
Florida law, an agency disclaimer provision is not controlling and a necessary element of an
agency relationship is control by the principal — which, for reasons discussed below, are the
pertinent issues before the Court.  *See Bigio v. Coca-Cola Co.*, 675 F.3d 163, 175 (2d Cir. 2012);
*In re JVJ Pharmacy Inc.*, 630 B.R. 388, 403 (S.D.N.Y. 2021); *Witover v. Celebrity Cruises, Inc.*,
161 F. Supp. 3d 1139, 1149 (S.D. Fla. 2016); *see also Villazon v. Prudential Health Care Plan,
Inc.*, 843 So. 2d 842, 853–54 (Fla. 2003) (holding that the nature and scope of the agency
relationship is a factual question determined by the totality of the circumstances and cannot be
decided based on how the parties define the relationship in a contract or series of contracts).  The
Court therefore applies New York agency law.

relationship."); *Mazart v. State*, 441 N.Y.S.2d 600, 605 (N.Y. Ct. Cl. 1981) (noting that "there

can be no agency relationship where the alleged principal has no right of control over the alleged

agent"). Where parties contend that an agency relationship is established by contract, a court

will look to the language of that agreement to ascertain the relationship created between the

parties. *See Steinbeck*, 400 F. App'x at 575; *EBC I, Inc. v. Goldman, Sachs & Co.*, 5 N.Y.3d 11,

19–21 (2005). However, contractual agency disclaimers are not always dispositive, and a court

may look to the facts and circumstances of the parties' relationship to determine whether an

agent-principal relationship existed. *In re JVJ Pharmacy Inc.*, 630 B.R. 388, 404 (S.D.N.Y.

2021) (recognizing that it is a "well-settled principle" that provisions purporting to disclaim an

agency relationship are not dispositive on the contract's language alone even though some courts

have given effect to agency disclaimers that are "express and unambiguous" (quoting *Supreme*

*Showroom, Inc. v. Branded Apparel Grp. LLC*, No. 16-CV-5211, 2018 WL 3148357, at *9

(S.D.N.Y. June 27, 2018))); *Taylor Grp., Inc. v. Indus. Distrib. Int'l Co.*, 506 F. Supp. 3d 1256,

1270 (S.D. Fla. Dec. 10, 2020) (finding that under Florida law, "[e]xpress disclaimers of agency

do not eliminate the existence of an agency relationship . . . . [but that] [n]evertheless,

considerable efforts to avoid an agency relationship through express disclaimers is 'palpable

evidence' that there was no consent or acquiescence to an agency relationship" (first quoting

*Carr v. Stillwaters Dev. Co., L.P.*, 83 F. Supp. 2d 1269, 1279 (M.D. Ala. 1999); and then citing

*Commodity Futures Trading Comm'n v. Gibraltar Monetary Corp., Inc.*, 575 F.3d 1180, 1189

(11th Cir. 2009))), *aff'd*, 859 F. App'x 439 (11th Cir. 2021); *Bank of New York Mellon Tr. Co.,*

*Nat'l Ass'n v. Morgan Stanley Mortg. Cap., Inc.*, No. 11-CV-505, 2013 WL 3146824, at *26

(S.D.N.Y. June 19, 2013) ("While parties may disclaim agency relationship in an agreement, a

'court is not bound by the disclaimer of . . . agency between the parties in determining their true

22

relationship.'" (alteration in original) (quoting *Gulf Ins. Co. v. Transatlantic Reinsurance Co.*,
886 N.Y.S.2d 133, 152 (N.Y. App. Div. 2009))); *see also Rensselaer Polytechnic Inst.*, 2019 WL
3755446, at *12 ("Defendant places undue reliance on the contracts' disclaimer of an agency
relationship, . . . [but] such disclaimers 'are not dispositive as to the existence of an agency
relationship[.]'" (quoting *Pacific Gas & Elec. Co. v. United States,* 838 F.3d 1341, 1359 (Fed.
Cir. 2016))); *Rubenstein v. Small*, 75 N.Y.S.2d 483, 485 (N.Y. App. Div. 1947) ("The court is
not bound by the disclaimer of partnership, joint venture or agency between the parties in
determining their true relationship."); *see, e.g.*, *Onebeacon Ins. Co. v. Forman Int'l, Ltd.*, No.
04-CV-2271, 2005 WL 100849, at *4 (S.D.N.Y. Jan. 19, 2005) (holding that the fact that the
defendants were characterized as agents was not dispositive of the agency issue, but rather, "the
alleged acts of the defendant and not the label are determinative of potential liability"); *Rendeiro
v. State-Wide Ins. Co.*, 777 N.Y.S.2d 323, 324 (N.Y. App. Div. 2004) (stating that "a broker will
be held to have acted as the insurer's agent where there is some evidence of 'action on the
insurer's part, or facts from which a general authority to represent the insurer may be inferred'").

    Although the Finance Agreement contains an agency disclaimer because such disclaimers
are not dispositive, the Court will analyze the relationship between Huston and Defendant to
determine if there is an agent-principal relationship.  *See TD Waterhouse Inv. Servs., Inc. v.
Integrated Fund Servs., Inc.*, No. 01-CV-8986, 2003 WL 42013, at *14 (S.D.N.Y. Jan. 6, 2003)
("[O]ne does not become an agent through the mere utterance of that term.  Rather, a party
claiming an agency relationship — to which a fiduciary duty might apply — must demonstrate
that the alleged fiduciary 'occup[ied] a position of trust or special confidence with regard to [the
plaintiff] that imposed obligations beyond the express agreements.'" (quoting
*Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 20 (2d Cir. 1996))); *see*

*also In re Shulman Transp. Enters., Inc.*, 744 F.2d 293, 295–96 (2d Cir. 1984) (affirming district court's refusal to find agency relationship despite "agency" contract); *Rensselaer Polytechnic Inst.*, 2019 WL 3755446, at *12 ("Defendant places undue reliance on the contracts' disclaimer of an agency relationship; such disclaimers 'are not dispositive as to the existence of an agency relationship.'" (citation omitted)); *N. Shipping Funds I, LLC v. Icon Cap. Corp.*, 921 F. Supp. 2d 94, 103–04 (S.D.N.Y. 2013) (analyzing the facts and circumstances of the parties' relationship to determine whether an agent-principal relationship existed even though an agency relationship was purported to be established by contract).

### ii.    Plaintiffs have sufficiently pled that Huston is an agent of Defendant

Defendant argues that Plaintiffs fail to allege that Cynosure, or its salesperson Huston, is its agent because it is "a mere legal conclusion and cannot be assumed to be true in analyzing the sufficiency of a complaint." (Def.'s Mem. at 8–9.)  In support, Defendant argues that the Court determines whether an agency relationship exists based on "the actual interactions of the putative agent and principal and not on the perception a third party may have of the relationship," and further argues that Plaintiffs have failed to allege any facts that Defendant did anything to authorize Huston to act as its agent. (*Id.* at 10–11 (quoting *Maung Ng We v. Merrill Lynch & Co.*, No. 99-CV-9687, 2000 U.S. Dist. LEXIS 11660, at *12 (S.D.N.Y. Aug. 14, 2000)).)

Plaintiffs argue that factual allegations in the Amended Complaint — construed in Plaintiffs' favor — support the reasonable inference that Defendant vested Huston with the apparent or actual authority to negotiate the Finance Agreement on Defendant's behalf. (Pls.' Opp'n at 9–10.)  In support, Plaintiffs argue that Defendant's website — "boast[ing] that [Defendant] has a close relationship with . . . Cynosure" — and Smolenski's restatement of Huston's misleading claims — "that procedures using the equipment were virtually painless" —

corroborate Defendant's and Cynosure's "close relationship . . . and illustrate[] that [Defendant] was aware of and authorized Huston's [misrepresentations]." (*Id.* at 10.)  In addition, Plaintiffs argue that Huston's representation that Cynosure would provide financing with no mention of Defendant or the need for its approval supports a reasonable inference that Defendant authorized Huston to present the Finance Agreement and act on behalf of Defendant.  (*Id.*)

A principal can be held vicariously liable for the acts of another under a theory of actual or apparent authority.  *DeAngelis v. Corzine*, 17 F. Supp. 3d 270, 286 (S.D.N.Y. 2014) (discussing potential vicarious liability of principal under a theory of actual and apparent authority); *Douyon v. N.Y. Med. Health Care, P.C.*, 894 F. Supp. 2d 245, 272 (E.D.N.Y. 2012) ("Where a principal does not control an agent, the principal may still be vicariously liable for the agent's actions where the agent is vested with apparent authority." (citing *Green Door Realty Corp. v. TIG Ins. Co.*, 329 F.3d 282, 289 (2d Cir. 2003))), *amended by*, No. 10-CV-3983, 2013 WL 5423800 (E.D.N.Y. Sept. 25, 2013); *see also Banks v. Pro Custom Solar*, 416 F. Supp. 3d 171, 173–74 (E.D.N.Y. 2018) (finding that a defendant may be held vicariously liable under the Telephone Consumer Protection Act consistent with traditional agency principles); *Meisel v. Grunberg*, 651 F. Supp. 2d 98, 121 (S.D.N.Y. 2009) (finding that the plaintiff had sufficiently alleged a co-defendant's indirect liability for fraud pursuant to an agency theory of vicarious liability).

"Actual authority 'is the power of the agent to do an act or to conduct a transaction on account of the principal which, with respect to the principal, he is privileged to do because of the principal's manifestations to him.'"  *Dinaco, Inc. v. Time Warner, Inc.*, 346 F.3d 64, 68 (2d Cir. 2003) (quoting *Minskoff v. Am. Express Travel Related Servs. Co.*, 98 F.3d 703, 708 (2d Cir. 1996)); *see United States v. Gatto*, 986 F.3d 104, 127 (2d Cir. 2021) (recognizing that actual

authority occurs "when the agent receives 'explicit permission from the principal to act on its behalf'" (quoting *Garanti Finansal Kiralama A.S. v. Aqua Marine & Trading Inc.*, 697 F.3d 59, 71 (2d Cir. 2012))). Such authority "is created by direct manifestations from the principal to the agent, and the extent of the agent's actual authority is interpreted in the light of all circumstances attending those manifestations, including the customs of business, the subject matter, any formal agreement between the parties, and the facts of which both parties are aware." *ABM Indus. Grps., LLC v. Int'l Union of Operating Eng'rs, Loc. 30, 30A, 30B, AFL-CIO*, 968 F.3d 158, 163 (2d Cir. 2020) (quoting *Highland Cap. Mgmt. LP v. Schneider*, 607 F.3d 322, 327 (2d Cir. 2010)). A court may infer actual authority "from words or conduct which the principal has reason to know indicates to the agent that he is to do the act." *United States v. Int'l Bhd. of Teamsters*, 986 F.2d 15, 20 (2d Cir. 1993).

"Apparent authority exists when a principal, either intentionally or by lack of ordinary care, induces [a third party] to believe that an individual has been authorized to act on its behalf." *Highland Cap. Mgmt.*, 607 F.3d at 328 (quoting *Peltz v. SHB Commodities, Inc.*, 115 F.3d 1082, 1088 (2d Cir. 1997)); *see Gatto*, 986 F.3d at 127 (recognizing that apparent authority occurs "when an agent has the ability to bind the principal to transactions with third parties because representations that the principal made to the third party make it reasonable for the third party to believe the agent has such an ability"); *Dinaco*, 346 F.3d at 69 ("Apparent authority arises from the 'written or spoken words or any other conduct of the principal which, reasonably interpreted, causes [a] third person to believe that the principal consents to have [an] act done on his behalf by the person purporting to act for him.'" (quoting *Minskoff*, 98 F.3d at 708)); *New York Wheel Owner LLC v. Mammoet Holding B.V.*, 481 F. Supp. 3d 216, 232–33 (S.D.N.Y. 2020) (same); *Edinburg Volunteer Fire Co., Inc. v. Danko Emergency Equip. Co.*, 867 N.Y.S.2d 547, 549

(N.Y. App. Div. 2008) ("Apparent authority will only be found where words or conduct of the principal — not the agent — are communicated to a third party, which give rise to a reasonable belief and appearance that the agent possesses authority to enter into the specific transaction at issue."). To prove that an agent has apparent authority, the plaintiff must establish that "(1) the principal was responsible for the appearance of authority in the agent to conduct the transaction in question and (2) the third party reasonably relied on the representations of the agent." *Star Funding, Inc. v. Tire Ctrs., LLC*, 717 F. App'x 38, 41 (2d Cir. 2017) (quoting *Herbert Constr. Co. v. Cont'l Ins. Co*., 931 F.2d 989, 993–94 (2d Cir. 1991)).

Plaintiffs' allegations support a reasonable inference that Huston had actual authority to act on behalf of Defendant. Huston's and Defendant's agency relationship can be implied through Defendant's "conduct as construed in light of the surrounding circumstances." *DeAngelis*, 17 F. Supp. 3d at 286 ("[C]onsent for actual authority may be either express or implied from the parties' words and conduct as construed in light of the surrounding circumstances." (quoting *Cromer Fin. Ltd. v. Berger*, Nos. 00-CV-2284, 00-CV-2498, 2002 WL 826847, at *4 (S.D.N.Y. May 2, 2002))). Huston, as a representative of Cynosure, offered to sell Plaintiffs the TempSure and SculpSure Systems and told Plaintiffs that Cynosure would provide financing for the products. (Am. Compl. ¶¶ 43–45.) To effectuate the sale of the products, Huston presented all four agreements to Plaintiffs and provided Plaintiffs with information related to the financing of the TempSure System (as well as the leasing of the SculpSure System). (*Id.* at ¶¶ 38–48.) Huston presented Plaintiffs with the Finance Agreement that was predated and preprinted with Dr. Averill's personal identifying information. (*Id*. at ¶ 48.) Drawing all reasonable inferences in Plaintiffs' favor, Plaintiffs have alleged that Huston impliedly represented that he was acting on behalf of Defendant when he provided Plaintiffs

27

financing for the purchase of the TempSure by presenting them with the Finance Agreement complete with Dr. Averill's information.  Moreover, Huston did not explain or counter-sign the Finance Agreement and Plaintiffs did not receive a fully executed copy of the Finance Agreement from Defendant until later, suggesting that Defendant maintained some control over the transaction.  *See DeAngelis*, 17 F. Supp. 3d at 286 (recognizing that the plaintiffs must also show that "the principal . . . maintain[ed] control over key aspects of the undertaking," but that "the control asserted need not include control at every moment") (first quoting *Com. Union Ins. Co. v. Alitalia Airlines, S.p.A.*, 347 F.3d 448, 462 (2d Cir. 2003); and then quoting *Cleveland v. Caplaw Enters.*, 448 F.3d 518, 522 (2d Cir. 2006)).  (*Id.* at ¶¶ 50, 58.)  Based on Plaintiffs' allegations, it is reasonable to infer — from Defendant's conduct of (1) providing Huston with a preprinted and prefilled Finance Agreement and permission to present the Finance Agreement to Plaintiffs, and (2) expecting Huston to return an executed Finance Agreement for Defendant to countersign — that Defendant conferred actual authority upon Huston to offer its financing for the TempSure System to Plaintiffs.  *See Craig v. Sandals Resorts Int'l*, 69 F. Supp. 3d 322, 328 (E.D.N.Y. 2014) ("[T]o adequately allege an actual agency relationship, a plaintiff need only allege facts sufficient to support a reasonable inference of actual authority, and its pleadings may rely upon facts that would constitute circumstantial evidence of authority." (quoting *Skanga Energy & Marine Ltd. v. Arevenca S.A.*, 875 F. Supp. 2d 264, 269 (S.D.N.Y. 2012), *aff'd sub nom. Skanga Energy & Marine Ltd. v. Petroleos de Venezuela S.A.*, 522 F. App'x 88 (2d Cir. 2013))); *DeAngelis*, 17 F. Supp. 3d at 286 ("To establish an actual agency theory of liability, Plaintiffs must allege '(1) the principal's manifestation of intent to grant authority to the agent, and (2) agreement by the agent.'" (quoting *Com. Union Ins. Co.*, 347 F.3d at 462)); *Skanga Energy & Marine Ltd.*, 875 F. Supp. 2d at 270 ("Whether actual authority exists 'depends on the

28

actual interaction between the putative principal and agent, not on any perception a third party

may have of the relationship.'" (quoting *Itel Containers Int'l Corp. v. Atlanttrafik Express Serv.*

*Ltd.*, 909 F.2d 698, 702 (2d Cir. 1990))). [9]

 Thus, Plaintiffs have plausibly alleged that Huston had implied actual authority to act as

Defendant's agent.

   **iii.** **Plaintiffs have plausibly stated a claim for fraudulent inducement**
      **under Florida law**

 Based on the allegations in the Complaint, Plaintiffs have adequately pled a fraudulent

inducement claim.

 "The elements of fraudulent misrepresentation and fraudulent inducement are: (1) a false

statement concerning a material fact; (2) the representor's knowledge that the representation is

false; (3) an intention that the representation induce another to act on it; and (4) consequent

injury by the party acting in reliance on the representation." *Moriber v. Dreiling*, 194 So. 3d

369, 373 (Fla. Dist. Ct. App. 2016) (citing *Butler v. Yusem*, 44 So. 3d 102, 105 (Fla. 2010)). [10]

---

 [9] Plaintiffs fail to plausibly allege that Defendant held Huston out as its agent under a
theory of apparent authority.  Plaintiffs do not allege that Defendant made any representations to
Plaintiffs about Huston's authority and Huston's conduct or words to Plaintiffs alone is
insufficient to infer an apparent authority relationship.  *See Elbit Sys., Ltd. v. Credit Suisse Grp.*,
917 F. Supp. 2d 217, 226 (S.D.N.Y. 2013) (finding that apparent authority was not adequately
alleged in the complaint because it "contain[ed] no allegations that [the defendant] made any
representations about [the alleged agent]'s authority to [the plaintiff]"); *Star Energy Corp. v.
RSM Top-Audit*, No. 08-CV-329, 2008 WL 5110919, at *5 (S.D.N.Y. Nov. 26, 2008) ("An
'agent cannot confer authority upon himself or make himself an agent merely by saying that he is
one.'" (quoting *Nuevo Mundo Holdings v. PriceWaterhouseCoopers LLP*, No. 03-CV-613, 2004
WL 112948, at *6 (S.D.N.Y. Jan. 22, 2004))).

 [10] While reasonable reliance is an element of a fraudulent inducement claim under New
York law, it is not an element under Florida law.  *See Goonewardena v. Forster & Garbus LLP*,
No. 18-CV-00029, 2019 WL 121677, at *6 (E.D.N.Y. Jan. 7, 2019) ("A party has made out a
claim of fraudulent inducement if [the party] has pled (i) a material misrepresentation of a
presently existing or past fact; (ii) an intent to deceive; (iii) reasonable reliance on the

Plaintiffs alleged that Huston, who had actual authority to act on behalf of Defendant, made false representations of material fact that the TempSure System was "a good fit for a new aesthetics practice" for Plaintiffs and virtually "pain-free" for patients.  (Am. Compl. ¶¶ 40, 42.) Prior to the June 26, 2019 presentation, Huston knew that Plaintiffs did not have an aesthetics practice, (*id.* at ¶ 38), and at a conference facilitated by Huston's employer, Cynosure, Plaintiffs learned that the TempSure System requires the use of anesthesia, indicating that the equipment was not "pain-free" or suitable for starting an aesthetics practice, (*id.* at ¶¶ 75–84).  Plaintiffs also alleged that when Plaintiffs expressed interest in one of the systems, Huston "pounced," "hastily" presented Plaintiffs with the prefilled Finance Agreement, (*see id*. at ¶¶ 37, 48), and after Plaintiffs executed it, Huston attempted to leave Plaintiffs' offices without providing Plaintiffs with a copy of the Finance Agreement, (*id*. ¶ 50).  Plaintiffs are indebted for the financing of the TempSure System even though it is not well-suited for their medical practice and they are unable and untrained to use it.  (*See id*. at ¶¶ 63–64, 82–86, 90.)  Accepting these factual allegations as true and drawing all reasonable inferences in Plaintiff's favor, Plaintiffs have adequately alleged that (1) Huston made false statements concerning material facts; (2) Huston knew that the representations were false; (3) Huston made the representations to induce Plaintiffs to act on them; and (4) Plaintiffs were injured by acting in reliance on Huston's representations.  *See Moriber*, 194 So. 3d at 373 (citing *Butler*, 44 So. 3d at 105).

---

misrepresentation . . . ; and (iv) resulting damages." (quoting *Ipcon Collections LLC v. Costco Wholesale Corp.*, 698 F.3d 58, 62 (2d Cir. 2012))).

Accordingly, the Court denies Defendant's motion as to Plaintiffs' fraudulent inducement claim.[11]

### e.    Plaintiffs fail to state a claim for violation of the FDUTPA

Defendant argues that Plaintiffs' claim that Defendant violated the FDUTPA is not sufficiently pled.  In support, Defendant contends that Plaintiffs' allegation that Smolenski,

---

[11]    The Court also finds unpersuasive Defendant's argument that Plaintiffs' fraudulent inducement claim is barred by the economic loss rule and the "hell or high water" clause in the Finance Agreement.  (Def.'s Mem. 16–19.)  Under Florida law, the economic loss rule does not bar an independent fraudulent inducement claim.  *See Tiara Condo. Ass'n, Inc. v. Marsh & McLennan Cos., Inc.*, 110 So. 3d 399, 402 (Fla. 2013) ("The economic loss rule has not eliminated causes of action based upon torts independent of the contractual breach . . ." (quoting *Indemnity Ins. Co. of N. Am. v. Am. Aviation, Inc.*, 891 So. 2d 532, 537 (Fla. 2004))); *see also HTP, Ltd. v. Lineas Aereas Costarricenses, S.A.*, 685 So. 2d 1238, 1239 (Fla. 1996) (finding that fraudulent inducement is not covered by the economic loss rule because the facts needed to prove the tort are different than those needed to prove breach of contract); *Castillo Grand LLC v. Sheraton Operating Corp.*, No. 06-CV-5526, 2009 WL 2001441, at *10 (S.D.N.Y. July 9, 2009) (interpreting Florida law) (same).  In addition, the Court cannot find as a matter of law that the alleged hell-or-high water clause bars this action; where a contract has been fraudulently induced, a hell-or-high-water clause is unlikely to be enforced because the alleged fraud may invalidate the contract and make it unenforceable.  *See* U.C.C. § 2A-407 cmt. 5 (recognizing that that a "hell or high water" provision is only enforceable "[a]bsent . . . application of the principles of law and equity, including the law with respect to fraud."); *In re Brican Am. LLC Equip. Lease Litig.*, No. 10-MD-2183, 2015 WL 235409 (S.D. Fla. Jan. 16, 2015) (recognizing that various claims of fraudulent inducement affect enforcement of "hell-or-high-water" clauses and lessee's waivers of defenses), *supplemented sub nom. In re: Brican Am. LLC*, No. 10-MD-2183, 2015 WL 11681185 (S.D. Fla. Apr. 23, 2015), *aff'd sub nom. Blank v. NCMIC Fin. Corp.*, 671 F. App'x 734 (11th Cir. 2016); *Leasetec Corp. v. Orient Sys., Inc.*, 85 F. Supp. 2d 1310, 1316–17 (S.D. Fla. 1999) (recognizing that in order to authorize rescission of a finance lease, including a "hell or high water" clause, the purported fraud of the employees of the equipment supplier must be imputed to the assignee lessors or the lease must be unconscionable (quoting *Colonial Pac. Leasing Corp. v. McNatt*, 486 S.E.2d 804, 808–09 (Ga. 1997))); *Hitachi Data Sys. Credit Corp. v. Precision Discovery, Inc.*, No. 17-CV-6851, 2019 WL 3802178, at *5 (S.D.N.Y. Aug. 13, 2019) (recognizing that fraud constitutes an exception to the otherwise enforceable "hell or high water" clause); *Sterling Nat'l Bank v. Kings Manor Estates, LLC*, 808 N.Y.S.2d 920 (N.Y. Civ. Ct. 2005) ("As a procedural matter, the party seeking to enforce a 'hell or high water' clause must show that a fraud defense lacks merit." ); *CIT Fin. LLC v. Treon, Aguirre, Newman & Norris PA*, No. 14-CV-800, 2016 WL 6610604, at *4 (D. Ariz. Nov. 9, 2016) ("[A] hell or high water clause in a lease that was induced by fraud is invalid because the lease itself is invalid.").

Defendant's President, said that he had undergone a painless treatment is irrelevant because he was referring to the SculpSure System — not the TempSure System — and, in any event, Plaintiffs' reliance on the alleged statement was not reasonable because the statement was allegedly made after Plaintiffs acquired the SculpSure and TempSure Systems. (Def.'s Mem. at 19–20.) In addition, Defendant argues that Plaintiffs have not pled actual damages or consumer harm as required to establish a FDUTPA claim. (*Id.* at 20.)

Plaintiffs contend that Huston's misrepresentations and Smolenski's statement that the SculpSure System was virtually "pain-free" were false and deceptive attempts to bolster the credibility of the equipment and caused them to incur expenses related to being burdened with the SculpSure and TempSure Systems, which Plaintiffs cannot use. (Am. Compl. ¶ 120; Pls.' Opp'n at 20.) Plaintiffs claim that they cancelled patient appointments, paid staff for training that never occurred, and hired an electrician to make modifications to their office to accommodate the equipment that they could never use. (Am. Compl. ¶¶ 62, 64; Pls.' Opp'n at 20.) In addition, Plaintiffs argue that they "did not receive the benefit of the bargain," because the TempSure System d[id] not live up to the misrepresentations wielded by [D]efendant." (Am. Compl. ¶ 91; Pls,' Opp'n at 20 (quoting *Debernardis v. IQ Formulations, LLC*, 942 F.3d 1076, 1084 (11th Cir. 2019)).)

The FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." *Marrache v. Bacardi U.S.A., Inc.*, 17 F.4th 1084, 1097 (11th Cir. 2021) (alteration in original) (quoting Fla. Stat. § 501.204(1)); *Wyndham Vacation Ownership, Inc. v. Sussman*, No. 18-CV-2171, 2021 WL 5177339, at *2 (M.D. Fla. Nov. 5, 2021) (same). In order to assert a claim for damages under the FDUTPA, a "plaintiff must only establish three objective elements:

(1) a deceptive act or unfair practice; (2) causation; and (3) actual damages."[12] *Carriuolo v. Gen. Motors Co*., 823 F.3d 977, 985–86 (11th Cir. 2016) (citing *City First Mortg. Corp. v. Barton*, 988 So. 2d 82, 86 (Fla. Dist. Ct. App. 2008)); *Hasemann v. Gerber Prods. Co*., 331 F.R.D. 239, 256 (E.D.N.Y. 2019) (same). The Florida Supreme Court has noted that "deception occurs if there is a representation, omission, or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment." *Zlotnick v. Premier Sales Grp., Inc*., 480 F.3d 1281, 1284 (11th Cir. 2007) (quoting *PNR, Inc. v. Beacon Prop. Mgmt., Inc*., 842 So. 2d 773, 777 (Fla. 2003)); *State v. Beach Blvd Auto. Inc*., 139 So. 3d 380, 387 (Fla. Dist. Ct. App. 2014) (same). As for damages, generally, there are two ways to measure actual damages in a FDUTPA claim: (1) the value between what was promised and what was delivered; or (2) the total price paid for a valueless good or service. *Dem. Rep. Congo v. Air Cap. Grp., LLC*, 614 F. App'x 460, 472 (11th Cir. 2015) (citing *Rollins, Inc. v. Heller*, 454 So. 2d 580, 585 (Fla. Dist. Ct. App. 1984)); *HRCC, Ltd. v. Hard Rock Cafe Int'l (USA), Inc*., 703 F. App'x 814, 816 (11th Cir. 2017) (per curiam) (citing *Carriuolo*, 823 F.3d at 986); *Hasemann v. Gerber Prod. Co*., 331 F.R.D. 239, 256 (E.D.N.Y. 2019) ("FDUTPA damages are measured according to the difference in the market value of the product or service in the condition in which it was delivered and its market value in the condition in which it should have been delivered according to the contract of the parties." (quoting *Carriuolo*, 823 F.3d at 986)). "In short, plaintiffs must marshal evidence to prove the gap in value between what was promised and what was delivered, unless defendant

---

[12] The Court finds unpersuasive Defendant's argument that the transfer of this action to the Eastern District of New York invalidates Plaintiffs' FDUTPA claim because New York law governs the Finance Agreement. (Def.'s Mem. at 19.) As discussed above, Plaintiffs' fraud claims are construed under Florida law. Moreover, the Court is adequately situated to address Plaintiffs' FDUTPA claim and give proper deference to Florida law. *See Hasemann v. Gerber Prods. Co.*, 331 F.R.D. 239, 258–64 (E.D.N.Y. 2019) (applying Florida law to analyze plaintiffs' FDUTPA claim and determine whether class certification was proper).

palmed off a product that was truly worthless.  In the latter situation, plaintiff may recoup the full

price he paid for the valueless good or service." *Dem. Rep. Congo*, 614 F. App'x at 472.

Moreover, "Florida courts have consistently held that [the] FDUTPA does not allow recovery of

consequential damages, including lost profits."[13]  *GE Transp. Parts, LLC v. Cent. Ry. Mfg., LLC*,

No. 19-CV-4826, 2021 WL 827146, at *4 (S.D.N.Y. Mar. 4, 2021) (collecting cases).

---

[13]  The Court recognizes that federal district courts in Florida have reached differing views as to whether lost profits are available for damages under the FDUTPA.  *Compare Tymar Distrib. LLC v. Mitchell Grp. USA, LLC*, --- F. Supp. 3d ---, ---, 2021 WL 4077966, at *7 (S.D. Fla. Sept. 8, 2021) (holding that lost profits are "actual damages" that are recoverable under FDUTPA), *with Midway Labs USA, LLC v. S. Serv. Trading, S.A.*, No. 19-CV-24857, 2020 WL 2494608, at *6–7 (S.D. Fla. May 14, 2020) (holding that lost profits are "consequential damages" that are not recoverable and collecting cases on the differing views); *Sandshaker Lounge & Package Store LLC v. RKR Beverage Inc.*, No. 17-CV-686, 2018 WL 7351689, at *6 n.15 (N.D. Fla. Sept. 27, 2018) (collecting cases).  As explained in *Midway*:

> [S]ome Florida district courts find that . . . lost profits are actual
> damages and may be recovered . . . . On the other hand, other
> district courts within Florida also find that . . . lost profits
> constitute consequential damages and may not be recovered under
> FDUTPA.  The Florida Supreme Court has not decided the issue
> . . . [and] the Eleventh Circuit Court of Appeals has not resolved
> the split either.

*Midway Labs*, 2020 WL 2494608, at *6.  In *Tymar Distribution LLC*, the Southern District of Florida clarified the district court split.  2021 WL 4077966.  The court explained that both consumers and corporate-competitor businesses can seek damages under the FDUTA, but "in a claim brought by a corporate competitor, there is no bargain giving rise to the expectancy measure of damages employed in traditional consumer cases."  *Id.* at *5.  Rather, unlike contract-based causes of action, "[c]orporate competitors instead suffer lost profits, lost revenue, reputational harm, and other damages commonly observed in business torts claims."  *Id.*  The court discerned that the differing views among Florida district courts is created, in part, by some courts holding that lost profits are available to a competitor company under the FDUTPA and others finding otherwise.  *Id.* at *5–6.  The court distinguished these business tort FDUTPA claims from FDUTPA claims arising in the consumer transaction context and recognized that corporate competitor plaintiffs can recover lost profits, but consumer plaintiffs cannot.  *See id.* at *7 (explaining that "a corporate-competitor plaintiff may seek lost profits damages under the FDUTPA."); *Desue v. 20/20 Eye Care Network, Inc.*, No. 21-CV-61275, 2022 WL 796367, at *10 (S.D. Fla. Mar. 15, 2022) ("The court's holding in *Tymar* applies specifically to 'FDUTPA claims arising outside the consumer transaction context.'").  Plaintiffs' claims arise out of a contract-based consumer transaction, not a corporate competitor business context.  (*See* Am. Compl. ¶¶ 6, 9; *see also* Pls.' Opp'n at 19.)  Accordingly, Plaintiffs' recovery is limited to

Plaintiffs have satisfied the first two prongs of a FDUTPA claim.  As discussed above, Plaintiffs have alleged that Huston, acting on behalf of Defendant, engaged in a deceptive act by making false statements about the TempSure System to induce Plaintiffs into financing it. However, Plaintiffs have failed to plead actual damages.  Plaintiffs allege that they cancelled patient appointments, paid staff for training that never occurred, hired an electrician to make modifications to their office to accommodate the equipment that they could never use, (Am. Compl. ¶¶ 62, 64), and that they "did not receive the benefit of the bargain," (*id.* at ¶ 91; Pls.' Opp'n 20).  The costs Plaintiffs incurred in anticipation of utilizing the TempSure System are not actual damages that are recoverable under the FDUTPA.  *See Dorestin v. Hollywood Imports, Inc.*, 45 So. 3d 819, 824–25 (Fla. Dist. Ct. App. 2010) ("The [FDUTPA] does not allow the recovery of other damages, such as consequential damages." (citing *Fort Lauderdale Lincoln Mercury, Inc. v. Corgnati*, 715 So. 2d 311 (Fla. Dist. Ct. App. 1998); *Casa Dimitri Corp. v. Invicta Watch Co. of Am., Inc.*, 270 F. Supp. 3d 1340, 1352 (S.D. Fla. 2017) ("Lost profits are a 'quintessential example' of consequential damages [and] 'harm in the manner of competitive harm, diverted or lost sales, and harm to the goodwill and reputation' are consequential damages." (first quoting *BPI Sports, LLC v. Labdoor, Inc.*, No. 15-CV-62212, 2016 WL 739652,

---

"damages attributable to the diminished value of the goods or services received." *Fort Lauderdale Lincoln Mercury, Inc. v. Corgnati*, 715 So. 2d 311, 314 (Fla. Dist. Ct. App. 1998); *see also Marrache v. Bacardi U.S.A., Inc.*, 17 F.4th 1084, 1098 (11th Cir. 2021) ("FDUTPA 'does not provide for the recovery of nominal damages, speculative losses, or compensation for subjective feelings of disappointment.'" (quoting *City First Corp. v. Barton*, 988 So. 2d 82, 86 (Fla. Dist. Ct. App. 2008))); *Wound Care Concepts, Inc. v. Vohra Health Servs., P.A.*, No. 19-CV-62078, 2022 WL 320952, at *18 (S.D. Fla. Jan. 28, 2022) ("Lost profits, competitive harm, lost sales, and harm to goodwill or reputation are deemed consequential damages which are ineligible to establish actual damages under a FDUTPA claim." (citing *Casa Dimitri Corp. v. Invicta Watch Co. of Am.*, 270 F. Supp. 3d 1340, 1344 (S.D. Fla. 2017))); *GE Transp. Parts, LLC v. Cent. Ry. Mfg., LLC*, No. 19-CV-4826, 2021 WL 827146, at *4–5 (S.D.N.Y. Mar. 4, 2021) (dismissing FDUTPA claim because only lost profits were requested and lost profits are not allowable under FDUTPA).

at \*6 (S.D. Fla. Feb. 25, 2016); and then quoting *Krupa v. Platinum Plus, LLC*, No. 16-CV-3189, 2017 WL 1050222, at \*7 (M.D. Fla. Mar. 20, 2017))).  In addition, while Florida courts have recognized that a "benefit of the bargain" allegation may constitute actual damages, *see Carriuolo*, 823 F.3d at 986, Plaintiffs have not pled enough information in the Amended Complaint as to what the bargain was for the TempSure System.  *See St. Francis Holdings, LLC v. Pawnee Leasing Corp.*, No. 20-CV-1101, 2020 WL 6287684, at \*7 (M.D. Fla. Oct. 27, 2020) (dismissing FDUTPA claim because "Plaintiffs have not pled enough information as to what the 'bargain' is"); *Emondson v. 2001 Live, Inc.*, No. 16-CV-3243, 2017 WL 10085029, at \*2 (M.D. Fla. July 25, 2017) (dismissing FDUTPA claim because plaintiff pled only conclusory allegations of actual damages).

Accordingly, the Court grants Defendant's motion as to Plaintiffs' FDUTPA claims.

### f.   **Plaintiffs sufficiently allege a claim for rescission**

Defendant argues that Plaintiffs cannot seek rescission of the Finance Agreement against it because Defendant assigned the Finance agreement to Amur.  (Def.'s Mem. at 20.)  In addition, Defendant argues that even if the Court finds that Plaintiffs can seek rescission of the Finance Agreement against Defendant, Plaintiffs' claim nevertheless fails because it is premised on Plaintiffs' claim for fraudulent inducement and Plaintiffs fail to state a cause of action for fraud.  (*Id.* at 21.)

Plaintiffs contend that they have pled their fraudulent inducement and FDUTPA claims with specificity and therefore their rescission claim must proceed.  (Pls.' Opp'n at 21.)  In support, Plaintiffs rely on Huston's misrepresentations and their attempts to rescind the Finance Agreement and return the TempSure System.  (*Id.*; *see also* Am. Compl. ¶¶ 68–70.)  In addition,

Plaintiffs allege that their failed attempts to return the TempSure System demonstrate that they do not have an adequate remedy at law to be made whole.  (*Id*.)

"[R]escission of [a] contract [is] an 'extraordinary remedy' that is generally unavailable under New York law." *Shane Campbell Gallery, Inc. v. Frieze Events, Inc*., 441 F. Supp. 3d 1, 5 (S.D.N.Y. 2020) (quoting *Krumme v. WestPoint Stevens Inc*., 238 F.3d 133, 143 (2d Cir. 2000)); *Courchevel 1850 LLC v. Espinosa*, No. 17-CV-799, 2020 WL 635498, at *4 (S.D.N.Y. Feb. 11, 2020), *aff'd sub nom. Courchevel 1850 LLC v. Wisdom Equities LLC*, 846 F. App'x 33 (2d Cir. 2021); *see Pyskaty v. Wide World of Cars, LLC*, 856 F.3d 216, 227 (2d Cir. 2017) ("Because it is an equitable remedy, rescission is available only if damages would not be a 'complete and adequate' remedy and 'the status quo may be substantially restored' by equitable relief." (quoting *Rudman v. Cowles Commc'ns, Inc*., 30 N.Y.2d 1, 13 (1972)); *Coscarelli v. ESquared Hosp. LLC*, No. 18-CV-5943, 2021 WL 5507034, at *5 (S.D.N.Y. Nov. 24, 2021) (recognizing that "[r]escission is an equitable remedy through which a party to a contract can seek the unilateral unmaking of [the] contract" (alterations in original)); *Empire Outlet Builders LLC v. Constr. Res. Corp. of New York*, 97 N.Y.S.3d 68, 69 (N.Y. App. Div. 2019) (recognizing that "the equitable remedy of rescission is not available where there is an adequate legal remedy" (citing *Lantau Holdings Ltd. v. General Pac. Grp. Ltd*., 81 N.Y.S.3d 384 (N.Y. App. Div. 2018))).  "The elements of a claim for rescission based on fraud are misrepresentation, concealment or nondisclosure of a material fact; an intent to deceive; and an injury resulting from justifiable reliance by the aggrieved party." *Allen v. WestPoint-Pepperell, Inc*., 945 F.2d 40, 44 (2d Cir. 1991) (citing *Nat'l Union Fire Ins. Co. v. Walton Ins. Ltd*., 696 F. Supp. 897, 902 (S.D.N.Y. 1988)); *New Paradigm Software Corp. v. New Era of Networks, Inc*., 107 F. Supp. 2d 325, 329 (S.D.N.Y. 2000) ("In order to justify the remedy of rescission, 'a party must allege

fraud in the inducement of the contract; failure of consideration; an inability to perform the contract after it is made; or a breach in the contract which substantially defeats the purpose thereof.'" (quoting *Mina Inv. Holdings Ltd. v. Lefkowitz*, 16 F. Supp. 2d 355, 362 (S.D.N.Y. 1998))); *see also Perlbinder v. Vigilant Ins. Co.*, 141 N.Y.S.3d 141, 146 (N.Y. App. Div. 2021) ("Generally, a party's unilateral mistake is a ground for rescission of a contract only where it was induced by fraud or other wrongful conduct by the other party.") (collecting cases); *Channel Master Corp. v. Aluminium Ltd. Sales, Inc.*, 4 N.Y.2d 403, 406 (1958).

Plaintiffs have adequately pled a claim for rescission based on their claim for fraudulent inducement.  As explained above, Plaintiffs have sufficiently alleged facts to support their claim that Huston, acting on behalf of Defendant, intentionally induced Plaintiffs to execute the Finance Agreement and based on his false statements of material fact, Plaintiffs executed the Finance Agreement and were injured.  Thus, Plaintiffs have properly established fraud as a ground for rescission.  *See Robinson v. Sanctuary Rec. Grps., Ltd.*, 826 F. Supp. 2d 570, 575 (S.D.N.Y. 2011) ("Rescission is used as a remedy in limited circumstances [including] fraud in the inducement of the contract . . .").

Accordingly, the Court denies Defendant's motion to dismiss Plaintiffs' rescission claim.

### g.   Plaintiffs abandoned their civil conspiracy claim

Defendant argues that Plaintiffs fail to state a claim for civil conspiracy because they have not established an underlying tort that the parties have conspired to commit.  (Def.'s Mem at 21–22.)

Plaintiffs have not addressed Defendant's arguments to dismiss their civil conspiracy claim in their opposition briefing and, in their motion to amend the Amended Complaint,

Plaintiffs state that they plan to eliminate the civil conspiracy claim in a second amended complaint.  (Pls.' Mot. at 4.)

Accordingly, the Court finds that Plaintiffs have abandoned this claim.  *See BYD Co. Ltd. v. VICE Media LLC*, 531 F. Supp. 3d 810, 821 (S.D.N.Y. Mar. 31, 2021) ("Plaintiffs' failure to oppose [d]efendants' specific argument in a motion to dismiss is deemed waiver of that issue." (quoting *Kao v. Brit. Airways, PLC*, No. 17-CV-232, 2018 WL 501609, at *5 (S.D.N.Y. Jan. 19, 2018))); *MYL Litig. Recovery 1 LLC v. Mylan N.V.*, No. 19-CV-1799, 2020 WL 1503673, at *7 (S.D.N.Y. Mar. 30, 2020) ("[The plaintiff] has failed to respond to this argument in its opposition.  Accordingly, any argument opposing [the defendant's] position here is waived." (citing *Kao*, 2018 WL 501609, at *5)); *Levy v. Maggiore*, 48 F. Supp. 3d 428, 452 (E.D.N.Y. 2014) ("Plaintiff does not respond to this argument and the [c]ourt therefore construes Plaintiff's failure to respond as an abandonment of this claim."); *see also Jackson v. Fed. Express*, 766 F.3d 189, 196 (2d Cir. 2014) ("Generally, but perhaps not always, a partial response reflects a decision by a party's attorney to pursue some claims or defenses and to abandon others. Pleadings often are designed to include all possible claims or defenses, and parties are always free to abandon some of them.").

### h. Leave to amend

Defendant argues that the Court should deny Plaintiffs leave to file a second amended complaint.  In support, Defendant claims that any amendment would be "fatally flawed" because all of Plaintiffs' claims are predicated on agency and there is no agency relationship.  (Def.'s Reply and Opp'n at 8.)  In addition, Defendant argues that the "hell or high water clause" in the Finance Agreement bars all of Plaintiffs claims, (*id*. at 9), and it "absolute[ly] and

unconditional[ly]" requires Plaintiffs to make payment regardless of any defenses, (*id*.; Def.'s Mem. at 17–19).[14]

Plaintiffs request an opportunity to amend the Amended Complaint in order to assert specific claims against Defendant, streamline the allegations, and address issues with the sufficiency of its allegations.  (Pls.' Mot. at 4.)  Plaintiffs argue that leave is particularly necessary because Cynosure and Pawnee are not before the Court.  (*Id.*)  In addition, Plaintiffs contend that Defendant would not suffer prejudice as the case is still in its early stages and discovery has not commenced, and the proposed second amended complaint is premised on the same underlying facts.  (*Id.*)  Therefore, the proposed pleading would not unnecessarily expand the scope of discovery or delay the progress of the litigation.  (*Id.*)

Rule 15 of the Federal Rules of Civil Procedure provides that "[l]eave to amend should be 'freely give[n] . . . when justice so requires,' but 'should generally be denied in instances of futility, undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, or undue prejudice to the non-moving party[.]'"  *United States ex rel. Ladas v. Exelis, Inc*., 824 F.3d 16, 28 (2d Cir. 2016) (second and third alterations in original) (citation omitted) (first quoting Fed. R. Civ. P. 15(a)(2); and then quoting *Burch v. Pioneer Credit Recovery, Inc*., 551 F.3d 122, 126 (2d Cir. 2008)); *see also Kainz v. Bernstein*, 841 F. App'x 249, 253 (2d Cir. 2020) (noting that leave to amend should be freely given).

The Court grants Plaintiffs leave to amend the Amended Complaint.  *See Woo Hee Cho v. Oquendo*, No. 16-CV-4811, 2018 WL 9945701, at *12 (E.D.N.Y. Aug. 25, 2018) ("When a

---

[14]  The clause Defendant relies on states that "[Plaintiffs'] obligation to pay all amounts hereunder is non-cancellable, absolute, and unconditional and will not be subject to any reduction, setoff, defense, counterclaim, deferment or recoupment for any reason, even if the [TempSure System] is damaged, destroyed or defective."  (*Disclaimer of Warranties and Claims*, Finance Agreement at 2.)

motion to dismiss is granted, the usual practice is to grant leave to amend the complaint."

(quoting *Hayden v. County of Nassau*, 180 F.3d 42, 53 (2d Cir. 1999))); *Caren v. Collins*, 696 F.

App'x 19, 22 (2d Cir. 2017) ("[D]ismissals for insufficient pleadings are ordinarily with leave to

replead."); *see also Cotiviti, Inc. v. Deagle*, 501 F. Supp. 3d 243, 264 (S.D.N.Y. 2020) (sua

sponte granting leave to file a second amended complaint where plaintiff could provide missing

facts necessary to support its claims); *Hitachi Data Sys. Credit Corp*, No. 17-CV-6851, 2019 WL

3802178, at *4 (S.D.N.Y. Aug. 13, 2019) (recognizing that fraud constitutes an exception to the

otherwise enforceable "hell or high water" clause).

Any second amended complaint must be filed within thirty days of the date of this

Memorandum and Order.  A second amended complaint will completely replace the Amended

Complaint and must stand on its own without reference to the Amended Complaint and must

contain all of the claims Plaintiff seeks to pursue.  The second amended complaint must be

captioned "Second Amended Complaint" and bear the same docket number as this Memorandum

and Order.  If Plaintiffs elect not to file a second amended complaint or fails to file a second

amended complaint within thirty days of this Memorandum and Order, the Court will direct the

Clerk of Court to enter judgment dismissing the Amended Complaint for the reasons stated

above.

### III.  Conclusion

Accordingly, the Court grants Defendant's motion to dismiss in part and denies it in part. The Court grants the motion as to Plaintiff's FDUTPA and civil conspiracy claims and denies the motion as to Plaintiffs' fraudulent inducement and rescission claims.  The Court grants Plaintiffs leave to file a second amended complaint within thirty days of the date of this Memorandum and Order.  Plaintiffs' fraudulent inducement and rescission claims may proceed to discovery.

Dated:  March 31, 2022
       Brooklyn, New York

SO ORDERED:


_____s/ MKB_____
MARGO K. BRODIE
United States District Judge